Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. CR 18-00465 MMC |
| | ) | |
| UNITED MICROELECTRONICS | ) | |
| CORPORATION; FUJIAN JINHUA | ) | |
| INTEGRATED CIRCUIT, CO. LTD.; | ) | |
| CHEN ZHENGKUN also known as | ) | |
| STEPHEN CHEN; HE JIANTING also | ) | |
| known as J.T. HO; and WANG | ) | |
| YUNGMING also known as KENNY | ) | |
| WANG, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, October 23, 2019

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
For Plaintiff:

    DAVID L. ANDERSON
    United States Attorney
    450 Golden Gate Avenue
    San Francisco, California  94102
BY: **JOHN H. HEMANN**
    **ASSISTANT UNITED STATES ATTORNEY**


For Defendant United Microelectronics Corporation:
    LATHAM & WATKINS
    505 Montgomery Street - Suite 1900
    San Francisco, CA  94111
BY: **LESLIE R. CALDWELL**
    **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Fujian Jinhua Integrated Circuit, Co. Ltd.:
                        MORRISON & FOERSTER
                        425 Market Street
                        San Francisco, CA  94105-2482
                BY:   **CHRISTINE Y.  WONG**
                        **ATTORNEY AT LAW**

For Victim Micron Technology, Inc.:
                        JONES DAY
                        1755 Embarcadero Road
                        Palo Alto, California  94303
                BY:   **NEAL J. STEPHENS**
                        **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Wednesday - October 23, 2019**</u>                          <u>**2:43 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Criminal Case Number 18-465, |
| 5 | United States of America versus United Microelectronics and |
| 6 | Fujian Jinhau Integrated. |
| 7 | Will counsel please step forward and state your |
| 8 | appearances for the record. |
| 9 | **MR. HEMANN:**  Good afternoon, Your Honor.  John Hemann |
| 10 | for the United States. |
| 11 | **THE COURT:**  Mr. Hemann. |
| 12 | **MS. WONG:**  Good afternoon, Your Honor.  Christine Wong |
| 13 | for Fujian Jinhau Integrated Circuit. |
| 14 | **THE COURT:**  Thank you. |
| 15 | **MS. CALDWELL:**  Your Honor, good afternoon.  Leslie |
| 16 | Caldwell for United Microelectronics. |
| 17 | **THE COURT:**  Very good. |
| 18 | **MR. STEPHENS:**  And, Your Honor, I apologize. |
| 19 | **THE COURT:**  I'm sorry. |
| 20 | **MR. STEPHENS:**  Good afternoon.  Good to see you.  It's |
| 21 | Neal Stephens on behalf of nonparty and victim Micron. |
| 22 | **THE COURT:**  I'm just going to add you on here for a |
| 23 | moment. |
| 24 | (Pause in proceedings.) |
| 25 | **THE COURT:**  All right.  Ms. Geiger, I want to hand you |

1   the file on Mr. Lott's case back just so I don't commingle

2   them.

3        All right.  What we have here is a dispute over what would

4   be the proper conduct of a protective order in this case

5   regarding alleged trade secrets and how they can be observed,

6   copied, et cetera, by various participants in the proceedings.

7        I generally understand what the parties' respective

8   positions are in this matter so I'm not too sure where to

9   start.

10       I have a number of questions.  I also tried to write down

11  a schedule of how long it takes to get from here to there and

12  wherever, and was going to confirm with counsel if those

13  various times are in accord with what they understand as travel

14  times because one of the concerns the defendant is raising is

15  "It's really hard for us to all get together if we all have to

16  be running around the globe."

17       There are questions about, then, whether that interest, of

18  course, outweighs whatever the Government and Micron's interest

19  is in protecting their trade secrets and whether there are any

20  alternatives, and so we'll just explore all this and see where

21  we come out.

22       Let me just put all this aside for a minute because I have

23  a lot of papers.

24       Okay.  As it stands now, the Government and the defendants

25  are essentially in accord with all of the terms of a protective

1    order with one exception; and that exception is whether in

2    viewing and having access, I guess you would say, to the

3    proprietary information that's claimed here, that that material

4    can be viewed in Hong Kong as opposed to simply the U.S.A.,

5    Singapore, Tokyo, or Taiwan.

6         But the agreed-upon venues would be U.S.A., Singapore,

7    Tokyo, and Taiwan; correct?  Everybody agrees?  Yeah, I'm

8    getting nods from Mr. Hemann.  Okay.

9         **MR. HEMANN:**  Yes.  Yes, Your Honor.

10        **THE COURT:**  Okay.  There's no demurrer to that.

11        Okay.  So the question is whether Hong Kong should be put

12   in the mix or not.  The Government has expressed their own

13   concerns and those of Micron, and then Micron has added some

14   further conditions that they would like to see on top of what

15   the Government and the defendants had agreed to with the

16   exception of the location which, of course, they don't want to

17   go to Hong Kong.

18        All right.  Just one minute.  I'm signing the surrender

19   order.

20                     (Pause in proceedings.)

21        **THE COURT:**  Then returning to the instant case, I just

22   want to make sure I've got everybody in the right place as far

23   as who's where.

24        Okay.  It's my understanding that counsel for the

25   defendants, which would be Latham & Watkins and

1  Morrison & Foerster, both have offices in Hong Kong.  That --

2  I'm sorry.  Latham also has offices in Singapore and Tokyo.

3       And does MoFo or Morrison & Foerster also have offices in

4  Singapore and Tokyo?

5            **MS. WONG:**  Yes, we do, Your Honor.

6            **THE COURT:**  Okay.  According to the defendants, the

7  defendant Jinhau, says they have crucial members of the Defense

8  teams in Hong Kong and war rooms in Hong Kong and majority of

9  the Defense teams are in Hong Kong.

10      I want to ask you about the plural in a minute.

11      And from Latham & Watkins' standpoint, they say one of

12  their lead attorneys is in Hong Kong.

13      So let me ask Ms. Caldwell.  Where's the other one?

14           **MS. CALDWELL:**  Here, standing in front of you.

15           **THE COURT:**  Oh, that's you.  Okay.

16           **MS. CALDWELL:**  But we also have some colleagues in

17  Shanghai who are working on the matter.

18           **THE COURT:**  Okay.  And are there -- if I could then

19  ask counsel for Jinhau, when you were using the plurals in your

20  papers, are you talking about there are maybe firms other than

21  Morrison & Foerster that are part of the Defense team or have

22  war rooms in their own offices, or anything like that?

23           **MS. WONG:**  I think when we were referring to the

24  plural, we meant both us and counsel for our co-defendant as

25  opposed to --

1          **THE COURT:**  Oh, okay.

2          **MS. WONG:**  -- Defense team for Jinhau.

3          **THE COURT:**  Okay.  All right.  So essentially just

4   arguing about the two firms that are here.

5          **MS. WONG:**  Correct.

6          **THE COURT:**  Okay.  Got it.

7      All right.  The defendants themselves, Jinhau is located

8   in Fujian Province in China?

9          **MS. WONG:**  That is correct.

10         **THE COURT:**  Okay.  And UMC is in Taiwan?

11         **MS. CALDWELL:**  Correct.

12         **THE COURT:**  Okay.  So somebody's going to have to go

13  somewhere unless -- well, pretty much somebody has to go

14  somewhere.  Everybody isn't starting in the same place; but I'd

15  like to ask the defendants -- I'll just start with Ms. Wong --

16  is there a reason that the Defense team is based in Hong Kong

17  as opposed to, let's say, here where you are?

18         **MS. WONG:**  I would say the Defense team is based both

19  here where I am and important members of our team are in

20  Hong Kong as well, and they're located there mainly because we

21  have expertise there, its proximity to the client, it is a

22  reasonable place for us to be in order to best service our

23  client.  And so in order for that team to be able to access the

24  discovery while having all their materials in front of them,

25  the ease of being in their own offices, that would require them

 1    to be able to review the discovery in Hong Kong.

 2          THE COURT:   Okay.  Ms. Caldwell, it's pretty much the

 3    same question.

 4          MS. CALDWELL:   Pretty much the same thing.  I would

 5    say that our client is in Taiwan, and it's much easier for my

 6    partner in Hong Kong to travel a one-hour flight to Taiwan than

 7    it is for me to take a 13-hour flight to Taiwan.  So she also

 8    has relevant experience.  She's a very experienced white-collar

 9    lawyer who's done trade secrets matters before.

10          THE COURT:   Now, we're not really talking about people

11    being able to meet with the client just in general but actually

12    looking at the stuff, whatever it is.  I'm not sure I

13    understand what it is.  I may ask somebody over here on the

14    other side to explain it a little more.  But are they going to

15    have to get together with the client a lot to look at this

16    stuff whatever it is?

17          MS. WONG:   I think that is certainly a possibility and

18    something that we are trying to prepare for to make sure that

19    we are in a position that if we do need to meet with our

20    client -- and, of course, it would be under the circumstances

21    that are set forth in the protective order for the client reps

22    to actually review the evidence in question -- that they are in

23    a place where it is convenient to both our Defense counsel in

24    Hong Kong and the client to meet, which, as Ms. Caldwell says,

25    is far simpler for the client to travel to Hong Kong than the

1    other options.

2         **THE COURT:**  This wasn't clear that you were going to

3    have to get together with the material and the client all that

4    frequently.  In other words, there's an allegation they already

5    know what it is so I don't know if there's any extra stuff.

6    Apparently nobody is objecting that a couple of employees from

7    both of the companies can look at this material.

8         Now, there are all kinds of concerns about whether members

9    of the bar can look at it and whatever, and the alleged thieves

10   are essentially being allowed to look at it.  They have to be

11   vetted I guess in some way.  So that kind of caught my

12   attention because everybody was so worried about other people

13   and yet the parties themselves were at least given some access.

14        Okay.  I want to go just back for a minute to Micron's

15   additional restrictions that they would propose.  One was they

16   didn't want the experts to copy anything.  Right now the

17   attorneys that are designated can make copies, but where are

18   the experts located?  Are they over there?  Are they here?

19   Where are these people?

20        **MS. CALDWELL:**  So UMC has not yet retained experts --

21        **THE COURT:**  Okay.

22        **MS. CALDWELL:**  -- but we anticipate that if this case

23   goes to the next stages, we will do that, and I don't know

24   where they would be at this point.

25        **THE COURT:**  What about from the Jinhau's standpoint?

1     **MS. WONG:**  Same for Jinhau.

2     **THE COURT:**  So if they couldn't have their own copies

3  in hand, so to speak, then what would they do?  Have to come to

4  your offices to look at it?  Is that the idea?

5     **MS. CALDWELL:**  Presumably.

6     I should note too, Your Honor, that there is a civil case,

7  as you're aware because it's pending before Your Honor, in

8  which the protective order does not contain restrictions of

9  copying by experts.

10     **THE COURT:**  So they're going to get to do it one way

11  or the other at some point.

12     **MS. CALDWELL:**  Well, we're not party to that

13  protective order so we don't have the same access that the

14  civil parties do.

15     **THE COURT:**  I see.  I understand.

16     Okay.  Well, are there going to be different experts in

17  the two cases?

18     **MS. CALDWELL:**  I think they may well be, Your Honor.

19     **THE COURT:**  Really?  Okay.

20     All right.  We don't know how hard it would be for, like,

21  the experts to come to somebody's office because we don't know

22  where they're going to be and what have you.

23     Okay.  Then the other question -- I mean, it would be

24  harder if they had to run around and look at things somewhere

25  other than their own, I guess, offices but, okay.

1          Then there's a distinction between, quote/unquote, "other

2     Defense counsel" and "Defense counsel," "other Defense counsel"

3     being -- well, let's start with "Defense counsel."  Are

4     "Defense counsel" intended to mean not just everybody at Latham

5     or Morrison & Foerster, but the attorneys who are appearing as

6     a matter of record in this case, or just anybody at either of

7     those firms?

8          MS. WONG:  I had actually thought it to mean anybody

9     at these firms, but perhaps that's --

10          THE COURT:  I don't want to end up with, like,

11     fighting over what --

12          MS. WONG:  The specific members of the Defense team of

13     Morrison & Foerster and Latham & Watkins?

14          THE COURT:  Well, what the agreement means once we get

15     whatever we get on file.

16          MS. CALDWELL:  I assume that it meant lawyers from

17     other firms, but I --

18          THE COURT:  Well, no.  That's the other Defense

19     lawyers.

20          MS. CALDWELL:  Oh, I'm sorry.

21          THE COURT:  I just want to first go to Defense counsel

22     because we're distinguishing "Defense counsel" and "other

23     Defense counsel," if "Defense counsel" means Latham,

24     Morrison & Foerster and "others" means other firms.

25          Okay.  And then I don't know whether you want to take

1   this, Mr. Hemann or Mr. Stephens, explain why he's worried

2   about "other Defense counsel."

3       My question is:  Why is it so worrisome given that under

4   the agreement they all have to be checked out and approved

5   first by the Government before they're allowed to see anything?

6           **MR. HEMANN:**  I'll let Mr. Stephens --

7           **THE COURT:**  Okay.

8           **MR. STEPHENS:**  Sure.

9       Your Honor, we were just trying to clarify.  It's our

10  understanding that, at least as to Jinhau, they know who some

11  of these people are.  They haven't been identified to us yet so

12  if they know who some of them are now, identify them, we can

13  vet them now, and see if we can work it out.

14          **THE COURT:**  All right.  You just want to get some of

15  this out of the way upfront rather than sort of have it

16  straggling in in some fashion.

17          **MR. STEPHENS:**  And then they'll also be put in a

18  position where it's assumed downstream that we had agreed to

19  anything because we don't know who they are, we don't know what

20  firm they're with, we don't know where they are, we don't know

21  where they sit.

22          **THE COURT:**  Well, I don't think anybody has yet,

23  assuming anybody's agreed to, because there has to be an

24  official stamp of approval.  I don't know if you trust

25  Mr. Hemann, but he's the one who's holding the stamp.

1       And so -- okay.  I mean, I understand what you're saying.

2  It does seem like they built in a protection.  It isn't like

3  they just hand this stuff out to anybody who's walking around,

4  you know, with a bar card.

5       Okay.

6           **MR. STEPHENS:**  And, Your Honor, just to clarify.

7           **THE COURT:**  Sure.

8           **MR. STEPHENS:**  On the expert copying --

9           **THE COURT:**  Yeah.  Let's go back to that.

10          **MR. STEPHENS:**  -- it's the fact that the experts can't

11  burn copies of what they receive from trial counsel.  It was

12  just to narrow it so the folks who could make a copy for their

13  teams would be the trial lawyers here that are in front of you.

14  So there's not additional copies of this stuff lying around

15  that the experts have made.

16          **THE COURT:**  Okay.  So what you're saying is that what

17  you don't object to is, let's say, Ms. Wong or Ms. Caldwell

18  making a copy and then we've got expert X or Y and they hand it

19  to them, but what they shouldn't be able to do is then make

20  another copy.

21          **MR. STEPHENS:**  Or any other copies, that's correct,

22  Your Honor, and that's assuming that the expert --

23          **THE COURT:**  Oh, I see.

24          **MR. STEPHENS:**  -- is approved through the protective

25  order process that you've just laid out.

1          **THE COURT:**  Okay.  They can have copies.  They can

2    work on them at their offices.  What they can't do is sort of

3    make more and distribute them is what you're afraid of.

4          **MR. STEPHENS:**  They could have a copy and they could

5    review it in one of the accepted geographies.

6          **THE COURT:**  Okay.  Did you understand that that was --

7    I think I misunderstood.  Did you understand it as it's just

8    been explained, Ms. Wong?

9          **MS. WONG:**  That is not how I understood it.

10          **THE COURT:**  Okay.  What about yourself?

11          **MS. CALDWELL:**  Likewise, Your Honor.  I interpreted it

12    as they were not allowed to take copies --

13          **THE COURT:**  Period.

14          **MS. CALDWELL:**  -- and review them in their own

15    offices.

16          **THE COURT:**  Yeah.  In other words, "You can't have

17    one.  You know, come here and look at ours but you can't have

18    it."

19        Well, that might be a little bit less onerous.  I can kind

20    of see how Micron would like to have some idea about who's in a

21    position to distribute, if you will.

22        Okay.  By the way, do you have -- either one of you can

23    take this question.  Do you know who some of these other

24    Defense counsel are at this point?

25          **MS. WONG:**  Frankly, I think that issue applies only to

1    Jinhau.

2             THE COURT:  Okay.  Do you happen to know?

3             MS. WONG:  We do know who they are, and the reason why

4    we were pushing forward to have this protective order taken

5    care of now was we didn't want it to be held up -- the

6    production overall to be held up by this one issue of approving

7    the other Defense counsel.

8             THE COURT:  See, I don't know if it would hold it up.

9    In other words, let's say that in an effort -- if I wanted to

10   say, "Okay, Defense counsel can see things if they're

11   approved."

12        Okay.  And to somewhat reassure Micron in that regard,

13   because we don't want to get down the road and say, "No Defense

14   counsel can ever look at this necessarily," if you could let

15   Mr. Stephens know, you can do it on the record, I mean, you can

16   let him know in advance so that it's still whether -- it can't

17   hold it up.  All it can do is hold up those people, but the

18   agreement can go forward either way with whatever orders I make

19   in connection with it.  He'd just like to have a little bit of

20   an idea who are you thinking about.  He would feel better about

21   it.

22        So if you know, I don't know if you can say it now or if

23   you've got it back at your office, but let me ask you that

24   first.

25             MS. WONG:  Unfortunately, I don't have the names right

1    here with me.  I'm happy to provide those names after this

2    appearance.

3           THE COURT:  Okay.

4           MS. WONG:  I can tell counsel and the Court that these

5    are all members of a U.S. State Bar and they are all members --

6    or practice with King, Wood & Mallesons, which is an

7    established firm -- established global law firm.

8           THE COURT:  All right.  And I think also don't they

9    have to sign the protective order or agree to be covered by it?

10          MS. WONG:  They have to sign a -- there is a form at

11   the end --

12          THE COURT:  Right.

13          MS. WONG:  -- stating that they have to agree to it.

14          THE COURT:  Right.  So it's not like someone, if they

15   did do something that was in violation of the order, even

16   though it looked upfront like they were going to be okay and

17   they were approved and, heaven forbid, they did something

18   someone didn't like, it isn't like they would not be subject to

19   whatever contempt powers the Court has under the agreement.

20   Okay.

21          MS. WONG:  And I might add also that we narrowed that

22   list to U.S.-admitted lawyers --

23          THE COURT:  Okay.

24          MS. WONG:  -- to be sure that they were subject to

25   some jurisdiction of the courts in the U.S.

1          **THE COURT:**  Okay.  Very good.

2      Okay.  So -- all right.  I actually had two separate

3  pages -- not pages -- pads where I wrote things.  First I wrote

4  them all scribbly, and then I thought maybe before I come here

5  I ought to neaten it up, but I actually kind of like the

6  scribbly format so I've got them both here.  I just want to

7  make sure I don't leave anything out in some of the preliminary

8  questions that I wanted to ask.

9      So are any of the -- is there any firm that's going to be

10  working on the case that has offices, for example, other than

11  yourselves, in, like, Tokyo or Singapore?

12      Nobody appears to be at the moment in Taiwan of the two

13  firms here, but I'll ask you about Taiwan in a minute.  Are

14  there other -- or do any of these other law offices who may be

15  working on the case also have offices in Singapore, Tokyo?  If

16  you know.

17          **MS. WONG:**  Do you mean the other Defense counsel that

18  I was just referring to?

19          **THE COURT:**  Yes.  Whoever they may be, yes.

20          **MS. WONG:**  Like King, Wood & Mallesons firm?  I

21  actually don't know where their other offices are.

22          **THE COURT:**  Anybody else in Taiwan?  See, neither of

23  these firms -- nobody is in Taiwan actually except UMC.

24  Neither of the law firms have an office there.

25      Okay.  Given where you have things kind of organized at

 1   the moment, would it be difficult to set up kind of a whole

 2   operation other than in Hong Kong?

 3        **MS. WONG:**  Yes, and I would say yes because it would

 4   require those individuals on the team now in Hong Kong to

 5   travel to another city to set up their files, their notes, the

 6   information that they rely on in this other city and have to

 7   travel there in order to review the evidence in totality with

 8   the other information that they have.

 9        **THE COURT:**  I'm assuming you're going to say the same

10   thing, Ms. Caldwell?

11        **MS. CALDWELL:**  Yes.  I think, in addition, it would

12   require lawyers who are very busy, and not only on this matter

13   but on other matters, to interrupt their work and go to either

14   Singapore or Tokyo taking a four-hour international flight,

15   going through customs, et cetera, to review the materials in

16   this case.

17        **THE COURT:**  Okay.  I tried to figure out about how

18   long it would take to get from place to place.  Here's a map

19   also that I printed out so I could just get a good feel for

20   where all these locations are.

21        Okay.  Latham & Watkins said that for counsel who are in

22   Hong Kong to get to Singapore or Tokyo, it's about four hours

23   either way.

24        **MS. CALDWELL:**  That's my understanding, Your Honor.

25        **THE COURT:**  Okay.  I, then, sort of trying to check

1    this out in some kind of judicial noticeable way -- and I'm

2    going to ask you about it to confirm this one way or another --

3    to get, for example, from Fujian -- they're in Jinjang; is that

4    where they are?  Is that how you pronounce it?

5             **MS. WONG:**  That's right.

6             **THE COURT:**  Okay.

7        -- to Tokyo looks like maybe a little less than four hours

8    and a little more to get to Singapore.  Does that sound about

9    right?

10            **MS. WONG:**  That sounds about right.

11            **THE COURT:**  And then for UMC, who's in Taiwan, to get

12   to Tokyo, it was a little less, maybe three hours but then it

13   looked like four to Singapore.

14            **MS. CALDWELL:**  And I don't think UMC, candidly,

15   Your Honor, would have to travel to either of those

16   jurisdictions because when we need to meet with our client, we

17   can travel to Taiwan from Hong Kong, but it's really for the

18   convenience of the legal team that's working on the materials

19   and needs access to the documents.

20            **THE COURT:**  Okay.  All right.

21       If we look primarily at the legal teams that are in

22   Hong Kong, it only takes -- well, if your clients are coming to

23   you, if that were the case, then it only takes the clients

24   about an hour, I think, or less to get to Hong Kong --

25            **MS. CALDWELL:**  Correct.

1          **THE COURT:**  -- from where they are.

2       If you were going to the clients, it would take around an

3    hour to get to Taiwan, and UMC it wouldn't take any time

4    because they're already there, and it would take around, you

5    know, an hour for Jinhau, I guess.

6       Based on my map, Taiwan and -- well, Hong Kong and

7    Fujian Province, Taipei, they're all fairly close.  When you

8    start getting to Tokyo, you start getting much farther away.

9    Singapore likewise just going in a different direction.  And

10   U.S.A. of course, very far away, although there are very able

11   lawyers here.

12      So all right.  Now, I can see the difficulties, to a

13   certain extent, presented.  I mean, everybody doesn't have to

14   start out in Hong Kong, but apparently you're established

15   there, you have good size offices there, and it fit to put this

16   case in Hong Kong.  It isn't like -- from what I gather, it

17   isn't like you got the case and then set everything up in

18   Hong Kong, but I could be wrong about that.

19         **MS. CALDWELL:**  Your Honor, one of the main reasons why

20   we've been using our Hong Kong resources is because our

21   Hong Kong partner has some technical expertise and she has been

22   the one who's been designated to be the point person on the

23   very technical issues.  So she's the one who's traveled to

24   Taiwan quite frequently to interview engineers and other people

25   and is very steeped in that information, and that's, of course,

1    what the trade secrets would be relevant to.

2         **THE COURT:**  Okay.

3         All right.  So if the firms had to go to Taiwan to turn

4    material over, let's say, and have a client look at it and

5    have -- they can't go to Mainland China.  So if they can't go

6    to Hong Kong, then it looks like Taiwan is the closest, but the

7    trouble is they don't have any offices there.  So even though

8    UMC is there and even if they maybe have conference rooms or

9    something, Jinhau doesn't even have anybody there.  I don't

10   know.  You'd have to go rent space or something so that --

11        Taiwan is as close as Hong Kong for people to get to it

12   but it's not set up as well.  That's kind of what I finally

13   figured out.  I hadn't been that familiar with that part of the

14   world and just was trying to get the relationship.

15        **MS. CALDWELL:**  Your Honor, just one other thing on

16   Taiwan.  While UMC does have an office in Taipei, most of its

17   facilities are much further south in Taiwan, and it takes --

18        **THE COURT:**  Oh, really?

19        **MS. CALDWELL:**  Yeah.  So it takes a little while to

20   get there.

21        **THE COURT:**  So it's a little farther away?

22        **MS. CALDWELL:**  Yes.

23        **THE COURT:**  No airport to that one or is there one?

24        **MS. CALDWELL:**  There's -- from -- I don't actually

25   know the answer to that one, if you can fly from Hong Kong to

1   southern Taiwan.

2           **THE COURT:**  Okay.

3           **MR. HEMANN:**  It's a very pleasant 90-minute bullet

4   train ride from the airport.

5           **MS. CALDWELL:**  From the Taipei Airport.

6           **MR. HEMANN:**  From the Taipei Airport.

7           **THE COURT:**  Okay.  You did that, Mr. Hemann?

8           **MR. HEMANN:**  Masa Maos (phonetic), yes.

9           **THE COURT:**  You did that, Mr. Hemann?  Okay.

10          **MR. HEMANN:**  I've gotten close.

11          **THE COURT:**  I didn't ask how hard it is for you to get

12  anywhere --

13          **MR. HEMANN:**  Nobody cares.

14          **THE COURT:**  -- and you didn't have to meet with the

15  clients.

16      All right.  So it seemed to me that as far as convenience

17  goes, that Singapore and Tokyo really aren't convenient for

18  anyone.  The U.S. could be but not necessarily for the client.

19      There are three people, I guess, that would have to go

20  to -- or, you know, three groups of people that would have to

21  go to Taiwan, only two, the clients would have to go to

22  Hong Kong or vice versa, so, okay, if you're going to go where

23  they are.

24      So, in fact, Hong Kong is probably the most convenient

25  place for the defendants to try to marshal whatever defense

1    they're going to have to these charges.

2        So we should then turn to, at this point, the Government

3    and Micron to see if one can say, nevertheless, the risks are

4    significant enough that it's just not appropriate to have this

5    material available there.

6        I'm not sure where you want to start.  I do want to say

7    that I didn't think the words "may be necessary" in the statute

8    were really dispositive.  I thought that was more a turn of

9    phrase, so to speak, not really the difference between the

10   Court finding something is necessary and, gee, there's a slight

11   possibility it might be.  I think it's just a way of talking in

12   statutory language; but if you had anything more to say on

13   that, that would be fine.

14       **MR. HEMANN:**  Well, nevertheless, it is the statutory

15   language --

16       **THE COURT:**  Yes, I know.

17       **MR. HEMANN:**  -- and the natural reading of it is as it

18   says.  I don't think there's an alternative reading other than

19   treating the word "may" out of the statute and replacing it

20   with "shall."  And clearly the purpose behind this particular

21   statute is to provide broadly prophylactic protection in this

22   circumstance.

23       And, you know, there's no way to debate.  This is a very

24   close question as exemplified by the fact that it is the one

25   part of this that we could not come to an agreement on.  It is

a close question.  It comes down to protection versus
convenience, and I'm not belittling the notion of convenience
as I say that, but that's what the issue is.

There's no doubt in this case, although the Defense do not
need to and are not right now admitting it, the trade secrets
at issue and the information at issue in this case was stolen
from Micron.  It's not what -- this case is not going to be
about whether or not information was stolen from Micron.  It
indisputably was.  It will be about whether that information is
a trade secret, which under the statute the Court must presume
that it was at this point in the discussions.

So what we have is trade secrets presumptively,
indisputably stolen, and then the question is risk versus
convenience; and it comes down to, then -- we sort of circle
back to where this is.  If it's not "may" in a hypothetically
possible, if that's not what "may" means, but it must mean
something short of "shall," where does the risk come in?

And, you know, there's also little risk given the
authorities that are cited by the parties in the briefs that
security professionals find Hong Kong to be at least somewhat
risky, and I think that the evidence points to the fact that it
is increasingly risky given recent events.

If at some point in the past before the PRC government
began to take the active interest in Hong Kong that it is
currently showing, it wasn't dangerous for information.  Many

1   knowledgeable security professionals find it to be dangerous

2   from the perspective of intellectual property theft now for the

3   same reason that Mainland China is dangerous from the

4   perspective of intellectual property theft.

5        So as we -- you know, if we begin from the point that this

6   is a close question, in the situation where there's a close

7   question under 1835, our view is that the close question should

8   be resolved in favor of making sure that the victim's trade

9   secret intellectual property rights are protected.

10       So once we get to close question, our view is that amongst

11  the reasonable compromises we've made, on this particular issue

12  being a close question, the Court should fall on the side of

13  protecting the victim's intellectual property rights.

14       And I think that that's really the essence of what the

15  Government's position is here now.  It's not this is easy or

16  this is clear.  It's protecting the victim versus legitimate

17  arguments with regard to -- you know, legitimate arguments

18  about protecting the victim versus legitimate arguments about

19  the convenience of the lawyers.  In this case, under 1835 the

20  way it is written, you've got to protect the victim.  That's

21  our view.

22            THE COURT:  Okay.  I'm not sure, just getting back to

23  the "may" and "shall," I don't know that "shall" fits in there.

24  If you were going to substitute a word, you could say instead

25  of "may be," "is."  All right?  But then that just means the

1    Court has to decide it is necessary or and the Court may find

2    necessary, you know.

3         So it sounds to me sort of the same, but I understand the

4    main point that you're making, which is that the first question

5    is protection.  All right.  If -- and we're not dealing with --

6    and just to point out kind of along with what you're saying,

7    though, we aren't dealing with not giving the information to

8    the defendant.  There are times that one can say "Gee, we can't

9    really defend against this case.  You won't give us" fill in

10   the blank.

11        Here the Defense will have the information so it's really

12   a question of how much and what I'm calling inconvenience, but

13   it can rise to the level of difficulty in defending and then

14   you get into some problems.

15        And so I don't -- you know, we don't want to set up

16   barriers to people that make it so hard for them to be able to

17   actually effectively represent their client, but the first

18   point is, perhaps, do we need this protection; and then we'll

19   look and see if you do, is there any really strong argument as

20   to why, nevertheless, it shouldn't be afforded.

21        Okay.  So the defendants will get the information.  It may

22   be harder for them to work with it and use it if they can't get

23   everything together in Hong Kong.  There's -- this is kind of

24   interesting.

25        Well, the defendants have pointed out, by the way, that

1  there are all kinds of companies that are doing business in

2  Hong Kong and Mainland China and they've got secrets all over

3  the place.

4       And my understanding from the Government was, well, those

5  are secrets different than our secrets; but the point is that

6  people trust secrets to be worked with in those two locations.

7  I don't think it matters whether it's process technology or

8  design or whatever some of these other words are that were used

9  to describe different aspects of how you finally get something

10 to market.

11      I mean, I think the idea was lots of people have secret

12 information and yet they're working in these locations.  Now,

13 maybe they're taking a risk.

14          MR. HEMANN:  But they're also making their own

15 decision.

16          THE COURT:  No, no.  I understand.

17          MR. HEMANN:  The owner of the information --

18          THE COURT:  Yes.

19          MR. HEMANN:  -- is making a decision --

20          THE COURT:  Yes.  Just a minute.

21          MR. HEMANN:  -- to bring the information over.

22          THE COURT:  Don't interrupt for a minute.

23          MR. HEMANN:  Oh, I'm sorry.

24          THE COURT:  I understand what you're saying, but --

25 okay.  They are taking the risk upon themselves, but an awful

1  lot of people have found that it's okay to do it.

2      Now, they're making a profit along with the risk.  Micron

3  is not getting anything out of it.  I understand that.

4      Okay.  But at least there's some suggestion these people

5  aren't all nuts who are risking losing all of their valuable

6  information in these places.

7      Okay.  The other --

8          **MR. HEMANN:**  Can I add one -- Sorry.

9          **THE COURT:**  Not yet.

10         **MR. HEMANN:**  Okay.

11         **THE COURT:**  Okay.  The other point that the defendants

12  have raised is that the information that the Government has

13  provided by way of articles or writings about the risks in

14  China have been pretty clearly focusing on Mainland China but

15  they really aren't talking about Hong Kong if you read the

16  commentary in context.  It sounds like they're talking about

17  Mainland China.

18      And although you're arguing that, yeah, Mainland China is

19  getting into this more and more and is having a greater

20  influence or intruding more into Hong Kong either politics or

21  what have you, there wasn't a lot of support for that in the

22  record that I have.  They may be.

23      I'll tell you, they're everywhere.  Okay?  I mean, I have

24  another case that I got where there's a question about a

25  security breach amongst a whole bunch of major hotel chains

that have a reservation system, and the thought is Mainland
China has somehow hacked into it here in the U.S.  So it
doesn't look like it can be super-protected no matter where you
are.

The main -- one thing I do want to say is that the thefts
that are alleged here are not high tech.  The material may be
but the means is the plain old traditional, pick it up and move
it out.

The allegation is that people who worked for Micron took
with them what they had access to and converted it to their own
use and that of the defendants.  It isn't like they hacked into
something, as far as I understand it, that was being protected.
They were trusted employees.  I'm sure there's a concern that
that trust was violated and people would feel strongly about
that, but it's old-fashioned theft.  It's not new-tech theft.

Okay.  You wanted to add something, though.  I don't want
you to forget it.

**MR. HEMANN:**  Well, I guess the one -- it is a
follow-on to the point that, yes, some companies -- many
companies and law firms allow some of or all of or a portion of
their secrets to go into Hong Kong, but they make that decision
and they make the cuts where they choose to make them based on
the risks and benefits.

The largest employer in the United States does not allow
me to bring my cell phone into Hong Kong because of the risk

1  that the cell phone will be compromised so that is -- I mean,

2  that's a fact and it's a judgment, and does allow me to bring

3  my cell phone into other countries because that decision has

4  been made.

5       Now, is that dispositive?  No.  But it certainly does,

6  again, say that different employers make the cut at different

7  places.  And here -- you know, I also think, and Mr. Stephens

8  can elaborate on this much more than I can, you know, Micron

9  has a fraught relationship with the government of China at this

10 point in time arising out of the circumstances of this case and

11 the theft involved in this case.

12      And there's been all manner of litigation, and so that the

13 profile of Micron and these secrets in China and the interest

14 in it by the Chinese government is not the same as it was when

15 a couple of employees uploaded from their Micron computers

16 these trade secrets and moved them around as they did.

17      So the ground has shifted a little bit, and I don't think

18 that just because that is the way it happened, that is

19 necessarily what the interest would be on this day.

20      But, again, you know, nobody's suggesting that the Court

21 can or should make a finding that intellectual property

22 definitely will be stolen if it is brought into Hong Kong.  We

23 don't know that that will happen.  We suspect that it could

24 happen, and that's what the position is.

25           **THE COURT:**  Why don't we hear from Mr. Stephens on

1    the -- maybe if he wants to elaborate on what this increasing

2    animosity is of some sort between Micron and the Chinese

3    government.

4           MR. STEPHENS:  I think that what Mr. Hemann is

5    referring to is just events that have happened since the case

6    has broken.  There is civil litigation here in the

7    United States.  There's civil and I understand regulatory

8    actions in China.  There's this case.

9           And, Your Honor, you're sitting on trade secrets that are

10   worth billions of dollars; right?  There's a lot on the line

11   for the victim that stands in front of you here today.

12          And I would like to actually go back to the statute real

13   quick to make sure that the use of "shall" in the statute is

14   that the Court "shall enter a protective order."  And it's

15   "shall enter a protective order" to protect the victim's trade

16   secrets in a matter just like this.  Then it is whether it may

17   be necessary.  What we're arguing is that it may be necessary

18   to keep this out of Hong Kong to protect those trade secrets.

19          THE COURT:  Okay.  Good point.

20          MR. STEPHENS:  And the other --

21          THE COURT:  Basically the Court is required to protect

22   your secrets and right now we have a starting point for doing

23   that.  In other words, there's a protective order that the

24   defendants say is not quite -- it goes beyond what's necessary,

25   and the Government and Micron are arguing, no, that's

 1    necessary.

 2         And so that's what I'm -- you know, that's what I'm trying

 3    to deal with.  I have to issue orders.  I am required to

 4    protect the secrets and not gamble with your client's secrets.

 5    No, I understand that.

 6         So, okay.  By the way, what about the recent riots in

 7    Hong Kong?  What effect does any of that have here?  It's in

 8    the paper every day.

 9         **MS. WONG:**  Your Honor, it's in the paper every day but

10    besides some vague statement that this somehow affects security

11    in Hong Kong, there's no specific reason why it would affect

12    the trade secrets in this case.

13         And when counsel argues that the Court shall enter a

14    protective order, certainly no one here is arguing no

15    protective order is required at all; but, rather, we need to

16    look at what are the trade secrets that are being protected and

17    from what.  And your question just now about the riots goes to

18    the second point, from what are we protecting the trade

19    secrets.

20         And the Government -- you know, we disagree about the

21    exact legal standard, but the Government's reply stated that

22    they must demonstrate a reasonable risk to trade secret

23    information.  And even under that standard, they talk about

24    recent events in Hong Kong, it affects security in Hong Kong,

25    the PRC security and Intelligence Services that are active in

1    Hong Kong; but they go on to say in those same papers, and as
2    Your Honor has recognized, those same services are active all
3    over the world.
4        So, in other words, the argument both fails to make any
5    specific nonspeculative demonstration of the threat in
6    Hong Kong and also proves too much about the existence of these
7    services.
8        Now, going back to my first point about that we need to
9    actually look at what the actual trade secrets are, as
10   Your Honor recalls from the Indictment, we're talking about
11   trade secrets from alleged conduct in 2015 and 2016, which even
12   at that time were well on their way into receding and to
13   pass -- into the past product life cycle.
14       So for the Government's argument to succeed about how
15   interested the Chinese government is and the changing landscape
16   given the relations between Micron and the Chinese government,
17   it would suggest that the Chinese government is keenly
18   interested in these particular trade secrets.
19       And I would argue that these trade secrets are, in fact,
20   so old and were able to be obtained through, as Your Honor has
21   stated, the old-fashioned theft way, that there's no need for
22   the sort of cyber theft, high-tech theft that we are trying to
23   ward against through preventing these trade secrets from being
24   in Hong Kong.
25       And, in fact, the very terms of the protective order,

 1   which are not light, already protect the trade secrets, the

 2   alleged trade secrets, sufficiently.

 3          THE COURT:  Let me ask a question just in terms of the

 4   vehicle this is being brought to my attention by.

 5      All right.  So I have a motion for protective order, which

 6   is asking me to order that the agreement, to the extent that

 7   it's approved by the Government and the defendants, be the

 8   protective order.  Micron is asking that I add some further

 9   protections and then joins otherwise in the Government's

10   motion.

11      The defendants are asking that I find that Hong Kong be

12   added as an appropriate venue for -- what would you fill in the

13   blank with at that point?

14          MS. CALDWELL:  For our attorneys, the people who are

15   on our team, to be able to review whatever these trade secrets

16   are in their offices in Hong Kong.

17          THE COURT:  In Hong Kong.

18          MS. WONG:  So in the same provision in the protective

19   order that states that the discovery can be produced in

20   Japan --

21          THE COURT:  Okay.

22          MS. WONG:  -- we would add Hong Kong.

23          THE COURT:  And then there's -- of course, there's a

24   reply responding to the arguments made by the defendants.

25      If I were to rule and essentially grant the motion, then I

1    would -- I'm saying this will be your protective order; and if

2    I deny the motion and essentially say it's going to be your

3    protective order plus the other location, Hong Kong, to be

4    treated in the same way as Taiwan, Singapore, and Tokyo and the

5    U.S., and then I would have to add also whatever I'm going to

6    add about Micron; right?  But I guess you're asking me to make

7    an order as to what your protective order should read as.

8              **MR. HEMANN:**  Yeah.  I mean it's just --

9              **THE COURT:**  Okay.

10             **MR. HEMANN:**  I think like we would do -- like we

11   frequently do with proposed orders of all sorts, we submit a

12   proposed order and the Court -- I think we're inviting the

13   Court to grant the order as modified if the Court feels a

14   modification is appropriate.

15             **THE COURT:**  Okay.  But you're asking to not modify.

16             **MR. HEMANN:**  Well, yeah.  We're asking --

17             **THE COURT:**  Micron is asking for a modification going

18   more strict and the defendants are asking for a modification to

19   be more lenient essentially in terms of what can be produced or

20   observed and where.

21             **MR. HEMANN:**  But we all want a protective order so

22   that we can move on with our situations --

23             **THE COURT:**  Yes.

24             **MR. HEMANN:**  -- one way or the other.

25             **THE COURT:**  All right.

1          **MS. WONG:**  And, Your Honor, we're happy to present a

2   proposed draft with our additions of Hong Kong if Your Honor

3   were to rule that Hong Kong should be added.

4          **THE COURT:**  All right.  Or if I were to add any of the

5   conditions that Mr. Stephens' client is asking for too.

6          **MR. STEPHENS:**  Yes.

7          And, Your Honor, in response to counsel's comments on your

8   last point, I do want to make clear, I don't want the victim in

9   this scenario to be punished for being reasonable in that it

10  was willing to agree to the United -- we started with the

11  United States.  Our preference is that the trade secrets get

12  reviewed in Mr. Hemann's office here in San Francisco and

13  that's it.  Right?

14         Over the course of time, we tried to make sure we were

15  being reasonable.  I understand that there's a need to move the

16  case along, but we shouldn't then put Hong Kong on the table

17  because we were reasonable about Singapore, Taiwan, and Japan;

18  and I'm concerned about the way that the tenor of the argument

19  has gone that it suggests that might be the case.  That is not

20  the case.

21         **THE COURT:**  I mean, in choosing, by the way, I mean,

22  you could have picked Australia, Denmark.  All right.  In other

23  words, I assume you picked these other locations because

24  someone could argue that it would be easier to get to than

25  coming here or convenient for some reason?

1          MR. HEMANN:  Yes.  Those are viable, relatively

2  convenient locations.

3          THE COURT:  Okay.

4          MR. STEPHENS:  And, Your Honor, if you were going to

5  have a heat mat index on that map, Hong Kong would be off the

6  charts as far as what our concerns would be about whether or

7  not a Chinese foreign agent could have access to those trade

8  secrets.

9          THE COURT:  Okay.

10     All right.  Now, it's the Government's motion.  Do you

11  have anything that you want to add to the record?

12          MR. HEMANN:  No, Your Honor.

13          THE COURT:  Any last comments from respondents here?

14          MS. CALDWELL:  I think, Your Honor, the only comment I

15  would make is that there are two things.  One is, in addition

16  to all the literature that has been presented to the Court

17  about why Hong Kong is a good place to do business and why

18  global companies do business there, Latham and

19  Morrison & Foerster also have an attorney-client privilege

20  obligation.  I think that's something that the Court shouldn't

21  lose sight of.  So we have an obligation to keep materials

22  confidential, which we, both firms, I'm sure, just as Jones

23  Day, take very seriously.

24     And the second point is, as Ms. Wong noted, these trade

25  secrets, if they were trade secrets at the time, are quite old

1  at this point given the life cycle of the technology in this;

2  and I realize these issues are not currently before you and

3  haven't been briefed or presented, but I think it's not

4  irrelevant to the Court's decision that Micron has very

5  significant ongoing current operations, including a R&D

6  facility, in China, is investing very heavily in China as per

7  their own CEO's public statements, has a very major customer in

8  Huawei, which has been deemed by the U.S. government to be a

9  national security threat.

10     I think those are relevant considerations because those

11  are -- if the Chinese can get these old trade secrets in

12  Hong Kong if they were motivated to get those, I would think

13  they would be even more motivated to get current R&D activity

14  information again.  I don't know what that is from a technical

15  perspective, but I'm assuming whatever is happening in 2019 is

16  more advanced than what was happening in 2015.

17     **THE COURT:**  I guess the response would be, again,

18  "Well, we have a calculated decision to make money in China and

19  we're willing to take that risk, but we're not willing to take

20  it when we don't get anything back for it."

21     **MR. STEPHENS:**  It's a little bit different than that,

22  Your Honor, and it's addressed in the Government's reply brief,

23  and basically it's apples and oranges as it goes to the

24  technology.  The technologies at issue here relate to process

25  trade secrets, which deal with converting the raw silicon

 1  wafers into a functioning memory chip.  A lot of what's done in

 2  China is back-end assembly where it's not involving the trade

 3  secrets that are at issue.

 4          **THE COURT:**  Any trade secrets or just not the ones we

 5  have here?

 6          **MR. STEPHENS:**  The ones in front of the Court --

 7          **THE COURT:**  Right.

 8          **MR. STEPHENS:**  -- those deal with the process.

 9          **THE COURT:**  The trade secrets.  I think the argument

10  is being made that you have exposed voluntarily your own trade

11  secrets.  Not these.  It's not like they're arguing, "You've

12  already given them every chance and they didn't do anything

13  yet."  The argument is that you have exposed your own trade

14  secrets that are valuable.

15      And it's been argued by Mr. Hemann earlier when other

16  companies were pointed to, not just Micron, but the binder that

17  I hauled out here of companies doing business, that they wanted

18  to support their assertions about the companies, firms, banks,

19  essentially everybody is in China.

20      Okay.

21          **MR. HEMANN:**  But all --

22          **THE COURT:**  Excuse me.

23      Mr. Hemann then said, "Well, that's their choice.  They

24  made that business decision and that's not what we're dealing

25  with here.  It's a different scenario," and I recognize that.

1        Okay.  Did you want to say anything else before I take

2   it --

3            MR. HEMANN:  But all trade secrets are not the same,

4   and I think the distinction that Mr. Stephens is making is that

5   process trade secrets are particularly valuable because they

6   teach how the thing is -- how the widget is built.  And, you

7   know, the higher the technology -- the higher the value of the

8   trade secret, the more restrictions that a company has.  The

9   lower the value, how you glue two widgets together may be a

10  trade secret because it's --

11           THE COURT:  Oh, I see what you're saying.

12           MR. HEMANN:  -- like the kind of glue you're using is

13  a company's trade secret.  But the company is going to say,

14  "Yeah, the cost of doing business in China is so much less that

15  if they steal the kind of glue that we're using, we'll live

16  with it; but we don't want them to know how we made the two

17  widgets that were going together in China."

18       Is that -- am I stating that right?

19           MR. STEPHENS:  Yes.  I agree with that.

20           THE COURT:  That's a fair point.  The idea is not just

21  they're different but they are at different levels of

22  sophistication.  That, I didn't get from the papers but, okay.

23  And not, frankly, knowing why design would be any less valuable

24  than process, and I'm not sure it is, but it looked to me like

25  everything was kind of on the same level of trade secrets.

```
 1  People are doing work there that could expose them to being

 2  hacked in some way.

 3        MR. HEMANN:  And on some level that's what this whole

 4  case is about, what we're arguing about right now; and

 5  Ms. Caldwell and Ms. Wong totally disagree with most of what I

 6  just said and they have their arguments as to why they

 7  disagree.  And, you know, Mr. Stephens probably thinks I didn't

 8  go far enough in what I said.

 9      And that's what the trial in this case ultimately will be

10  about, is the value of these trade secrets, but that's why --

11        THE COURT:  Right.

12        MR. HEMANN:  -- you know, that's why in this unsettled

13  circumstance we suggest falling in favor of more protection

14  rather than less.

15        MR. STEPHENS:  And, Your Honor, just one more comment,

16  just so it's on the record.

17        THE COURT:  This is the last comment, otherwise I have

18  to keep giving other people equal time and you-all keep

19  thinking of new things to say or emphasize.  I don't want to

20  cut you off.  I know it's important to you.

21        MR. STEPHENS:  Yes.  And I'm not interjecting a new

22  point.  I'm just -- simply, so the Court knows, Micron

23  disagrees with Defense counsel's position that these trade

24  secrets are older and stale.  It's the way that Mr. Hemann

25  described it.  They build on each other from generation of
```

1    product to generation of product.

2          **THE COURT:**  Okay.  Fair enough.

3          Now, I don't think the age of the secrets is a point that

4    would be determinative here; in other words, I'm perfectly

5    happy to accept that somebody would find them valuable.

6    Whether they're the most current technology, whether there's

7    something that you need to then develop the new technology,

8    whatever, somebody thought at least earlier they were worth

9    taking, according to the allegation.

10         So, no, I would find that what we're dealing with is

11    something that could have value, yes, to another country and

12    the question, then, is what we're going to do.

13         So I'm deeming the matter submitted, and I'm going to

14    rule.  You want to get going here in one fashion or another

15    with the case.

16         Okay.  I can't -- you know, I don't find, frankly, and I

17    can be happy with this part, but I really can't find that

18    Hong Kong is in the same category as Mainland China.  And I

19    understand why you're particularly concerned about Mainland

20    China, and they certainly do have a reputation for being

21    interested in trade secrets around the world; but Hong Kong is

22    in a little different situation, historically they were and

23    even currently, and I don't know that there's been enough of a

24    showing that they've been essentially absorbed in some way by

25    Mainland China.

1     I don't think the unrest that's going on there now really

2  bears on this particular issue, and the complaints that are

3  being made there by students is different than what we're

4  really dealing with here.

5     We have two very reputable law firms here -- I mean, all

6  the firms are -- Jones Day, Latham & Watkins,

7  Morrison & Foerster -- that have some credibility at least in

8  the sense historically of standing by their word and also the

9  lawyers who are involved in the case directly.  So I think that

10  goes a ways too.

11     The protective order as proposed to this point or agreed

12  upon, we'll say, to this point by three of the players here is

13  pretty restrictive.  In other words, there are various

14  safeguards that have been put into place and that really all

15  the people that would have their hands on the material are, to

16  a certain extent, a narrow group and they are professionals who

17  have a certain obligation to the Court.

18     I understand the question about the experts, and I think

19  that what Mr. Stephens is saying about not allowing them to

20  make extra copies is a reasonable request.  If for some reason

21  that would become particularly problematic in whatever is going

22  on, somebody could call it to my attention; but at the moment I

23  think that request, which I hadn't understood originally to be

24  as focused as it was, is reasonable.

25     And I also understand his desire not to just have a

1    constant flow of people to be looked into and try to figure out

2    if it's okay for them to look at things wherever they're

3    looking at them, whether they're looking at it in Tokyo or

4    Singapore or whatever.

5         So I would direct -- at the moment all we know is

6    Ms. Wong's client, but both attorneys are advised that if at

7    this time they know of what fall into the category of "other

8    Defense counsel" who they wish to have access to the material,

9    that they provide that information.

10        Do you want to give it to the Government and have the

11   Government give it to Mr. Stephens?

12             **MS. WONG:**  Yes, Your Honor.

13        **THE COURT:**  Is that probably the best, maybe, way to

14   do it so there's just one pipeline in effect?

15        Then I would direct that you provide that no later than --

16   oh, we'll just say November 1.  That gives you an easy date to

17   remember.

18             **MS. WONG:**  Thank you, Your Honor.

19        **THE COURT:**  Okay.  And I am going to allow Hong Kong

20   to be put on the list.  I recognize what Mr. Stephens has said

21   about not wanting to be perceived as automatically thinking all

22   these other places are terrific, and certainly he would like to

23   keep things as close as possible to home.

24        In the same light, given where the events occurred, where

25   the people are located, and where at this point a large chunk

of the lawyers are working, I'm going to find that in the absence of a stronger showing of risk here, that the concerns the defendants have made weigh in favor of allowing Hong Kong.

It is a relatively close question, and I had not made up my mind before coming out here. I wanted to explore some of the questions I had; and some of them didn't particularly help the defendants, others didn't particularly help the Government. It's just a call the Court has to make.

Certainly if there are changes in whatever the dynamic is that's underlying this protective order, the Court would want that called to my attention. The concern of, of course, the Government and Micron is they won't know about it; but if they do, then they should bring it to my attention.

So I will ask -- I had an offer from Ms. Wong to produce a protective order that adds Hong Kong to the list of approved locales; and also, however, to make clear, as to the experts, that they are not to make their own copies.

And where would that fit in the order? Does anybody just quickly have a suggestion as to that? I can look too.

**MS. WONG:** I think there is a section that discusses how the experts shall maintain the materials. So it's in -- let's see... It's paragraph 6(c), "Disclosure of Confidential Material to Experts."

**THE COURT:** All right. What I recommend is you come up with a proposal that you think works as to language to be

1    added, that you run it by the other side, let them see if they

2    have any concern about it reflecting or not reflecting what

3    I've tried to order here today; and then hopefully resolve that

4    and plug it in to the proposed order, and then I'll look for it

5    there unless somebody lets me know it's somewhere else.

6         As far as the names that you currently have of the other

7    Defense counsel, that won't go in the order.  It will just

8    be -- in other words, we're not naming names right now.  That

9    will just be a separate order that I'm making now so that

10   Mr. Stephens and Mr. Hemann will have a better idea of what's

11   coming down the pike and can be ready to either approve or not

12   approve those people when request is formally made.

13        Okay.  Anything else that anyone wants to bring up in

14   connection with what we're doing here today?

15             **MS. CALDWELL:**  No, Your Honor.

16             **THE COURT:**  Ms. Geiger?

17             **THE CLERK:**  Do you want to give them a future date?

18             **THE COURT:**  She says we don't have another date on the

19   case.

20             **MS. CALDWELL:**  Yes.

21         **MR. HEMANN:**  Here's my suggestion as to that:  Once

22   the protective order is signed and entered, we have some

23   discovery to produce.  We'll get that produced; and then once

24   that's done, it would probably be a good idea to come back and

25   set for scheduling, a scheduling proceeding.

1          **THE COURT:**  Well, do you want to just pick a date down

2    the road that just ballparks where you think that might fall?

3    And then if we're too optimistic about it, you can give me a

4    stipulation and just push it back.

5        We do have concerns.  While this motion is pending, we're

6    not running any time off the speedy trial clock, but that would

7    have to be in somewhere someplace.  I don't know.

8          **MR. HEMANN:**  So we'd suggest -- which date did you

9    think?

10         **MS. CALDWELL:**  Either December 18th or December 4th,

11   whichever is better for the Court.

12         **THE COURT:**  Okay.  Let me just take a look again.

13         **THE CLERK:**  The 18th.

14         **THE COURT:**  The 18th?

15         **THE CLERK:**  Yes.

16         **THE COURT:**  Then let's go with that.

17         **MR. HEMANN:**  Yes.  And then we'd ask to exclude time

18   between now and then under the speedy trial clock.

19         **THE COURT:**  All right.  I assume there's no opposition

20   to that.

21         **MS. CALDWELL:**  No.

22         **MS. WONG:**  No opposition.

23         **THE COURT:**  Okay.  So the matter will be continued to

24   December 18 at 2:15.  I'll exclude time from the running of the

25   speedy trial clock for effective preparation all the way

1  around, that those interests are in the defendants' best

2  interests and outweigh any other interest either defendant

3  would have or the public in moving the case without this

4  exclusion.

5      Okay.  Any idea when you might be able to get the order to

6  me, just a proposed order?

7          MS. WONG:  Today is Thursday?

8          MR. HEMANN:  Wednesday.

9          MS. WONG:  Today is Wednesday.

10         THE COURT:  Maybe within a week?  Is a week enough

11 time for you?

12         MS. WONG:  Plenty of time, Your Honor.

13         THE COURT:  All right.  So why don't we just say that

14 defendant Jinhau is to provide the Court with a proposed order.

15 If you run into a snag, let us know.  I'm not trying to rush

16 you along.  I just don't want to forget about it, frankly.

17     I'll tell you what.  We'll pick that same date,

18 November 1, then you only have one date that you have to

19 remember.

20         MS. WONG:  Thank you, Your Honor.

21         THE COURT:  Okay.  I don't know -- thank you for all

22 the work everybody did on the case and, you know --

23         MR. HEMANN:  Thank you for your -- this is -- thank

24 you for thinking about it so much.

25         THE COURT:  Well, I did think about it.

1    **MR. HEMANN:**  It's two legal pads' worth of thinking,

2  Your Honor, so that's --

3    **THE COURT:**  I didn't have the heat-seeking map or

4  anything but I had my own map.

5    Anyway, okay.  Yeah, just be sure you protect those

6  secrets.

7    **MS. WONG:**  Yes, Your Honor.

8    **MR. HEMANN:**  Thank you, Your Honor.

9    **MR. STEPHENS:**  Thank you, Your Honor.

10    **MS. CALDWELL:**  Thank you.

11    **THE COURT:**  We'll be in recess.  Thank you.

12    (Proceedings adjourned at 3:51 p.m.)

13    ---oOo---

14

15    <u>CERTIFICATE OF REPORTER</u>

16    I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  DATE:   Monday, October 28, 2019

20

21

22

23    _____

24    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

25