STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Laura.Vartain@usdoj.gov
    Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

    950 Pennsylvania Ave., NW
    Washington, DC 20530
    Tel: (202) 353-3434
    Fax: (202) 233-2146
    Nicholas.Hunter@usdoj.gov
    Stephen.Marzen@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.,<br><br>    Defendant. | CASE NO. 18-CR-00465 MMC<br><br>UNITED STATES' MOTION IN LIMINE NO. 1:<br><br>MOTION TO ADMIT STATEMENTS OF AGENTS PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(D) |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 1

    I.    Overview of the Statements the United States Seeks to Admit ........................................ 1

        A.    Interviews Taken During Taiwan's Investigation ................................................... 1

        B.    Depositions Taken During Civil Litigation ............................................................ 3

    II.    UMC and Jinhua Were Engaged in a Technology Cooperation Agreement to Develop and Produce DRAM Jointly ................................................................................ 4

        A.    The Technology Cooperation Agreement Between UMC and Jinhua ................... 4

        B.    The Structure of the UMC-Jinhua Relationship ................................................... 6

ARGUMENT .......................................................................................................................... 11

    I.    Federal Rule of Evidence 801(d)(2)(D) Provides for the Admission of Statements by Agents Against Their Principal ............................................................... 11

    II.    The Statements of Jinhua Employees Are Admissible Against Jinhua ........................... 13

    III.    The Statements of Joint UMC and Jinhua Employees Are Admissible Against Jinhua ............................................................................................................................. 13

        A.    Stephen Chen's (Chen Chengkun) Deposition ................................................... 13

        B.    J.T. Ho's (He Jianting) Interviews ...................................................................... 14

        C.    Neil Lee's (Li Fuzhe) Interview ......................................................................... 16

        D.    Ray Guo's (Guo Fengming) Interview ............................................................... 17

    IV.    The Statements of UMC Employees Working on the TCA Managed by Stephen Chen Should Be Admissible with Proper Agency Foundation ......................... 17

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*Bourjaily v. U.S.*,
   483 U.S. 171 (1987)................................................................................................ 11

*Dearborn v. Mar Ship Operations, Inc.*,
   113 F.3d 995 (9th Cir. 1007)................................................................................. 15

*NLRB v. Friendly Cab Co., Inc.*,
   512 F.3d 1090 (9th Cir. 2008)......................................................................... 12, 15

*United States v. Bonds*,
   608 F.2d 496 (9th Cir. 2010)................................................................................. 15

*United States v. Gibson*,
   690 F.2d 697 (9th Cir. 1982)................................................................................. 13

*United States v. Kirk,*
   844 F.2d 660 (9th Cir. 2008)................................................................................. 13

*United States v. Saks*,
   964 F.2d 1514 (5th Cir. 1992)......................................................................... 13, 15

## RULES

Fed. R. Evid. 801(d)(2)(D) ........................................................................................1, 11, 12

## OTHER AUTHORITIES

United States-Taiwan Agreement on Mutual Legal Assistance in Criminal Matters, Mar. 26, 2002, A.
   Inst. In Taiwan – Taipei Econ. & Cultural Representative Office in the U.S., *available at*
   https://www.ait.org.tw/wp-content/uploads/sites/269/2016/12/20020326-mutual-legal-asssitance-
   agreement.pdf................................................................................................................. 2

**INTRODUCTION**

The United States seeks to admit certain statements by Fujian Jinhua Integrated Circuit Company, Ltd. ("Jinhua"), employees made in interviews conducted by Taiwan law enforcement and depositions in a civil case, its case-in-chief pursuant to Federal Rule of Evidence 801(d)(2)(D). These statements fall into two categories. First, some of the statements are of persons employed solely by Jinhua. Second, some of the statements were made persons employed by Jinhua and United Microelectronic Corporation, Inc.'s ("UMC")  simultaneously. All of the statements concern matters within the scope of the employment, specifically Jinhua's and UMC's cooperative development of Dynamic Random Access Memory ("DRAM").

At trial, the United States may also seek to admit certain statements by employees of UMC who were acting as agents of Jinhua with the agency deriving from Stephen Chen's dual employment and supervision of UMC employees.  For this category of statements, the agency assessment is highly fact intensive, and so the United States asks the Court's leave to defer a ruling until the United States presents evidence at trial to establish the necessary agency relationship to seek admission under Rule 801(d)(2)(D) for UMC employee statements.

**BACKGROUND**

The statements described below are set out in exhibits filed with this motion and will be identified on the United States' Exhibit list, to be filed on December 3, 2021.

I.      **Overview of the Statements the United States Seeks to Admit**

A.      **Interviews Taken During Taiwan's Investigation**

In February 2017, investigators from Taiwan's Ministry of Justice Investigation Bureau ("MJIB") conducted a series of judicially authorized searches of UMC's facilities and the residences of certain employees of UMC and Jinhua. They also summoned certain employees of UMC and Jinhua for interviews with MJIB investigators and then separate interviews with Taiwanese prosecutors. Most of these were interviews of witnesses, but Kenny Wang (Wang Yangming) and J.T. Ho (He Jianting)[1] were

---

[1] Because the evidence referred to in this motion *in limine* uses the Chinese names for many of

interviewed as subjects.  None of the interviews were custodial.  All were proceeded by advisements, including advisements of rights including the right to stay silent and have an attorney present. Subsequent interviews occurred in 2018 and 2019 as the Taiwanese investigation into the theft and use of Micron Technology Inc.'s ("Micron") trade secrets and a related Taiwanese investigation into concealment of certain electronic devices by certain UMC employees continued.

At the beginning of the interviews, the law enforcement interviewer advised each witness or subject that the statements were being recorded and written records were being made of each interview, as further discussed below. The written records constituted transcription taken during the interview, given to the witness or subject for review and then for the witness/subject's signature and fingerprinting once the witness/subject concluded that the writing was accurate. In addition to the written record of investigation, the United States has received video files of the interviews, pursuant to the United States' requests made under the Mutual Legal Assistance Agreement ("MLAA") with Taiwan (the U.S.-Taiwan MLAA").[2] In addition, Taiwan provided certifications of authenticity of foreign public documents to accompany these.  The subject of this motion is the written record of investigation of each statement, as agreed to by signature by each witness/subject.

The general process that the MJIB followed to prepare the written record of investigation of each interview was as follows, and as an MJIB witness at trial will generally testify: (1) MJIB summonsed the witness; (2) upon appearing for the interview, each witness was notified that the interviewer would also record the interview; (3) during the interview, a written summary was prepared; (4) the interview concluded by asking if the statements made by the witness were true and all were answered in the affirmative; (5) MJIB provided each witness the written investigation record for review, and (6) each interviewee reviewed the written statement for accuracy and then signed and fingerprinted the document when satisfied there were no errors. Some interviews were also conducted by the prosecutors, who

_____

the individuals, this motion will introduce both Chinese and English names in many instances.

[2] The United States-Taiwan Agreement on Mutual Legal Assistance in Criminal Matters, Mar. 26, 2002, A. Inst. In Taiwan – Taipei Econ. & Cultural Representative Office in the U.S., *available at* https://www.ait.org.tw/wp-content/uploads/sites/269/2016/12/20020326-mutual-legal-asssitance-agreement.pdf.  Pursuant to the MLAA, the United States received certificates of authenticity of foreign public documents for the interview statements, which the United States expects to use together with testimony from relevant witnesses to establish the authenticity of the written investigation reports.

followed a similar format. The United States has translated each written interview record. Witnesses who had attorneys present were also given an opportunity for the attorney to review and sign the statement attesting to its accuracy.

The statements at issue concern various topics relevant to the proof in this case, including: (1) Stephen Chen's (Chen Chengkun) hiring of personnel to Jinhua while he was employed by UMC; (2) efforts to conceal electronic devices that stored Micron confidential information when Taiwan law enforcement executed a search warrant at UMC; and (3) monthly payments by Jinhua to J.T. Ho and Neil Lee (Li Fuzhe) beginning in mid-2016.  Chen's role is probative of Jinhua's liability in this case, the efforts by UMC and Jinhua employees to conceal incriminating evidence is key conspiracy evidence, and the payments are probative of Jinhua's liability in this case.

The United States will offer these statements for their truth. The statements are identified and further discussed below.

### B.    Depositions Taken During Civil Litigation

The United States seeks to admit excerpts of two depositions taken in *Micron Technology, Inc. v. United Microelectronics Corp., Fujian Jinhua Integrated Circuit Co., LTD., and Does 1-10*, Case No. 17-06932 MMC, and taken in July 2018. All but one of these statements is offered for the truth, as discussed below.

### 1.    Excerpts of Jennifer Wang's Deposition

Jennifer Wang was a UMC Human Resources Manager who traveled from Taiwan to Santa Clara in October 2016 to recruit engineers for Jinhua.  In her deposition, she explained that the recruitment was for positions at Jinhua, and that she traveled with Sandy Kuo (Kuo Peishan), Stephen Chen, and Albert Wu (Wu Kunrong), among others. For example, she was asked: "When the five UMC people went to the CASPA job fair, was that for the purpose of finding people to apply to UMC or Jinhua or both?" She answered, "only for Jinhua."  When asked, "why was UMC helping Jinhua fill DRAM engineer jobs at the CASPA job fair?" she replied, "I came there because Stephen Chen's instruction." *See* Exhibit A (Excerpts of Wang deposition).[3]

---

[3] The United States has attached excerpts of each interview or deposition and highlighted the

### 2.    Excerpts from Stephen Chen's Deposition

In his deposition taken in June 2018, Stephen Chen stated that at that time he worked for UMC and also was the President of Jinhua. The United States seeks to introduce an excerpt of his deposition in which Chen called the project between UMC and Jinhua a "joint development project," as well as his description of traveling to Silicon Valley to recruit for Jinhua. *See* Exhibit B (Excerpts of Chen deposition).

## II.    UMC and Jinhua Were Engaged in a Technology Cooperation Agreement to Develop and Produce DRAM Jointly

As alleged in the Indictment, UMC and Jinhua entered into a technology cooperation agreement "in which UMC would develop DRAM technology, transfer the technology to Jinhua, and Jinhua would mass produce DRAM." Indictment ¶ 20.  At UMC, this project was generally referred to as "Project M," and it began prior to UMC and Jinhua signing the Technology Cooperation Agreement ("TCA").  Trial evidence will establish that Stephen Chen began work on Project M with a small group of employees at UMC, including J.T. Ho and Neil Lee in December 2015, and that UMC and Jinhua negotiated the TCA for several months prior to signing it in May 2016.

### A.    The Technology Cooperation Agreement Between UMC and Jinhua

The TCA was a five-year contract was executed on May 13, 2016.  *See* Exhibit C (Excerpts of the TCA). The contract defined UMC as Party A and Jinhua as Party B. *Id.* at Preamble.  The stated purpose of the contract was for the parties to:

> both comprehensively provide the global resources which they respectively own and collaborate to engage in development of process technologies related to dynamic random-access memory (DRAM) with feature 32/32S nanometer. The site of the cooperative research and development is in a designated location in Fab 12A Plant of Tainan Science Park ("Tainan research and Development Base", which is owned by Party A. Once Party B's production lines are completed, the technological achievements from the cooperative research and development by the two parties shall be transferred to party B in their entirety, enabling the operation site located in Jinjiang city to achieve mass production, and Party B shall carry on subsequent research and development work on the basis of existing technology.

statements that it seeks to admit within each exhibit.

*Id.*[4]  Accordingly, the agreement between UMC and Jinhua was that the parties would cooperatively conduct the DRAM research and development in Taiwan and transfer the jointly developed technology to Jinhua upon completion of the production lines in China. The contract included an "Estimated Schedule for Technological Development," (Annex 1), which further specified milestones by quarter for the development of the DRAM technology at issue through the fourth quarter of 2020.  In addition, the "Payment Schedule for 32 Nanometer Technology Research and Development Funding" (Annex 1), and the "Payment Schedule for 32S Nanometer Technology Research and Development" (Annex 2), specify UMC's obligations in key quarters and payments by Jinhua.

Specific terms of the TCA further enumerate the UMC's and Jinhua's intention to develop jointly DRAM for the five-year period in various ways, including: joint ownership of intellectual property rights, including trade secrets (Provision 1.2); selection of a design services company to complete the design of the DRAM (Provision 2.2); joint ownership of research and development equipment (Provision 2.4); continued support from UMC to Jinhua on the technology yield (Provision 2.7); UMC provision of Jinhua with all technical documents related to the "joint development of technologies and/or the intellectual property rights" and the manpower for manufacturing DRAM (Provision 3.1); and, protection of confidential information and confidentiality obligations (Provision 3.2).

As illustrative of the joint nature of the TCA for the duration of the five-year term, Article 2.4, which concerns the joint ownership of technology rights, reads in part:

> [T]he joint development technologies under the Agreement which are developed or generated due to the provision of technical services by Party A to Party B under this article shall be jointly owned by both parties, and both parties also have the right to use….

*Id.* at Article 2.4.  Article 3 of the Agreement concerns the Technological Information Disclosure and Confidentiality Obligations, and reads in part:

> Once the Agreement is signed, Party A shall provide Party B with technical documents, parameters and data, etc., related to the joint development of technologies and/or the intellectual property rights under the Agreement

---

[4] Although the Technology Cooperation Agreement refers to development of 32 nanometer DRAM, UMC never developed that technology.  Instead, UMC developed a slightly more advanced 25 nanometer DRAM, and that is the technology that it first developed for production by Jinhua in China. Internally, UMC and Jinhua referred to the 25 nanometer technology being developed was referred to initially as "F32" to correspond to the 25 nanometer technology.

UNITED STATES' MOT. IN LIMINE NO.1
MOT. ADMIT STATEMENTS OF AGENTS
18-CR-00465 MMC                    5

1
2

> according to the schedule agreed upon by both parties, and also provide
> Party B with all necessary technical consulting and professional manpower
> required for manufacturing the dynamic memory DRAM wafer products.

3   *Id.* at Article 3.1. The contract also specified:

4
5
6
7
8

> Within the range that the number of personnel and service period provided
> by Party A for 32 nanometer and 32S nanometer are no more than 60
> individuals month in total…the specific number of personnel and period
> shall be determined by Party A), Party A will send personnel to Party B's
> location to fulfill the obligations under the Agreement. And, the
> expenditures related to salaries, travel expenses, raises, board and lodging,
> and transportation, etc., shall all be borne by Party A. The portion in excess
> shall be borne by Party B, which should be reimbursed for one's actual
> expenses, such as accommodation and transportation expenses, etc.

9   *Id.* at Provision 4.3.

10   **B.      The Structure of the UMC-Jinhua Relationship**

11   The TCA specifies that UMC personnel will provide "technical consulting and professional

12   manpower." As a practical matter, UMC spearheaded work in both areas for Jinhua, and the trial

13   evidence will establish this fact in the ways discussed below.

14   **1.      Relevant Background about UMC in 2015**

15   At UMC, the New Business Development Unit ("NBD"), was responsible for the execution of the

16   TCA. Formed prior to the execution of the TCA, UMC established a small office in late 2015 comprised

17   of Stephen Chen, J.T. Ho and Neil Lee, and later expanded that as the NBD. By the time the TCA was

18   executed in May 2016, the NBD had grown in size and ultimately went through restructuring to divide it

19   into multiple units, all run by Stephen Chen, who held the title of Senior Vice President. The purpose of

20   the NBD was to develop DRAM, a technology that UMC had not produced for more than a decade and

21   did not own. Rather, UMC manufactured semiconductor logic products. Trial testimony will explain that

22   logic and DRAM are two distinct technologies, and that the DRAM industry in 2015 was comprised of a

23   small number of companies – UMC was not one of them – that had either spent decades and large

24   amounts of capital developing the technology or had obtained the technology through acquisitions and/or

25   licensing.

26   **2.      Defendant Stephen Chen's Dual Roles**

27   Evidence at trial will establish that Stephen Chen started at UMC in September 2015, having left

28

Micron's Taiwanese entity Micron Memory Taiwan ("MMT") just prior, and he quickly took over UMC's efforts to enter the DRAM market by finding a China-based partner.  At UMC, Chen ran the NBD, and stayed in that role after execution of the TCA and until UMC released him from his role so that he could take over as the President of Jinhua.

Chen was instrumental in the establishment of Jinhua from the beginning. For example, in December 2015, he wrote to his former colleague, Albert Wu (Wu Kunrong), that he needed Wu's help setting up a business together.  Subsequently, Jinhua hired Wu was hired as an executive, and Chen and Wu worked closely on the DRAM project together going forward.

Documents obtained through UMC's cooperation and from Stephen Chen's UMC email account show that he received and attended Jinhua board meetings as early as March 2016 and routinely received updates on all aspects of Jinhua's business, including manager updates, Board updates, and other correspondence.

As discussed below, throughout 2016 and prior to his formally taking on the role of President of Jinhua, Stephen Chen – while employed by UMC – directly hired Jinhua employees.  As demonstrated by certain of the statements at issue in this motion, he and his UMC Project Manager, Sandy Kuo, often were the only individuals who interviewed future Jinhua employees.  The documents also show that in addition to hiring employees for Jinhua, Chen ensured that key UMC engineers received additional payment from Jinhua for the engineers' work pursuant to the TCA.

Critically, Stephen Chen was often the outward face of efforts to build the Chinese semiconductor facility (sometimes called a "fab") to vendors.  In late 2016 and early 2017, using his UMC company email address, Stephen Chen corresponded with a company to solicit bids for the gases needed in China at Jinhua's semiconductor facility in Jinjiang, China. Similarly, when Stephen Chen traveled to Silicon Valley to meet with equipment vendors for the purpose of purchasing equipment that would ultimately be used in the Jinjiang, China fab, Chen held out himself out as the point of contact for the project. Documents and testimony will show that he made the presentations to vendors on behalf of Jinhua, notwithstanding that Albert Wu, a Jinhua executive, was present at the events. At trial, the United States will introduce a UMC document from February 2016 explaining that UMC had signed an agreement with

Jinjiang City government to build a DRAM company owned by Fujian Province and that Stephen Chen would become the CEO, which manifests an early plan for UMC and Jinhua to be linked closely through Chen.  In early 2017, an executive from a gas supply company that had just been awarded a contract for Jinhua's fab wrote to Stephen Chen at Chen's UMC email address, and thanked Chen for selecting the company as Jinhua's supplier in China.

By 2017, Chen was fully immersed at Jinhua, having taken the title of President. In short, the evidence will show that Stephen Chen was at the heart of building and running Jinhua, whether he was doing that wearing his UMC hat or his Jinhua hat or both. It will further show, as described below, that UMC employees working with Chen were instrumental in the operations of Jinhua.

### 3.	UMC and Jinhua Jointly Recruited for the TCA

Trial evidence will show that between signing the TCA and 2018, UMC employees spearheaded the recruiting of professional manpower and technical consulting personnel for both companies. Specifically, evidence will show that Stephen Chen and Sandy Kuo, while working for UMC, hired personnel for Jinhua. The documents will show that the general framework was for Chen and Kuo to interview candidates, including those being hired by Jinhua.

A key example of the joint recruiting effort occurred in Santa Clara, California, in the Northern District of California, in October 2016.  *See* Indictment ¶ 31.  Stephen Chen, together with Sandy Kuo, brought a delegation of Jinhua employees, including Albert Wu, the Vice General Manager of Jinhua, and Chinese government officials to the Northern District of California to recruit Jinhua employees as well as to meet with Silicon Valley-based vendor companies necessary to developing Jinhua's semiconductor fab. Evidence will show that the coordination of this event occurred primarily through Sandy Kuo.  For example, the organizers at Chinese American Semiconductor Professional Association ("CASPA") coordinated an October 2016 UMC and Jinhua event through Sandy Kuo and wrote to confirm her address at Jinhua's office in China. The emails show that Kuo coordinated the corporate sponsorship and payment of Jinhua at the event. Testimony and documents will show that at the CASPA recruiting event, UMC employees like Stephen Chen and Sandy Kuo handed out UMC business cards alongside the Jinhua employees and recruited for the joint project. The positions for which Chen and Kuo

were soliciting hires were at Jinhua. After the event, Kuo received applications for Jinhua and emailed both UMC and Jinhua senior employees those candidates. In her email, she called the event a "Jinhua" promotion event.

The joint recruiting is further evidenced by documents flowing back and forth between UMC and Jinhua employees regarding status updates. For example, on November 27, 2016, Hero Lo, a Jinhua employee emailed Albert Wu at a Jinhua email address, as well as Stephen Chen and Sandy Kuo at their UMC email addresses, with a "weekly status update" concerning recruiting. Hero Lo's statements are at issue in this motion and discussed further below.

The statements of Jinhua employees at issue in this motion corroborate the documentary evidence that Chen and his team were integral to the operations at Jinhua and the hiring of both technical and operational employees.  In an interview with the Taiwan prosecutor in January, Chen Shiyan, a Jinhua engineering employee, explained that in August 2016, he was working at Micron in Taiwan, and wanted to look for a job. He contacted Sandy Kuo and interviewed with her and Stephen Chen and was hired by Jinhua.  The prosecutors asked: "Before you went to take the position at Jinhua Co., apart from Chen Chengkun were you acquainted with other employees at Jinhua Co.?"  Shiyan answered: "I was only acquainted with Chen Chengkun and Kuo Peishan." Exhibit D (Chen Shiyan interview).  Another former Micron employee based in Taiwan and subsequently hired by Stephen Chen into a job at Jinhua in the Manufacturing Department in November 2016 explained similarly in his interview with a Taiwan prosecutor, and said that at the time he was hired at Jinhua, he had only met with Stephen Chen and Sandy Kuo.  See Exhibit E (Hero Lo interview); *see also* Exhibit F at (Xiao Xinhuang interview, explaining that Chen hired him into his role in information technology at Jinhua, and there were no other interviews); Exhibit G (Que Liangwu interview explaining that Chen hired him as a financial officer for Jinhua in 2018, at which point Chen was a Deputy General Manager for UMC and General Manager for Jinhua); Exhibit H (You Zhenfu interview explaining that he wrote to Chen in October 2016 for a position at Jinhua, and further discussing the Labor Contract with J.T. Ho and attached to his interview); Exhibit I (Wu Kunrong explaining that Chen hired him to the job at Jinhua in 2016).

1

### 4.     Consultant Employment Contracts

Certain UMC employees working on the TCA were offered "consultant employment contracts" with Jinhua as the employer, in which Jinhua paid the UMC employee as a technology consultant, while the individual remained employed by UMC. Key members of the technology development team, including J.T Ho and Neil Lee, had such contracts. The evidence at trial will show that UMC and Jinhua jointly developed the concept of providing contracts and payments by Jinhua for work at UMC in order to retain engineers working on the TCA.  In his interview on February 14, 2017, J.T Ho explained that his contract with Jinhua was for a term of five years with monthly payments to his bank account in China. He further stated:

> the reason behind signing this contract was because Chen Zhengkun wanted to attract external hires with a better compensation package, to recruit people from other DRAM companies to work on UMC's memory project. And so Chen was able to secure this development bonuses from JHICC. Then he designated a few employees who he believed to be superior performers and deserve the incentive. My understanding was that along with myself, Li Fuzhe [Neil Lee] and Guo Fengming opened accounts at Xiamen Bank after signing the contract with JHICC in order to draw the bonus money. Our entering into a contract with JHICC signified that we would be precluded from receiving bonuses, quarterly awards, and an additional signing bonus from UMC.

Exhibit J (J.T. Ho February 14, 2017 interview). In his interview, Li Fuzhe (Neil Lee) explained the process similarly. He explained that he opened a bank account in China and received payments from Jinhua for his work.  *See* Exhibit L (excerpts of Neil Lee interview report).

Through UMC's Cooperation, the United States has obtained and will introduce at trial an email sent to Sandy Kuo on June 13, 2017 from a Jinhua employee attached the "employment contracts" of Kuo Fengming (also known as Guo Fengming and Ray Guo), J.T. Ho, and Neil Lee. *See* Exhibit M (cover email to contracts).

### 5.     UMC Employees Worked Closely on Implementing the TCA for Jinhua

The nature of the work on the TCA was integrated such that Jinhua employees relied on UMC for critical information and functions, including development of the business plan. One UMC executive provided all of the updates in Jinhua's March 2016 Board of Directors meetings, on topics including: (1) Review of Jinhua Company's Organization Structure During Development Phase; (2) Discussion on

Jinhua Company Development and R&D Team Formation; (3) Discuss Jinhua Company's Compensation Proposal during the Construction Period; and (4) Review of Jinhua Company's 2016 Fab Development Plan.

In June 2016, Sandy Kuo, the Project Manager who worked closely with Stephen Chen, received a request from Jinhua to provide "the following information of Jinhua: 1. Company Organization Chart…2 A summary of the Relevant DRAM Project (Scale of operation, Products line-up and Potential Clients List)…3. Whole JV's Business Plan." *See* Exhibit N. According to the email, a bank needed the requested information. This document is notable for at least two reasons: first, here a Jinhua employee refers to the project as a "JV," and second, a Jinhua employee sought information from UMC about Jinhua. Evidence at trial will further bear out that UMC's NBD developed this type of information for Jinhua. Sandy Kuo, in November 2016, emailed Jinhua a UMC PowerPoint update on the DRAM development project to Jinhua so that Jinhua could provide it to the local government in China.

### 6.    Joint Ownership of Patents and Joint Contracting

Consistent with the joint ownership of intellectual property rights specified in the TCA, UMC and Jinhua jointly filed patents on DRAM technology and products.

Consistent with Provision 2.2, Jinhua and UMC jointly contracted for chip design services from Ultra Memory Inc. ("UMI"). The face of that contract reads: "F32nm Design services agreement among Ultra Memory Inc., United Microelectronics Corporation and Fujian Jinhua Integrated Circuit Co., Ltd."

## ARGUMENT

### I.    Federal Rule of Evidence 801(d)(2)(D) Provides for the Admission of Statements by Agents Against Their Principal

As relevant to this motion, Federal Rule of Evidence 801 provides that opposing party's statements are not hearsay when offered against the opposing party.  The relevant provision for the purpose of this motion is Fed. R. Evid. 801(d)(2)(D), which provides that "statements offered against an opposing party and made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay.

Preliminary questions of fact with regard to agency are must be established by a preponderance of

the evidence under Federal Rule 104(a).  *See Bourjaily v. U.S.*, 483 U.S. 171, 175-76 (1987). "The statement must be considered but does not by itself establish the declarant's authority under (C); the existence of scope of the relationship under (D); or the existence of the conspiracy or participation under (E)."  Fed. R. Evid. 801(d)(2); *see also* Advisory Committee Note to 1997 amendment ("the amendment extends the reasoning of *Bourjaily* to statements offered under subdivisions (C) and (D) of Rule 801(d)(2)… The Advisory Committee believes it appropriate to treat analogously preliminary questions relating to the declarant's authority under subdivision (C), and the agency or employment relation and scope thereof under subdivision (D).").

The test is a "fact-based inquiry applying common law principles of agency."  *United States v. Bonds*, 608, F.3d 495, 504 (9th Cir. 2010) *quoting NLRB v. Friendly Cab Co., Inc.,* 512 F.3d 1090, 1096 (9th Cir. 2008).  Under the Third Restatement of Agency, agency is defined as "the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Section 1.01 Agency Defined.  "Agency encompasses a wide and diverse range of relationships and circumstances. The elements of common-law agency are present in the relationships between employer and employee, corporation and officer, client and lawyer and partnership and general partner." Comment to Section 1.01. In assessing whether a person is an employee or independent contractor, the Restatement holds out a ten factor test:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e ) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; (j) whether the principal is or is not in business.

Restatement 2d, Section 220 (Definition of Servant).

1

## II.   The Statements of Jinhua Employees Are Admissible Against Jinhua

2       The United States seeks to admit the statements that five Jinhua employees made to Taiwanese

3    law enforcement in interviews: Que Linagwu, Chen Shiyan, Hero Lo, Xiao Zinhuang, and You Zhenfu

4    These five employees worked solely for Jinhua at the time they made their statements.  Further, the

5    statements are within the scope of the employment, as all of the statements concern these individuals'

6    hiring at Jinhua and basic information about each individual's job responsibilities and the company. *See*

7    Exhibit D-I.  Because the statements were made by the employees during the course of their employment

8    by Jinhua and about their hiring and job functions at Jinhua, they fall within the text of the rule and

9    should be admitted.  *See United States v. Kirk,* 844 F.2d 660, 661 (9th Cir. 2008) (statements of company

10   salespeople admissible against the founder of company as nonhearsay statements under Rule

11   801(d)(2)(D)); *United States v. Gibson,* 690 F.2d 697, 699 (9th Cir. 1982) (testimony of investors

12   regarding statements made by company employees not hearsay, or if so, are nonhearsay under Rule

13   801(d)(2)(D) when offered against founder of company).  Accordingly, the United States seeks the

14   admission of interview statements of Jinhua employees about their employment at Jinhua.

15   ## III.   The Statements of Joint UMC and Jinhua Employees Are Admissible Against Jinhua

16       This category of statements comprises (1) the deposition statements of Stephen Chen and the

17   Taiwanese law enforcement interview statements of (2) J.T. Ho, (3) Neil Lee, and (4) Ray Guo.

18   ### A.   Stephen Chen's (Chen Chengkun) Deposition

19       Stephen Chen's deposition testimony was taken while he was employed by Jinhua, and so

20   satisfies the requirement that he be an agent of Jinhua. The statement that the United States seeks to

21   admit are statements within the scope of his agency, because concerns the TCA, or, as Stephen Chen

22   calls it in his deposition testimony, the "joint development project."  *See* Exhibit B at 52.  Other

23   statements concern the Jinhua recruiting fair in Silicon Valley and Chen's acknowledgment that the

24   recruiting was for Jinhua.  *Id.* at 77-78.

25       Jinhua expressly authorized Stephen Chen to be its agent when it appointed him President of

26   Jinhua.  However, prior to his formal installation as President, Stephen Chen was also an authorized

27   agent for Jinhua, as the facts in this motion establish. He hired for Jinhua and entered into business

28

1 contracts for Jinhua at the time of the recruiting fair, and so his statements about it should be admitted.

2 Admission of civil deposition testimony of an agent against a co-defendant is proper, so long as the

3 statements satisfy the Rule. *See United States v. Saks*, 964 F.2d 1514, 1525 (5th Cir. 1992) (admitting

4 civil deposition testimony of one partner in criminal trial of other partner). Here, Stephen Chen's

5 statements while an agent of Jinhua and concerning the TCA are admissible at trial against Jinhua.

6     **B.**     **J.T. Ho's (He Jianting) Interviews**

7     The United States seeks to admit certain statements made in J.T. Ho's interviews with MJIB and

8 Taiwanese prosecutors. *See* Exhibit J (February 14 interview); Exhibit K (February 15 interview). The

9 February 14 statement was an interview with MJIB investigators. At that interview, J.T. Ho was advised

10 of his right to counsel and to remain silent. Exhibit J at 20. He had counsel present. At the end of the

11 interview, he signed and fingerprinted the written summary and said that he had reviewed it and that the

12 document was accurate. Then, during his interview with Taiwanese prosecutors on February 15, 2017,

13 the prosecutors asked Ho regarding his testimony the day prior with the investigators: "did you

14 thoroughly review and signed the transcript?" Ho confirmed that he had. Exhibit K at 3. At the end of the

15 interview with the prosecutors, both Ho and his attorney reviewed and signed the second interview

16 transcript. Exhibit K at 13.

17     J.T. Ho was an employee of Jinhua at the time of both interviews. During the February 14

18 interview, J.T. Ho was asked to review his Labor Contract with Jinhua, and he said that he signed it in

19 October or November 2016.[5] In his February 15 interview, Ho said he signed the contract in October

20 2016 and that he started receiving bonuses in July 2016. The contract itself is dated July 2016.

21     At the time J.T. Ho made those statements, he was an agent of Jinhua pursuant to the Labor

22 Contract signed by both parties for a duration of five years. *See* Exhibit H at Provision 1.1 p. 19;[6] *see*

23 *also* Exhibit M. The United States received J.T. Ho's employment contract, which Taiwan law

24 enforcement seized from his residence and showed to You Zhenfu, a Jinhua Human Resources executive,

---

25     [5] The term of the contract began July 1, 2016. *See* Exhibit H at 19 Provision1.1 (Labor Contract)

26     [6] Unlike other contracts between Jinhua and its employees, which the United States does not have, United States obtained this contract through MLAA. MJIB seized the Labor Contract upon execution of the search warrant in Taiwan. MJIB then showed the contract to You Zhengu (Jeff Yu) during an interview and attached the Labor Contract to the interview report.

during his interview. *See* Exhibit H at page 11.  The contract expressly hired J.T. Ho to "serve in the position of Director of Technological Research and Development, to engage in the work of Internal Memory Process and Technology Research and Development." This is an express manifestation of establishing a principal-agent relationship through an employee contract in which J.T. Ho had a specific title and position for Jinhua. The contract set the place of work to be Tainan, Taiwan, at UMC. *Id.* Here, the contract reads:

> Party A is aware and agrees that, at the time of signing this contract and during the term of the contract, Party B can simultaneously hold a position and receiving a salary from Taiwan United Microelectronics Corporation; however, Party B's employment at the above organization shall not influence Party B's completion of work tasks for Party A. Party B guarantees that the above organization is already aware and agrees that Party B shall hold a position with Party A…

Exhibit H at 11.1. The parties expressly contracted for J.T. Ho to be a Jinhua employee while also employed by UMC.

Other terms of the contract further establish that J.T. Ho was Jinhua's contractual employee, including: (1) agreement of both parties that J.T. Ho could be an employee of UMC and receive a salary from UMC while completing work for Jinhua; (2) J.T. Ho's agreement follow Jinhua internal rules, including employee handbook; (3) provision concerning leave and vacation including holidays; (4)  J.T. Ho's obligation to keep information of Jinhua confidential; (5) ownership by Jinhua of intellectual property of J.T. Ho; (6) provisions regarding dissolution and amendment; and (7) monthly payment of wages on the tenth of each month; (8) additional payment of bonus. *See* Exhibit H at p 12-19.

The contract and J.T. Ho's statements establish that Jinhua had sufficient control over J.T. Ho to make him an agent of Jinhua. *See Friendly Cab,* 512 F.3d at 1096 (control by the employer is the essential ingredient; *compare United States v. Bonds*, 608 F.2d 496, 505-06 (9th Cir. 2010) (finding no control where individual used his own equipment and was not paid pursuant to a contract).  Jinhua has already, through expert notice, indicated that it disputes that J.T. Ho is an employee of Jinhua, suggesting that he is at best a consultant. Whether J.T. Ho is a consultant or an employee is irrelevant for the purposes of the analysis of this motion because he is plainly an agent. *See Dearborn v. Mar Ship Operations*, *Inc.*, 113 F.3d 995, 998 n.3 (9th Cir. 1007) (recognizing that an independent contractor may

1   be an agent when subject to principal's direction and control). J.T. Ho was employed to work for Jinhua,

2   paid a salary to do so, expected to abide by company policies, and received other benefits.

3   　　　The statements at issue concern the scope of his employment while J.T. Ho was an employee of

4   both UMC and Jinhua.  The first category of statements is those statements concerning his employment

5   with Jinhua, specifically J.T. Ho's statements about his payments by Jinhua into a bank account in China

6   for his work.  These statements are highly probative of J.T. Ho's relationship to Jinhua, which is a core

7   issue in dispute in this case. Because J.T. Ho was an agent of Jinhua and speaking about that agency such

8   that the statements are within the scope of it, the Court should admit these statements under Rule

9   803(d)(2)(D).

10   　　　The second category of statements at issue in J.T. Ho's February 14 (Exhibit J) and February 15,

11   2017 (Exhibit K) interviews concerns J.T. Ho's conduct when law enforcement searched UMC's Tainan,

12   Taiwan campus, where J.T. Ho was stationed as an employee both of UMC and Jinhua.  The statements

13   demonstrate that J.T. Ho sought to conceal electronic devices by handing them to a UMC coworker (who

14   later provided these devices to Taiwanese law enforcement).  These devices show J.T. Ho's accessing of

15   Micron trade secrets, and his statements acknowledging that he had the devices and tried to conceal them

16   upon learning of Taiwanese law enforcement's search serve both to establish the custody of the devices

17   and also J.T. Ho's state of mind.  These statements should be admitted against Jinhua because they were

18   made by an employee of Jinhua about conduct concerning his work for Jinhua and UMC.

19   　　**C.**　　**Neil Lee's (Li Fuzhe) Interview**

20   　　　The statements that Neil Lee made to Taiwanese prosecutors in 2017, see Exhibit L, were made

21   while he was receiving monthly payments from Jinhua, as established by his statement and also by J.T.'s

22   statement on February 14, 2017 that he traveled with Neil Lee and Ray Guo (Guo Fengming) to China to

23   open accounts together for deposits from Jinhua. *See* Exhibit J.  Neil Lee stated that he went to China to

24   open an account into which Jinhua paid his "salary."  Exhibit L at 6.  Further, on July 1, 2017, Sandy

25   Kuo received an email from Jinhua attaching a scanned copy of Neil Lee's employment contract, together

26   with J.T. Ho's and Guo Fengming's. *See* Exhibit M.  Together, J.T. Ho's and Neil Lee's statements

27   regarding payments from Jinhua and the receipt of a contract from Jinhua by Sandy Kuo titled "Li Fuzhe

28

employment contract" are strong evidence that Neil Lee was an employee of Jinhua and that his statement about being paid by Jinhua should be admitted under Rule 801(d)(2)(D).

### D.    Ray Guo's (Guo Fengming) Interview

Like J.T. Ho and Neil Lee, Ray Guo was a UMC engineer who signed an employment contract with Jinhua. The evidence of this employment is: (1) a draft employment contract provided by UMC from Sandy Kuo's UMC email files; and (2) J.T. Ho's interview statements that he traveled with Neil Lee and Ray Guo to China to open an account at Xiamen bank so that Jinhua could deposit their respective salaries into the accounts.

The statements at issue are set out at Exhibit O and concern the attempt to conceal electronic devices from Taiwan law enforcement in February 2017, when Ray Guo was drawing a paycheck from both UMC and Jinhua for his development of DRAM. Specifically, the investigator played the recordings at issue in the United States' motion *in limine* No. 2, filed concurrently with this motion. During the interview and while listening to the recordings, Ray Guo provided background and context to the recordings, and the United States seeks admission of those statements pursuant to Rule 801(d)(2)(D).

### IV.   The Statements of UMC Employees Working on the TCA Managed by Stephen Chen Should Be Admissible with Proper Agency Foundation

The statements of UMC employees working under Stephen Chen should be attributable to Jinhua for the purposes of admission of the statements under Rule 801(d)(2)(D) because all of these employees reported to Stephen Chen at UMC, who wore dual hats with Jinhua. Accordingly, Jinhua had control over these employees through Stephen Chen, notwithstanding no direct employment contracts with the employees. Recognizing the Court may benefit from the evidence at trial on the fact intensive inquiry on this category of statements, the United States intends to lay a foundation at trial that certain UMC employees were agents of Jinhua such that their Taiwan interviews concerning their work under the TCA should be admitted at trial, and to seek a ruling after laying necessary foundation through evidence presented at trial. The witness statements will be disclosed on the United States' exhibit list, to be filed on December 3, 2021.

However, as to the statements of Jennifer Wang made in her deposition testimony concerning the October 2016 CASPA event, the Court should admit those based on the facts presented in this motion.

Jennifer Wang, a UMC employee, stated in her deposition that the CASPA event was to hire for Jinhua, and not UMC. She traveled from Taiwan to Silicon Valley at Stephen Chen's direction.  *See* Exhibit A at 32:18-21).  This statement demonstrates that Jennifer Wang was in fact an agent of Jinhua because she was directed by Stephen Chen and the statements concern that work.  It should be admitted at trial.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the motion to admit: *first,* the statements of Jinhua employees Que Linagwu, Chen Shiyan, Hero Lo, Wu Kunrong, Xiao Zinhuang, and You Zhenfu in their Taiwan interviews and as set out in the Exhibits D-I attached to this motion pursuant to Rule 801(d)(2)(D); *second,* the statements of Stephen Chen (Exhibit B), Neil Lee (Exhibit L) and J.T. Ho (Exhibits J and K) and Ray Guo (Exhibit O) pursuant to Rule 801(d)(2)(D); and *third*, the deposition testimony of Jennifer Wang set out in Exhibit A pursuant to under Rule 801(d)(2)(D).

Further, the United States respectfully requests that the Court permit the United States to lay a foundation for the agency relationship at trial for the statements of certain UMC employees and then to ask permission at trial to offer statements within the scope of that agency as made to Taiwan law enforcement.

Dated: December 1, 2021                               Respectfully Submitted,

                                                                       STEPHANIE M. HINDS
                                                                       Acting United States Attorney

                                                                        */s/ Laura Vartain Horn*
                                                                       LAURA VARTAIN HORN
                                                                       NICHOLAS WALSH
                                                                       Assistant United States Attorneys

                                                                       NICHOLAS O. HUNTER
                                                                       STEPHEN MARZEN
                                                                       Trial Attorneys, National Security Division