# EXHIBIT H

“”’D-0000960

Interrogation Record

Interrogation under 2018 United States Assistance Trade Secrets Case No. 1, at 10:13 AM on January 29, 2019, in Investigation Room No. 15, Taiwan Taichung District Prosecutors Office, personnel in attendance as follows:
Prosecutor: CHEN Liwei Clerk: CHEN Yiching
Those present as follows: Defense Counsel: Attorney present
Roll Call: Present
Prosecutor requested the name, age, address, and National Identification Number
Witness response:

YOU Zhenfu Male 52 years of age
National Identification Number: No.
Established Registration:
Contact Telephone Number:

Prosecutor stated the obligations of an affidavit and the penalty for perjury.
Prosecutor advised as to the provisions of Article 180, Section 1, and Article 181 of the Code of Criminal Procedure.
Article 180, Section 1, of the Code of Criminal Procedure stipulates that: “A witness may refuse to testify under one of the following circumstances: (1) Currently or formerly being the spouse, lineal blood relative, collateral blood relative within the third degree of kinship, relative by marriage within the second degree of kinship, head of household, or dependent of the defendant or private prosecutor. (2) Being betrothed to the defendant or private prosecutor. (3) Currently or formerly being the statutory agent of the defendant or private prosecutor, or where the defendant or private prosecutor currently or formerly served as one’s statutory agent.”
Article 181 of the Code of Criminal Procedure stipulates that: “The witness may refuse to testify if the testimony may subject himself or a person having a relationship to him as in Section 1 of the preceding article to criminal prosecution or punishment.”
Question: Your educational background?
Answer: Institute of Human Resources at Central University.
Question: Where do you currently work? How long have you worked there?
Answer: I currently work at Fujian Jinhua Integrated Circuit Co., Ltd. (referred to below as Jinhua Co.), I started working in late March 2017 under the Western calendar, and I am the Director of the Human Resources Division at Jinhua Co.

[2018 United States Assistance_000001_1080129101341]
Taiwan Taichung District Prosecutors Office

Question: Explain who your direct superior is for the Division of Human Resources at Jinhua Co?

Answer: My direct superior is President CHEN Chengkun, and above the President, the Board Chair is a person of Mainland nationality, LU Wensheng.

Question: Your previous company before taking the position at Jinhua Co.?

Answer: United Microelectronics Corporation, I started in a position at Microelectronics Corporation in February 1999, and in March 2017 under the Western calendar, I resigned from United Microelectronics Corporation; the reason was that I switched to a position at Jinhua Co., because I knew there was an opportunity at Jinhua Co., I actively made contact, and went to Jinhua Co. of my own accord.

Question: Before you went to take the position at Jinhua Co., did you receive an interview?

Answer: In October 2016, I wrote a letter to Mr. CHEN Chengkun, inquiring of him whether there could be an opportunity to take a position at Jinhua Co.; at the time, CHEN Chengkun was the Senior Vice President at United Microelectronics Corporation; later, in January 2017, I received an interview at the temporary offices of Jinhua Co. in Jinjiang City, Fujian Province, and at that time, it was an interview with the then-Board Chair of Jinhua Co. (that is, SHAO Yulong, a person of Mainland nationality). As to whether there were other people present during the interview at that time, I don't remember, but I remember that CHEN Chengkun also sat in.

Question: During the interview, was your salary at Jinhua Co. discussed?

Answer: The salary was not discussed at that time, it was only later that an OFFER was sent for me to see.

Question: United Microelectronics Corporation and Jinhua Co. held a talent recruitment activity in Santa Clara, California, in the United States, in February 2016 under the Western calendar, do you know of this matter?

Answer: I know.

Question: Who was responsible for this talent recruitment activity?

Answer: I'm not sure about the specific responsible personnel, at the time I was still holding the position at United Microelectronics Corporation, serving as Head of the Human Resources Division; I was present at the recruitment activity, at the time, because Jinhua Co. did not have dedicated HR (that is, Human Resources) personnel, personnel at United Microelectronics Corporation were therefore asked to assist by going to gather resumes, at the time, the procedure was that Jinhua Co. held a briefing in the afternoon, to introduce Jinhua Co.; at the briefing, there was a talk of approximately half an hour, and some people stayed behind to continue making inquiries, while some people submitted resumes on the spot to apply for jobs at Jinhua Co.

Question: At the time, which person at United Microelectronics Corporation instructed you to go to Santa Clara, California, in the United States to assist at the aforementioned recruitment activity?

Answer: It was KUO Peishan, CHEN Chengkun's Executive Assistant, who inquired whether or not I could provide support.

Question: What talents were [they] hoping to find at the above-mentioned recruitment activity?

Answer: I'm not very clear now on the detailed contents, because it wasn't I who published the job vacancies at Jinhua Co., I just went to assist.

Question: The above-mentioned talent recruitment activity, was it held because United Microelectronics Corporation and Jinhua Co. were thereafter going to engage in DRAM technology cooperation?

Answer: This talent recruitment was initiated by Jinhua Co., I'm not very clear on its objective.

Question: How many people did United Microelectronics Corporation send to participate in the recruitment activity in Santa Clara, California?

Answer: I need to explain that this activity was not like the talent recruitment I'm familiar with, it was meant to just purely be gathering resumes on the scene from those with a mind to go take a position at Jinhua Co., the people from United Microelectronics Corporation who were present included Senior Vice President CHEN Chengkun, as well as the assistants to the Vice President, KUO Peishan and WANG Junfen (she was my subordinate in the Human Resources Department at United Microelectronics Corporation at the time), and Jinhua Co. sent Vice President WU Kunrong as well as Vice President XU Zheng (a person of Mainland nationality) to attend.

Struck 1 character

[Stamp: CHEN Yiching] [Illegible] 1 character

Question: ~~Have~~ >Where are the headquarters of Jinhua Co. established?

Answer: No. 88 Lianhua Avenue, Integrated Circuit Science Park, Jinjiang City, Fujian Province.

Question: Do you know who contributed capital to Jinhua Co.?

Answer: I'm not very clear, I had looked it up online, it was the Jinjiang Municipal Government, the Quanzhou Municipal Government, as well as Fujian Electronics and Information Group.

Question: What is the management organization at Jinhua Co.?

Answer: This company has installed one board chair, and several directors; below the Board of Directors, it has installed one president, an office held by CHEN Chengkun; below the president, it has installed 4 vice presidents, and below the vice presidents there are "divisions," which are Level 1 units; below the divisions, there are "departments," which are Level 2 units.

Question: What type of products is Jinhua Co. currently producing.

Answer: There should not be any products at present.

Question: What business is Jinhua Co. currently doing?

Answer: Because the United States implemented an embargo, after that, it is currently in a shutdown, but the supervisors would still require that employees attend class.

Question: Does Jinhua Co. have DRAM research, development and technology [?]

Answer: I'm not very clear.

Question: Do you know of the F32 Nanometer Design Services Agreement signed by United Microelectronics Corporation, UMI of Japan, and Jinhua Co.?

Answer: I'm not very clear on this.

Question: What do you know about the technology contract agreement between United Microelectronics Corporation and Jinhua Co.?

Answer: I've read about this agreement in the newspaper, but I did not participate, and certainly don't know the contents.

Question: What do you know about Jinhua Co.'s background in DRAM research and development?

Answer: I'm not really sure.

~~Question: Do you know very~~

Question: Which people at United Microelectronics Corporation were responsible for executing the technology contract agreement between United Microelectronics Corporation and Jinhua Co.?  Which people at United Microelectronics Corporation were responsible for liaising?

Answer: I did not participate in this area, I'm not sure.

Question: Do you know if the DRAM technology developed by United Microelectronics Corporation on behalf of Jinhua Co. has already been transferred to Jinhua Co.?

Answer: I'm also not sure about this matter.

Question: Do you know if Jinhua Co. must pay technology transfer fees to United Microelectronics Corporation under the technological cooperation provisions signed by United Microelectronics Corporation and Jinhua Co.?

Answer: I did not participate in this area, I'm not at all clear on the detailed contents.

Question: Do you know if there were personnel holding positions at United Microelectronics Corporation who simultaneously also signed labor contracts with Jinhua Co.?

Answer: I know that there were a few employees of United Microelectronics Corporation who signed consultant agreements with Jinhua Co., as far as I know, those who signed labor contracts were formal employees of Jinhua Co., while those who signed consultant agreements just served in consultant positions at Jinhua Co.

Question: As far as you know, which type was the contract signed between CHEN Chengkun and Jinhua Co.?

Answer: After I took the position, CHEN Chengkun did sign a labor contract.

Question: As far as you know, did CHEN Chengkun ever simultaneously serve in positions at United Microelectronics Corporation and Jinhua Co.?  What was the time period?

Answer: Yes, CHEN Chengkun on the one hand served as Senior Vice President at United Microelectronics Corporation, and also served as President of Jinhua Co., I'm not very clear on the time period during which he simultaneously served in the above two positions.

Question: Are you acquainted with HO Chienting?
Answer: I know of this person.
Question: Did HO Chienting, like CHEN Chengkun, simultaneously serve in positions at both Jinhua Co. and United Microelectronics Corporation?
Answer: What HO Chienting signed was a consultant contract at Jinhua Co., he was not regarded as a formal employee of Jinhua Co.
Question: The New Taipei Investigations Office of the Investigation Bureau of the Ministry of Justice seized a labor contract with serial number 2B-3 (photocopy presented) from the personal office of HO Chienting at Southern Taiwan Science Park of United Microelectronics Corporation on February 14, 2015, under the Western calendar; in this document, it is recorded that it is a labor contract, not a consultant agreement, what is the reason [for this]?
Answer: I have not seen this document before, he likely signed it before I took the position at Jinhua Co.
Question: Have you read the contents of the consultant contract which you state that HO Chienting signed with Jinhua Co.?
Answer: I have not read the contents, but when I sign the payslips each month, one expenditure item which they include is consultant fees, and I have seen that HO Chienting was receiving consultant fees.
Question: The time period in which HO Chienting served as a consultant at Jinhua Co.?
Answer: I'm not very certain about the starting point; by October 2018, after the United States implemented the embargo against Jinhua Co., the cooperative relationship between Jinhua Co. and United Microelectronics Corporation was completely terminated, and Jinhua Co. was no longer paying consultant fees.
Question: As far as you know, you mentioned just now that there were a few individuals holding positions at United Microelectronics Corporation, while simultaneously also serving as consultants at Jinhua Co., how many of such people were there?
Answer: Approximately 10 or more individuals.
Question: Why would these people simultaneously hold positions at United Microelectronics Corporation while also serving in positions at Jinhua Co.?
Answer: I'm not very sure about the reason, but when I served as the Director of Human Resources at United Microelectronics Corporation, I once handled a case, at the time, United Microelectronics Corporation had hired a South Korean individual to come to the Research and Development unit of United Microelectronics Corporation, and because the salary requested by this South Korean individual exceeded the salary cap at United Microelectronics Corporation, United Microelectronics Corporation and Jinhua Co. therefore made an agreement that a portion of the salary would be paid by Jinhua Co. as consultant fees.

Question: According to your statement, as of the present, there are no longer any personnel of United Microelectronics Corporation receiving consultant fees at Jinhua Co.?

Answer: Yes, as I said just now, because the United States implemented an embargo.

Question: What is the current state of the business relationship between Jinhua Co. and United Microelectronics Corporation?

Answer: Currently there are absolutely no business dealings.

Question: How many people are there who, like you, previously worked at United Microelectronics Corporation, and now only work at Jinhua Co.?

Answer: I'm not very certain, likely no more than 10 people, but I'm not very familiar with the names of these people.

Question: Do you know which people at United Microelectronics Corporation are responsible for submitting DRAM patent applications in China and the United States?

Answer: I'm not sure.

Question: While you were holding a position at United Microelectronics Corporation, were you aware that notebook computers with USB interfaces were distributed to personnel?

Answer: The notebook computers given to employees by United Microelectronics Corporation have USB interfaces, but they can only connect to the mouse and keyboard, and cannot be used for writing information.

Question: If it were necessary to have a notebook computer that reads USB portable drives, it would be necessary to separately submit an application at United Microelectronics Corporation?

Answer: Yes.

Question: Do you know if there were notebook computers that read USB portable drives at United Microelectronics Corporation which were ever used by employees to read information belonging to Taiwan Micron Inc.?

Answer: I'm not sure about this.

Question: Do you have anything else to add?

Answer: No.

Question: The matter under investigation by the prosecutor today is classified as a confidential matter and cannot be publicly divulged, are you clear?

Answer: I understand.

Notice was given of invitation to return.

Taiwan Taichung District Prosecutors Office

11:26 AM, January 29, 2019
This record has been reviewed as error-free, and is signed below:

Subject of Interrogation: [Signature: YOU Zhenfu]

Clerk: [Signature: CHEN Yiching]

Prosecutor: [Signature: Chen Liwei]

Taiwan Taichung District Prosecutors Office

7

[Blank page]

Witness Oath (Before Interrogation)

I appear now in this office as a witness in 2018 United States Assistance Trade Secrets Case No. 1, Defendant: Not Stated, and shall give testimony in accordance with the facts, without concealment, qualification, addition or diminishment.

Witness: [Signature: YOU Zhenfu]

January 29, 2019

1. The witness shall be asked to read this oath aloud.  For those who cannot read it aloud, the clerk shall read it aloud, and shall explain its significance, if necessary.
2. Article 168 of the Criminal Code stipulates that: A witness, expert witness, or interpreter who, during a trial before a government office discharging judicial functions or during interrogation before a prosecutor, who makes a false statement on a matter material to the case, before or after providing an affidavit, shall be sentenced to a fixed term of imprisonment for not more than seven years.
3. Article 180 of the Code of Criminal Procedure stipulates that: A witness may refuse to testify under one of the following circumstances:
   (1) Currently or formerly being the spouse, lineal blood relative, collateral blood relative within the third degree of kinship, relative by marriage within the second degree of kinship, head of household, or dependent of the defendant or private prosecutor.
   (2) Being betrothed to the defendant or private prosecutor.
   (3) Currently or formerly being the statutory agent of the defendant or private prosecutor, or where the defendant or private prosecutor currently or formerly served as one's statutory agent.
   One who has a relationship as in the preceding section with one or more individuals among the joint defendant or private prosecutors may not refuse to testify where serving as a witness on matters relating only to other joint defendant or other joint private prosecutors.
4. Article 181 of the Code of Criminal Procedure stipulates that: The witness may refuse to testify if the testimony may subject himself or a person having a relationship to him as in Section 1 of the preceding article to criminal prosecution or punishment.
5. Article 183 of the Code of Criminal Procedure stipulates that: A witness who refuses to testify shall clearly state the reasons for the refusal.  However, under the circumstances in Article 181, [he or she] shall be ordered to make an affidavit in lieu of giving a clear

Note: For those providing an affidavit in advance, the words "have" and "did not" shall be deleted; for those subsequently providing an affidavit, the words "shall" and "without" shall be deleted.

[Blank page]

50

Net Monthly Income = 37500 – 283.73 – 6999.068 = 30217.202
(Monthly Wages) (Five Personal Insurance Funds) (Individual Tax)
Bonus / 12 = (50000 – 4895) / 12 = 45105 / 12 = 3758.75
(Bonus) (Individual Tax)

→ Mainland

12 months * 25% = 3 months = (30217.202 + 3758.75) * 3 = 33975.952 * 3 = 101,927.85 (Publicly Funded)

12 months * 75% = 9 months = (30217.202 + 3758.75) * 9 = 33975.952 * 3 = 305,783.568 (Actual Income) 40 [Illegible]

Note: Individual tax rebate subsidy policy: On the basis of 100% for 5 years, where the annual total individual tax payment = 88,883.81, approximately 88,883.81 * 35% * 100% = 31,109,3335 RMB could be rebated

071

[Right margin]
No.
2B-1
[Illegible]

be served to the mailing address of Party B (including the emergency contact) as specified in this contract. If Party B (including the emergency contact) relocates or changes the contact address, Party B shall give written notice to Party A; if Party B fails to fulfill the obligation to give notice, the mailing of relevant materials by Party A to the original mailing address shall be regarded as fulfilling the obligations of service of process. For in-person delivery of the aforesaid materials, the time of delivery shall be regarded as service of process.

11.10 This contract is subject to the laws of the People's Republic of China.

Appendix 1: "Terms and Conditions of Technical Services"

Party A: [Stamp: Fujian Jinhua Integrated Circuit Co., Ltd.]
Authorized Signatory: [Illegible signature]
Date:

Party B: HO Chienting
Signature: HO Chienting
Date:

9.1 If a labor dispute should arise between the two parties, they shall first negotiate a resolution. If a resolution cannot be reached through negotiations, an application may be made for mediation. If the negotiations or mediations are unsuccessful, and either party requests arbitration, an application may be made for arbitration.

9.2 If either party objects to the arbitration ruling, legal proceedings may be initiated. Choice of region for arbitration and legal proceedings: the place of registration of Party A.

**10 Effectiveness of Labor Contract**

10.1 This contract shall be established upon being stamped or signed by both parties; it is in duplicate, with one copy to be retained by the employee, and one copy to be retained by the company. Both copies of the contract have equal legal effectiveness.

**11 Other**

11.1 Party A is aware and agrees that, at the time of signing this contract and during the term of the contract, Party B can simultaneously hold a position and receive a salary from Taiwan United Microelectronics Corporation; however, Party B's employment at the above organization shall not influence Party B's completion of work tasks for Party A. Party B guarantees that the above organization is already aware and agrees that Party B shall hold a position with Party A, and shall not use this as grounds to investigate Party A for any liability; otherwise, this shall be regarded as a severe violation of the rules and regulations of Party A by Party B, and Party A shall have the right to dissolve this contract and require that Party B make compensation for damages. Apart from the aforesaid organization, during the term of the contract, without the approval of Party A, Party B is prohibited from holding a concurrent position at another organization.

11.2 The signing of this contract signifies that Party B authorizes Party A to withhold and remit individual income taxes on behalf of Party B from the labor remuneration, benefits and perquisites obtained by Party B from Party A, in accordance with the requirements of Chinese laws and relevant regulations.

11.3 The rules and regulations mentioned in and applicable under this contract refer to the relevant provisions in Party A's most recently issued or revised and legally valid employee handbook, operations handbook, various types of rules and regulations, working procedures, operating manuals, and this contract, et cetera. Party A's most recently issued or revised and legally valid employee handbook, operations handbook, various types of rules and regulations, working procedures, and operating manuals are a component part of this contract.

11.4 Party B's leave, other types of vacation time, and corresponding benefits shall be executed in accordance with the applicable laws and relevant rules and regulations.

11.5 Prior to the expiration of this contract, if Party A intends to renew this labor contract with Party B, a letter of intent to renew the labor contract shall be delivered to Party B and signed for receipt; if Party A agrees to renew, he or she shall sign the labor contract at the place of signature prior to the expiration of the contract and in accordance with the time period specified by Party A, and return it to Party A; otherwise, this shall be regarded as Party B having not agreed to the renewal.

11.6 Without the written permission of Party A, Party B is prohibited from divulging any technological secrets or commercial secrets of Party A by any means. If Party B violates this provision, it shall be regarded as a serious breach of discipline, and Party A shall have the right to immediately dissolve this contract, and shall not be obliged to issue written notice in advance and pay economic compensation. If damages are incurred by Party A due to Party B's violation of the duty of confidentiality, Party A shall have the right to require that Party B make compensation. Following the expiration of this contract, Party B shall still bear the same duty of confidentiality as during the period of employment.

11.7 For all service periods specified in this contract or another agreement between the two parties, unless otherwise indicated in this contract or another agreement, the date of expiration of the period of service with the latest expiration as specified in this contract or another agreement shall be the date of expiry.

11.8 Party B agrees that, if he or she is in a situation involving barriers to communication (including but not limited to Party B's hospitalization due to severe illness, experiencing an accident, loss of personal liberty, and other circumstances), the emergency contact (Name) _______________, Identity Card No.: _______________, Mailing Address: _______________, Contact Telephone Number: _______________ shall be authorized to serve as Party B's entrusted agent, and said entrusted agent shall enjoy plenary power to handle all issues involved under the articles of this contract on behalf of Party B, including but not limited to the powers of engaging in negotiations, talks and reconciliation with Party A, serving as agent in the receipt and payment of relevant funds, and acting as agent in the receipt and delivery of relevant documents, et cetera.

11.9 All notices, files, documents, materials, and so on issued or provided by Party A in the course of the fulfillment of this contract shall

4.3     Party A shall grant Party B the enjoyment of legal holidays, annual leave, marriage leave, bereavement leave, maternity leave, paternity leave, and other paid leave in accordance with regulations, and the specific methods shall be executed in accordance with relevant national regulations and the relevant regulations of Party A.

**5       Labor Protection, Labor Conditions, and Occupational Hazard Protection**

5.1     Party A must provide Party B with suitable working and labor conditions, labor protection, and occupational hazard protection on the basis of the characteristics of Party B's job position, and in accordance with the relevant provisions of applicable laws, codes, rules and regulations.

5.2     Party B shall strictly execute the relevant safety procedures, use of protective safety gear and equipment, labor safety and personal hygiene, and other provisions under applicable laws, rules and regulations.

5.3     If either party fails to abide by the duties of the given party with respect to labor safety, causing the counterparty to incur damages, said party shall bear liability, and shall make compensation for damages to the other party.

**6       Social Insurance, Benefits and Perquisites**

6.1     Party A shall process the various types of social insurance and pay social insurance premiums on behalf of Party B in accordance with the regulations of the state and the local government.  Party A may withhold and remit the portion of social insurance premiums to be paid by the individual from Party B's wages.

6.2     If Party B suffers an occupational disease, work-related injury, or work-related fatality, Party A shall handle it in accordance with the provisions of the "Regulations on Work-Related Injury Insurance."

6.3     If Party B suffers an illness or non-work-related injury or fatality, it shall be addressed in accordance with the current relevant national regulations.

**7       Technological Achievements and Attribution**

7.1     During Party B's term of working for Party A, relevant intellectual property rights arising due to the performance of job duties shall all fall under the ownership of Party A, and Party A may fully and freely utilize them within its scope of business, and use them in applications for rights protection, production and operations, or transfer to a third party.  In accordance with Party A's requirements, Party B shall provide all necessary information and take all necessary actions, including application, registration, filing, et cetera, to assist Party A in acquiring and exercising relevant intellectual property rights, and both during

the term of the contract or after the expiration of the contract, Party B cannot divulge relevant technology to a third party.

7.2 In accordance with Party A's requirements, Party B shall regularly report to Party A via email, written files, and other forms on the work situation, including but not limited to weekly and monthly work reports, project research reports, as well as other reports related to Jinhua projects. The quality of service of Party B shall conform to the assessment requirements of Party A and United Microelectronics Corporation.

**8 Amendment, Dissolution and Termination of the Labor Contract**

8.1 Upon negotiation and agreement by both parties, this contract can be amended or dissolved.

8.2 If Party B experiences any one of the following circumstances, Party A can immediately dissolve this contract, and shall not be required to pay economic compensation:

1) Proven to not meet the terms of employment during the probationary period;
2) Severe violation of the rules and regulations of Party A;
3) Severe dereliction of duty or private embezzlement, causing Party A to incur major damages;
4) Being under investigation for criminal liability in accordance with the law.

8.3 The amendment, dissolution or termination of the labor contract between Parties A and B, if not specified in this contract, shall be executed in accordance with the provisions of the "Labor Law," the "Labor Contract Law," the company's employee handbook, and relevant personnel rules and regulations.

**9 Resolution of Labor Disputes**

and Party B accepts said appointment. For details on the specific contents of the work and services of Party B, see Appendix 1: "Terms and Conditions of Technical Services."

2.2 The primary place of work of Party B is Tainan, Taiwan.

2.3 Due to the requirements of business development, changes to Party B's job position or place of work upon negotiation and agreement between the two parties can be made without re-signing the labor contract; an agreement shall merely be reached regarding the relevant provisions, and an amendment agreement shall be signed.

**3 Labor Remuneration**

3.1 During the period of appointment and engagement in the aforesaid position, Party A shall pay an annual salary of RMB 450,000 yuan to Party B, including monthly basic wages of 37,500 yuan (before tax), and the bonus for each contract year shall be RMB 50,000 yuan (before tax). The contract year refers to the period from the starting date of the contract as specified in Article 1.1 of this contract to the day prior to the same date in the following year.

3.2 Party A shall pay the basic wages for the previous month to Party B in RMB on the 10th of each month; if this falls on a rest day or legal holiday, issuance shall be made on the nearest preceding business day.

3.3 Party A shall pay an annual bonus to Party B in accordance with the following methods:

1) Once this contract has been in effect for one full month, at the end of each year (general convention: after New Year's Day under the Gregorian calendar and before the New Year under the lunar calendar), after conducting an assessment of Party B, Party A shall make a one-time payment to Party B as a bonus for the first contract year during the term of this contract. During the term of the contract, apart from the final contract year, if Party B has worked for Party A for less than one contract year, the bonus for the current year shall be calculated on the basis of the actual working time.

2) Beginning in the second contract year during the term of this contract, for each full contract year in which Party B works for Party A, at the end of each year (general convention: after New Year's Day under the Gregorian calendar and before the New Year under the lunar calendar), after conducting an assessment of Party B, Party A shall make a one-time payment to Party B as a bonus for the previous contract year.

3) Both parties agree that, on the premise that Party B is in service to Party A for the full period of time specified in Article 1.1 of this contract, and furthermore renews the labor contract with Party A at the time of expiration of the term of this contract, Party A shall have an obligation to pay a bonus for the final contract year to Party B. If Party B does not serve for the full period of time specified in Article 1.1 or does not renew the contract with Party A, Party B shall have no right to demand that Party A pay a bonus for the final contract year.

3.4 If, due to production requirements, Party A must arrange for Party B to work overtime, the approval of the labor union or Party B shall be obtained, and overtime pay shall be paid in accordance with the relevant provisions of Chinese laws.

3.5 If a reason unrelated to Party B causes Party B to be unable to provide regular labor during the statutory working time, Party A shall pay Party B's wages in accordance with national regulations.

3.6 On the basis of Party B's labor skills, labor intensity, labor responsibilities, labor conditions, and actual contributions, as well as the circumstances of this unit's economic performance, following an assessment, Party A can issue a bonus to Party B, and the specific method of issuance or amount shall be executed in accordance with Party A's internal rules and regulations.

**4 Working Time, Rest Breaks, and Leave**

4.1 Party A has implemented a work system with standard working hours. In accordance with the regulations of a work system with standard working hours, Party A has implemented three shift categories: the regular day shift, a three-shift system, and a four/two-shift system (namely, work two days, rest two days), and Party A has the right to alter Party B's shift category on the basis of work needs. For the times of the specific shift categories, refer to the relevant regulations of Party A.

4.2 Party A shall strictly abide by the statutory working time, to guarantee Party B's rest and physical health. If, due to production and operations, Party A requires that Party B work overtime, Party A shall arrange for compensatory leave or payment of overtime pay for Party B in accordance with relevant national regulations.

[Right margin]
4.
**5**
5.
5.1
5.3
**6**
6.1
6.2
6.3
**7**
7.1
7.2
**8**
8.1
8.2
1)
2)
3)

4)
8.3
**9**

**Labor Contract**

Party A (Employer): Fujian Jinhua Integrated Circuit Co., Ltd.
Legal Representative or Responsible Party: SHAO Yulong
Registered Address: 6th Floor, Qun Tower, Power Company Building, Meiling Street, Jinjiang City, Quanzhou City, Fujian Province
Mailing and Contact Address: Sanchuang Garden (Sunei Community, Luoshan Street), Shiji Avenue, Jinjiang City, Fujian Province Postal Code: 362200

Party B (Worker): HO Chienting
Party B's Residential Address: ____________
Mailing and Contact Address: No. 18, Nanke 2nd Road, Xinshi District, Tainan City, Taiwan
Passport No.: ____________ Nationality: ____________
Contact Method: Mobile Phone: ____________ Residential Landline: ____________
Name of Emergency Contact and Relationship to Self: __________ Contact Tel.: 886-65054888

[Stamp: Jinhua (Illegible)]

Parties A and B have concluded this contract in accordance with the "Labor Law of the People's Republic of China" (hereafter abbreviated as the "Labor Law"), "Labor Contract Law of the People's Republic of China" (hereafter abbreviated as the "Labor Contract Law"), "Regulations for the Administration of Employment of Foreigners in China," as well as relevant national, provincial and municipal regulations, and in adherence to the principles of lawfulness, fairness, equality, voluntariness, agreement through negotiation, and good faith.

1 Term of Contract and Renewal

1.1 The term of this contract is a fixed term, starting on July 01, 2016, and ending on June 30, 2021, for a total of 5 years.

1.2 During the term of this contract, both parties shall process and obtain a Foreigner's Work Permit, Occupation Visa, Employment Permit, Residence Permit, Employment Permit for Taiwanese, Honk Kong and Macao Persons, and other documents required by Party B to work for Party A; if the above documents cannot be obtained or become invalid during the term of the contract, then this contract shall be ineffective or shall be terminated early. If this contract is ineffective or is terminated early due to the aforesaid reasons, Party A shall not be required to pay any economic compensation, and both parties shall mutually bear no liability, unless otherwise specified in this contract or other agreements (such as special training agreements) signed by the two parties.

1.3 If this contract has expired, but service constraints continue to exist between the two parties, under the premise that the other provisions of this contract shall be unchanged, Party A can

require that the contract term be extended until the time of expiration of the service term, and Party B is prohibited from refusal of this, or else must bear liability for breach of contract.

**2 Job Position and Location**

2.1 Party A appoints Party B to serve in the position of Director of Technological Research and Development, to engage in the work of Internal Memory Process and Technology Research and Development,