STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Laura.Vartain@usdoj.gov
Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 353-3434
Fax: (202) 233-2146
Nicholas.Hunter@usdoj.gov
Stephen.Marzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.,<br><br>Defendants. | CASE NO. 18-CR-00465 MMC<br><br>UNITED STATES' MOTION IN LIMINE NO. 2:<br><br>MOTION TO ADMIT AUDIO RECORDINGS |

# TABLE OF CONTENTS

INTRODUCTION ........................................ 1

BACKGROUND ........................................ 1

ARGUMENT ........................................ 5

I. The Court Should Admit the Two Audio Recordings from David Huang ........................................ 5

A. The Recordings are Authentic........................................ 5

B. The Recordings are Admissible as Agent or Co-Conspirator Statements under 801(d)(2)(D) and (E). ........................................ 9

CONCLUSION ........................................ 10

# TABLE OF AUTHORITIES

## CASES

*United States v. Damrah*, 412 F.3d 618 (6th Cir. 2005) ........ 7

*United States v. Green*, 40 F.3d 1167 (11th Cir. 1994) ........ 7

*United States v. Kandiel*, 865 F.2d 967 (8th Cir. 1989) ........ 7

*United States v. Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1995) ........ 7, 8

*United States v. O'Connell*, 841 F.2d 1408 (8th Cir. 1988) ........ 8

## STATUTES

18 U.S.C. § 3505 ........ 5

18 U.S.C. § 3505(a)(1)(A) ........ 6

18 U.S.C. § 3505(a)(1)(B) ........ 6

U.S.C. § 3505(a) ........ 6

## RULES

Fed. R. Evid. 901(a) ........ 7

Fed. R. Evid. 901(b)(4) ........ 7

Federal Rules of Evidence 801(d)(2)(D) ........ 9

## INTRODUCTION

The United States obtained two audio recordings from United Microelectronics Corporation's ("UMC's") former in-house counsel David Huang[1] of interviews he participated in as part of UMC's internal investigation into the theft of trade secrets from Micron Technology Inc. ("Micron"). The first recording ("Recording #1) is of an interview of a UMC secretary named Huang Wanjun (aka, Joyce Huang) who originally procured the secret, off-network laptops Stephen Chen authorized so employees working on Project M could access stolen Micron trade secrets. *See* Ex. A (English-language transcript of Chinese audio recording of interview of Huang Wanjun). This recording was conducted by phone. After Huang Wanjun hangs up the phone, the recording continues to capture David Huang discussing the illicit procurement of the secret laptops. The second recording ("Recording #2") is of an interview of Project M engineer Guo Fengming (aka, Ray Guo)—employed both by UMC and Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua")—who had worked on the project since early 2016. *See* Ex. B (English-language transcript of Chinese audio recording of interview of Guo Fengming). In the recording, the Guo Fengming discusses with David Huang and outside counsel Chen Zhehong (aka, C.H. Chen) his attempts to hide one of the secret laptops and wipe its hard drive. After hearing that Guo Fengming just wanted to "bury" the laptop, UMC's Chen Zhehong advised him to get rid of the laptop by giving it to Stephen Chen's secretary to "take care of it."

The audio recordings are highly relevant evidence of the existence of a criminal conspiracy, the co-conspirators intent and consciousness of guilt, and Jinhua's participation in the conspiracy. The recordings are authenticated by a variety of evidence and admissible in their entirety at least under Federal Rule of Evidence 801(d)(2)(D) and (E).

## BACKGROUND

As described in more detail in the United States' Motion *in Limine* No. 3 to admit the damaged hard drive, the United States intends to prove at trial that in December 2015 defendant Stephen Chen— a

[1] David Huang made the recordings while he worked for UMC. He turned the recordings over after he left his post at UMC.

Senior Vice President at UMC and would-be executive of Jinhua—approved special off-network, USB-enabled laptops knowing and intending that UMC engineers, including J.T. Ho and Neil Lee, would use those laptops to access stolen Micron's trade secrets for the benefit of Project M—the joint DRAM development and manufacturing project between UMC and Jinhua.

A day after J.T. Ho attempted to hide his "public-use" laptop in February 2017 from Taiwan's Ministry of Justice Investigation Bureau ("MJIB") by giving it to an assistant named Huang Shuhan (aka, Emily Huang), Huang Shuhan turned the laptop into investigators. She decided to turn over Ho's public-use laptop based on the advice of David Huang. Chen Zhehong disliked that decision. After taking over the internal investigation, which was initiated after the first MJIB search, Chen Zhehong advised a much different disposition of the second public-use laptop: to make it disappear by giving it to Stephen Chen's secretary.

David Huang was concerned that he could be implicated in the criminal destruction of evidence. After leaving his position at UMC, he turned over copies of audio recordings he made during two interviews conducted as part of UMC's internal investigation of the theft of Micron's trade secrets. He first provided copies of the audio recordings to Micron's counsel in Taiwan. Micron provided copies to the FBI on February 14, 2019. David Huang also provided abbreviated copies of the recordings to Taiwanese prosecutors on April 22, 2019, when a Taiwan prosecutor interviewed him in Taiwan. The Taiwanese prosecutor played the recordings during that interview. David Huang authenticated the recordings and provided the names of the participants in each. *See* Ex. C at 8-11 (translation of part 1 of interrogation of David Huang); Ex. D at 6. (translation of part 2 of interrogation of David Huang). He also stated that "the law division [at UMC] had a practice of recording any internal investigations involving employee conduct infractions, or any conference discussions on patent infringement or disputes." Ex. C at 9; *see also* Ex. D at 6 ("All internal investigation interviews were recorded.")

Recording #1 is of a telephone interview of Huang Wanjun, who was involved in the original procurement of the public-use laptops. *See* Ex. A at 2-3. During the questioning by the Taiwanese prosecutor, the David Huang identified the interviewee in the recording as Huang Wanjun and named the other participants as himself, his colleague, and the Huang Wanjun's supervisor. *See* Ex. D at 6. In the

recording, the Huang Wanjun states that J.T. Ho and Neil Lee requested the public-use laptops after "[t]hey mentioned they probably had a discussion with their chief" (i.e., Stephen Chen) about it. Ex. A at 3. Huang Wanjun said she did not know that Ho and Lee used the laptops to access stolen Micron information. She had, however, looked into the laptops because she was "concerned they're still under my name" and other secretaries "suggested that I'd stop tracking them down." *Id*. at 5. Huang Wanjun recalled that the laptops were "sealed off" without access to computer networks. *Id.*

After Huang Wanjun hung up the phone, the remaining participants discussed the public-use laptops, all of which was captured on the recording. One stated that the laptops were "out of control" and "[t]hat's how they were able to read Micron's stuff." *Id.* at 8. "They downloaded 20,000, 25,800— [chuckle]." *Id.* "They didn't have to connect to any network, they simply used the USB brought from Micron." *Id*. at 9. David Huang summarized the situation as follows:

> I should say that they had brought USB thumb drives from Micron with downloaded over 20,000 documents. At first they used the PCs at works to store these files, but they were caught by IT. After IT caught them, they managed to get these two laptops, which IT could not find. That, this way, they could read the documents in this way.

*Id.* at 9. One of the participants stated that "IT once said that Vice President Chen . . . wanted to bring in his private laptop into the company" but "IT said that it was not allowed." *Id.* at 10. Another colleague stated the "[t]he prosecutor has confiscated one of the two [laptops], as for the other one, [another UMC secretary] said it was lost. Was it really lost? Nobody knows." *Id.* at 13. David Huang responded: "If it was lost, then we'd be in big trouble." *Id.* The participants then discuss how incredible it would be to lose UMC-controlled property so easily. *Id.*

Recording #2 is of an interview of Guo Fengming (aka, Ray Guo), who the United States intends to prove was an employee of both UMC and Jinhua. *See* United States Motion *in Limine* #1. During the interview, the participants discussed, among other things, disappearing one of the public-use laptops. Ex. B at 6-12. During his questioning by the Taiwanese prosecutor, David Huang named the attendees of the recorded interview as himself, Guo Fengming, Chen Zhehong, and one of Chen Zhehong's colleagues. Ex. D at 6. On the recording, Guo Fengming acknowledged he knew the purpose of the public-use

laptops and stated that he was responsible for one. He then stated: "That's why I must admit . . . I did not let it reappear again." Ex. B at 6. Guo Fengming stated that "J.T. [Ho] was making preparations to return" his public-use laptop to the prosecutor. *Id.* Guo Fengming, on the other hand, "was going to find a way to see if I can do away with" the public-use laptop he used. *Id.* at 7. Guo Fengming stated that he formatted (*i.e.,* wiped) the hard drive and "wanted to . . . find a hole and bury it [laughs]." *Id.*at 7. The interviewers confirmed nobody else knew about the computer and advised Guo Fengming "don't let anyone else know." *Id.* at 9. One of the interviewers expressed worry that, if the computer were found, someone could determine that UMC had destroyed evidence to engage in a cover up:

> [S]o once it's been formatted, from a technical view point, can it be known afterwards that it had been formatted? That is to say, after a certain timeframe . . . I'm thinking back to a while ago, where, in the U.S., the AUO was searched by the FBI. Mother fucker! Whatever was formatted, the FBI was able to restore the whole thing to its original content. What I'm saying, is there a possibility that they would discover the thing had been formatted after the search? [pause, laughs]. Do you think it's possible? Wow! Fuck! If they find out the format was done after the search, we would look as if a futile attempt was made to cover up the obvious.

*Id.* at 11. After considering what to do with the laptop, Chen Zhehong states: "Just take care of it . . . . Give it to [Stephen] Chen's secretary." *Id.* at 12. The Project-M engineer agreed to do that. *Id.*

Guo Fengming provided further authentication of Recording #2. MJIB interviewed Guo Fengming on April 22, 2019—the same day David Huang turned over his recordings to the Taiwan prosecutors. Guo Fengming began by stating he did now know anything about the two public-use laptops. Ex. E at 6 (translation of 4/22/2019 MJIB interview of Guo Fengming). He changed his story after MJIB played a portion of Recording #2 and provided him with a transcript. *See id.* at 6. Referencing the transcript, Guo Fengming stated the otherwise-unidentified speakers on the recording included himself, "a UMC attorney with the last name CHEN" (i.e. Chen Zhehong), David Huang, and a person he did not know. *Id.* at 7; *see also* Ex. F at 2 (translation of 4/22/2019 prosecutor interview[2] of Guo Fengming) (recalling the circumstances and participants of recorded interview). Guo Fengming

[2] Most interviews by law enforcement in Taiwan consist of an initial interview with MJIB agents, followed by an interview with a prosecutor. The prosecutor typically verifies the substance of the first interview and asks follow-up questions. Both interviews are memorialized as a written statement of questions and answers that the witness reviews, adopts, and signs.

then attempted to explain away the recording, by for example, saying that parts were a "joke" and that he "was really just kidding" when he made those statements. *E.g.*, Ex. F at 4.

## ARGUMENT

### I. The Court Should Admit the Two Audio Recordings from David Huang

#### A. The Recordings are Authentic

The United States asserts that the recordings at issue are audio recordings of interviews of Huang Wanjun and Guo Fengming, conducted as part of an internal investigation at UMC of the trade-secret theft alleged in this case. The recordings may be authenticated *in limine:* (1) as foreign business records; (2) based on their distinctive characteristics and content; and (3) by a Project M engineer in an interrogation by Taiwan's MJIB.

The United States seeks authentication of the UMC internal investigation recordings *in limine* to facilitate trial preparation. A pretrial determination of authenticity of this important evidence will streamline the government's case in chief.

If the Court is not inclined to rule on the audio recordings' authenticity before trial, however, the United States will contend at trial that David Huang is a whistleblower who, like almost all whistleblowers, provided business records of his employer (here, UMC) to the authorities. David Huang's out-of-court statements authenticate the audio recordings and documents as UMC business records that were generated during the course of UMC's internal investigation. David Huang's out-of-court statements are admissible to authenticate the internal investigation records because those statements were against his interest under Federal Rule of Evidence 804(b)(3). The United States believes that ample grounds exist to authenticate the audio recordings before trial but will authenticate the audio recordings (and documents) at trial if necessary.

##### 1. The Recordings are Authenticated as Foreign Business Records

David Huang's signed interview transcript is a foreign certification sufficient to authenticate the recordings as a foreign record of a regularly conducted activity (*i.e.*, a foreign business record). Under 18 U.S.C. § 3505, copies of foreign records of a regularly conducted activity shall not be excluded as

hearsay if accompanied by a "foreign certification" that, in substance, mirrors the traditional domestic business-records certification set forth in Federal Rule of Evidence 803(6). The certificate must state that the record was made contemporaneously by a person with knowledge, was made as part of a regular practice of a business, and is a duplicate of the original. *See* U.S.C. § 3505(a).

David Huang's sworn and signed statements to the Taiwan prosecutor satisfies all the requirements of a "foreign certification" under § 3505(a)(1). First, David Huang spoke about *audio recordings* that he made of interviews that he participated in. *See, e.g.*, Ex. C at 8 ("I have the audio file of the recorded interview at that time."); *id.* at 9 (explaining why he made recordings). The recordings, therefore, were necessarily made "at or near the time of the occurrence of the matters set forth, . . . by a person with knowledge of those matters." 18 U.S.C. § 3505(a)(1)(A). David Huang also stated that the "the law division [of UMC] had a practice of recording any internal investigations involving employee conduct infractions, or any conference discussions on patent infringement or disputes." Ex. C at 9; *see also* Ex. D at 6 ("All internal investigation interviews were recorded."). The recordings, therefore, were "kept in the course of a regularly conducted business activity," (i.e., investigations conducted by in-house counsel) and were made "as a regular practice" of that business activity" (i.e., recording interviews of such investigation). 18 U.S.C. § 3505(a)(1)(B), (C). And the recordings are each a "duplicate of the original," *id.* § 3505(a)(1)(D). *See, e.g.*, Ex. C at 8-9 (agreeing to submit audio files of recorded interviews to prosecutors). David Huang signed his statements to the prosecutor under penalty of perjury. *See* Ex. C at 2 ("The prosecutor informed the witness of his obligation to make an affidavit and the punishment for perjury."); Ex. D at 2 (same); Ex. C-O at 11 (original Chinese-language transcript of part 1 of interrogation of David Huang); Ex. D-O at 10 (original Chinese-language transcript of part 2 of interrogation of David Huang).

The foreign certification provided for the abbreviated versions of the recordings provided to law-enforcement in Taiwan is sufficient to authenticate the longer recordings the United States obtained from David Huang through Micron. The Taiwan Ministry of Justice provided transcripts of the abbreviated recordings made during the interrogation of UMC's in-house counsel. Apart from to-be-expected variations that occur when translating Chinese to English, the abbreviated transcripts in substance match

the corresponding portions of the longer versions of the recordings. *Compare* Ex. A at 1-7 *with* Ex. G (translation of MJIB transcript of abbreviated recording of interview of Huang Wanjun) at 1-5; Ex. B at 11-13 *with* Ex. H at 1-3 (translation of MJIB transcript of abbreviated recording of interview of Guo Feng Ming).

**2. The Recordings are Authenticate Based on Distinctive Characteristics and Content**

The audio recordings are authenticated by their content and the identity of the person who produced them. *See* Fed. R. Evid. 901(b)(4) ("contents" and "other distinctive characteristics" can authenticate item of evidence). "[T]apes are sufficiently authenticated Fed. R. Evid. 901(a) if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity." *United States v. Matta-Ballesteros*, 71 F.3d 754, 768 (9th Cir. 1995). The United States is not required to present evidence of how audio recordings were made and handled prior to their acquisition by law enforcement to authenticate them. *See id.*; *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005); *United States v. Green*, 40 F.3d 1167, 1173 (11th Cir. 1994); *United States v. Kandiel*, 865 F.2d 967, 973-74 (8th Cir. 1989).

The contents of the recordings prove that the recordings are what the United States claims them to be. The substance of the recordings reflect that they are of people intimately involved with the very specific and unique facts of this case. *See Matta-Ballesteros*, 71 F.3d at 769 (authentication of audio recordings accomplished "by proving a connection between the evidence and the party against whom the evidence is admitted"). In Recording #1, Huang Wanjun is identified by name. Ex. A at 2. The participants about the MJIB searches of Project M on February 7 and February 14 that precipitated the interview, and the accusations of stolen Micron trade secrets. *Id.* They discuss the public-use laptop computers and identify them by the last 3-digits of those computers' UMC property identification numbers. *Id.* at 2 (referencing "laptop computers Number 525 and Number 761); *see also* Ex. M at 1 (untranslated UMC property request forms for public-use laptops numbered UMC0351525 and UMC030761); Ex. N (translation of same). They discuss the involvement of J.T. Ho, Stephen Chen, and Neil Lee. Ex. A at 3. After Huang Wanjun hangs up, David Huang and his colleague discuss detailed

facts about the theft of Micron's documents, the IT department catching J.T. Ho and Neil Lee, and the issuance of the two laptops, among other things. *Id.* at 9.

The same goes for Recording #2. The participants discussed "[t]he stuff from Micron," defendant Kenny Wang "doing a massive amount of downloading" from Micron, and Guo Fengming's prior employment at Micron. Ex. B at 1-3. They discuss the special laptops at UMC and who knew about them, including J.T. Ho and Neil Lee. *Id.* at 7. They talk about defendant Stephen Chen ("Chen Zhengkun") and name his secretary. *Id.* at 12. They talk about Guo Fengming's interactions with Kenny Wang after the MJIB searches and mention the fact that Wang's wife works for Micron. *Id.* at 13-14. Such specific details —which are corroborated by independent evidence in the case—make it virtually impossible to reasonably conclude that the audio recordings are anything but what the United States purports them to be.

Moreover, UMC's in-house counsel made the recordings and produced them to Micron and Taiwan law enforcement. The recordings are of the type one would expect an in-house counsel to have: interviews of employees regarding an important legal matter to the company. A reasonable juror could conclude that the source of the recordings is sufficient evidence to conclude the recordings are authentic. *See Matta-Ballesteros*, 71 F.3d at 768 ("[W]hen the facts demonstrate that the recording was found in a defendant's possession, it should not be subject to the same requirements we apply when a government agent or informant initiates a conversation knowing it to be recorded." (citing *United States v. O'Connell*, 841 F.2d 1408, 1420 (8th Cir. 1988) (internal quotation marks omitted)).

### 3. Guo Fengming Authenticated the Recording of His Internal UMC Interview When the MJIB Played it To Him

Guo Fengming's own admissible statements to MJIB agents and the prosecutor in Taiwan are prima facie evidence of the authenticity of Recording #2. The Taiwan MJIB played Recording #2 to Guo Fengming during a sworn interview on April 22, 2019. When asked who the participants in the recorded meeting were and if he was one of them, Guo Fengming stated that the "meeting was held after February 7 or 8 of 2016"[3] and proceeded to identify speakers—including himself—from the recording and the

[3] The Project M engineer likely meant February 7 or 8 of *2017*, the year the searches of UMC

associated transcript. Ex. E at 6-7. In the follow-up interview with the Taiwan prosecutor, Guo Fengming further identified the speakers and stated the meeting on the audio recording took place in "a meeting room at UMC's Nanke plant, and it was conducted after the search by inspection/investigative personnel at the Nanke plant." Ex. F at 2.

An FBI linguist has Recording #2 and the recording played to Guo Fengming by the Taiwan MJIB. She determined that the recordings are of the same interview. *See* Shum Decl. (Ex. L).

Guo Fengming's sworn statements to investigators and prosecutors in Taiwan are admissible evidence establishing the authenticity of Recording #2. As discussed in more detail in the United States Motion *In Limine* #1, Guo Fengming was a joint employee of both UMC and Jinhua. His statements are therefore admissible against Jinhua as agent admissions under Rule 801(d)(2)(D). Upon reviewing those statements, a reasonable juror could conclude that Recording #2 is authentic.

### B. The Recordings are Admissible as Agent or Co-Conspirator Statements under 801(d)(2)(D) and (E).

The United States intends to offer some of the statements in the two audio recordings for something other than the truth of the matter asserted. Nonetheless, the audio recordings (and their translated transcripts) are admissible in their entirety under Federal Rules of Evidence 801(d)(2)(D) and (E).

The entirety of each recording is admissible under Rule 801(d)(2)(D) because the participants were all acting as employees or agents of the Project M joint venture between UMC and Jinhua. The Huang Wanjun (aka, Joyce Huang) was a UMC employee who worked on Project M. *See* Ex. I (12/7/2015 meeting notice from Joyce Huang for "Project M discussion"); Ex. J (12/23/2015 meeting notice from Joyce Huang for "Project M roadmap discussion"); Ex. K (11/7/2017 meeting notice for "Project M [New Plant Design] – fab Internal meeting" including Joyce Huang).

Guo Fengming was a UMC employee who worked on Project M. *See* United States' Motion *In Limine* #1. The other participants on both recordings were conducting an internal investigation in support of Project M. Therefore, all of the participants were agents or employees of the Project M joint

---

occurred.

technology cooperation agreement between UMC and Jinhua. Their statements, therefore, are admissible against Jinhua.

For the same reasons, both recordings are admissible as co-conspirator statements under Rule 801(d)(2)(E). The conspiracy the participants were involved in was the develop DRAM for manufacturing by Jinhua in China.

Recording #2 is further admissible because the participants are engaged in a criminal conspiracy to destroy or otherwise hide evidence of criminal activity. The recording itself establishes the formation of that illicit agreement, which is corroborated by other evidence in the case, including the damaged hard drive that is the subject of the United States' Motion *In Limine* No. 3. Recording #2, therefore, is admissible in its entirety as a co-conspirator statement under Rule 801(d)(2)(E).

Finally, Recording #2 is admissible against Jinhua because Guo Fengming was a joint employee of UMC *and* Jinhua, as explained in the United States' Motion *In Limine* No. 1. His statements in Recording #2, therefore, are admissible in their entirety as employee or agent admissions under Rule 801(d)(2)(D). The statements of the other participants in the meeting are primarily not offered for the truth or to give necessary context to the Project M engineer's statements. The entirety of Recording #2, therefore, is admissible under Rule 801(d)(2)(D).

**CONCLUSION**

The Court should admit the audio recordings made by UMC's in-house counsel.

Dated: December 1, 2021

Respectfully Submitted,

STEPHANIE M. HINDS
Acting United States Attorney

*/s/ Nicholas O. Hunter*
LAURA VARTAIN HORN
NICHOLAS WALSH
Assistant United States Attorneys

NICHOLAS O. HUNTER
STEPHEN MARZEN
Trial Attorneys, National Security Division