# Exhibit A

UNCLASSIFIED

*A copy of this transcript was not available in print on February 15, 2017, when HE Jianting [IL] thus it is being been made available for side-by-side reference.*

| **TRANSCRIPT** | | | | | February 14, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Tainan Investigation Division, MJIB | | |
| SYNOPSIS | WANG [3769] FNU allegedly violated the Trade Secrets Act. | | | | | | |
| Q | NAME | NICKNAME | GENDER | DATE OF BIRTH (YYYY/MM/DD) | PLACE OF BIRTH | OCCUPATION (GRADE LEVEL) | NATIONAL ID NUMBER |
| A | HE Jianting [0149/1696/1694] | | Male | ▊▊▊ | Taichung | Engineer | ▊▊▊ |
| Q | ADDRESS | | | TELEPHONE | | HOUSEHOLD ECONOMIC STATUS | EDUCATION |
| A | Residence: ▊▊▊, Taichung Domicile: ▊▊▊, Tainan | | | ▊▊▊ ▊▊▊ | | middle class | Master's Degree, Institute of Applied Mechanics, National Taiwan University |

Q:     You are being accused of violating Articles 13.1 and 13.2 of the Trade Secrets Act and Article 359 of the Criminal Procedure Code. This Division (New Taipei City Investigation Division of the Ministry of Justice Investigation Bureau) has requested your presence here today as the accused. You arrived at 7:15 p.m. on February 14, 2017. After being granted a meal and rest break, the examination interview commenced at 8:23 p.m. During the interview, you are allowed to exercise the following rights: 1) Remain silent and not make statements contrary to your own wishes. 2) You have the right to legal representation. If you are low income, lower-middle income, of indigenous status, mentally handicapped, or a member of any other protected class qualified to apply for legal assistance under the law, you may do so. 3) You may request an investigation of evidence favorable to you. Do you understand?

A:     Yes, I do.

Q:     Do you belong to a protected class, such as low income, lower-middle income, indigenous status, or any other that would qualify you to apply for legal assistance under the law?

A:     No, I do not.

Q:     Since the sun has already set, do you consent to a nighttime interview?

A:     I do.

Q:     Do you need to appoint defense counsel?

A:     I do. I have already retained JIA Junyi, Esq. as my defense counsel. He is currently on his way here.

Q:     Do you consent to being interviewed prior to legal counsel's arrival?

021

A:     I would like the interview to commence when Mr. JIA is present.

UNCLASSIFIED

UNCLASSIFIED

Q:      The time now is 8:38 p.m. This Division will suspend the interview until your legal counsel arrives. However, the rules stipulate that if more than four hours elapse, we must proceed with the interview. Do you understand?

A:      I do.

Q:      The time now is 10:01 p.m. Your legal counsel JIA Junyi, Esq. is now present. This Division will now proceed with the interview. Do you understand?

A:      I do.

Q:      Do you have a criminal record?

A:      No.

Q:      Pursuant to Search Warrant Request No. 000421 issued by Taiwan Taichung District Court in the 2017 today (the 14th) this Division conducted a search of your Project Management II (*PM2*) offices located at 57 Nanke Third Road, Xinshi District, Tainan, at the New Business Development Center of United Microelectronics Corporation (hereinafter UMC). Were you present for the duration of the search? Do you have any objections regarding the search process?

A:      I was present for the entire process. I have no objections.

Q:      Do you have anything to add to the transcript produced at this office on February 7, 2017?

A:      Yes. In the last transcript, I didn't inform your Division that I duplicated and took work-related materials – both hardcopies and electronic files on a *USB* drive – from my former employer, Micron Memory Taiwan (MMT), to the *PM2* office at UMC, so as to be able to read and reference them at work. Also, on that same afternoon, approximately 15 minutes prior to your Division's arrival at the *PM2* office to conduct the search, *PM2*'s person in charge, Assistant Manager RONG Letian, did come over to tell me that the Prosecutor is coming. If there were any personal materials present, I should hurry up and put them away. After hearing this and just as I was taking out the previously mentioned *USB* drive that contains the MMT electronic files (which also include materials from Rexchip Electronics and Powerchip Technology), WANG Yongming, who was also told by RONG Letian, was handing his personal materials over to HUANG Shuhan. HUANG sat on the right-hand side behind WANG. I, too, gave HUANG my USB drive and paper copies and asked her to store them elsewhere. Not long after I gave [them] to her, your Division personnel entered to conduct the search. HUANG put some of the materials given to her in her cabinet, but took some away from the *PM2* office. What was removed included WANG's cell phone, which was on her person, when she was requested by your Division to return to the office.

022

UNCLASSIFIED

UNCLASSIFIED

Q:      You said earlier that RONG Letian came to where you sat, told you that the Prosecutor is coming to conduct a search, and to hurry up and put away any personal materials. What was meant by personal materials that needed to be put away?

A:      I knew what RONG Letian meant. He was referring to materials brought to UMC from MMT, where I previously worked.

Q:      How did RONG Letian let WANG Yongming know that the Prosecutor and this Division's personnel were coming to conduct a search?

A:      I don't know. After I took out the previously mentioned USB drive and paper copies, I either saw WANG take similar items to HUANG, or I might have asked WANG how he was going to put away things. That was how I knew WANG was also notified by RONG.

Q:      When interviewed by the Prosecutor on February 8, 2017, WANG Yongming stated, "…RONG Letian spoke to us about this matter during yesterday's search by the government investigators. He told HE Jianting and me to remove MMT-related items…my understanding was that he must also have some MMT materials…called me into his office to tell me…my impression was both at the same time…" Is this an accurate depiction of what took place at the time?

A:      What WANG said differs from my recollection. RONG Letian did in fact tell me that the Prosecutor is coming for a search, but he did not tell me explicitly to remove MMT materials. It is my understanding that RONG meant the MMT materials were included. WANG certainly was aware that I brought work materials from MMT over to UMC. RONG did call me to come into his office, but I declined since I was busy. He then told me that the Prosecutor was on his way to conduct a search. As far as how RONG notified WANG, I didn't see any of it. RONG didn't speak to us at the same time.

Q:      Why does WANG Yongming know that you brought MMT materials to UMC?

A:      I've mentioned it during chats with WANG. I've also requested CHEN Zhengkun (also known by the English name *Stephen*) to provide me with a company computer that has *USB* read permissions, so that I could access personal materials at the office. There were times when WANG would borrow this computer. I have, therefore, chatted with WANG about my bringing over MMT materials.

Q:      Has WANG Yongming also used this company computer to access related files a 023 materials he took from MMT?

A:      I know that WANG also took related MMT work materials. When he has borrowed this company computer, it would be to access his personal materials. Since the office computers restrict *USB* read access, personal materials could only be accessed on this type of company computer, which has been approved for no *USB* restrictions. As for whether WANG did use this particular company computer to access files and materials he took from MMT, I have no knowledge.

UNCLASSIFIED

UNCLASSIFIED

Q:    As for the previously mentioned paper documents and USB drive(s) that were given to HUANG Shuhan by you and WANG Yongming prior to the search conducted by this Division on February 7, 2017, where are they now?

A:    After being questioned by the Prosecutor on February 8, 2017, I returned to the office sometime between 5:00 p.m. and 6:00 p.m. The company's legal department personnel said at the time that the items WANG and I gave to HUANG for safekeeping must be handed over to the Prosecutor. Therefore, these items should all be with the Prosecutor at this time.

Q:    (Note:  The catalogued list and properties in the custody of the Taiwan Taichung District Prosecutors Office) Items noted are the previously mentioned objects that you and WANG Yongming gave to HUANG Shuhan. Prosecutors Office personnel rendered a catalog of the seized properties after they were turned over to the Prosecutor on February 9, 2017. Please examine the contents and identify the items that were in your and WANG's possessions?

A:    (After an examination) One notebook computer marked as Article One; the smaller black-colored USB drive in the plastic bag marked as Article Two; of the paper materials marked as Article Three, a total of 13 notebooks labeled two to eight and ten to fifteen; and the Elpida-Rexchip Houli R&D Center Business Plan marked as Article Five. These are the items I gave to HUANG Shuhan at the time. As for the other items, they should all belong to WANG.

Q:    Three user accounts, 00046294, 00046324, and *itoaservice,* appear on the notebook computer numbered Article One when it is powered on. Who are their respective users? What are the passwords?

A:    My UMC employee number is 00046294 so this user account is mine. The password is *ASDf1234*. 00046324 should be LI Fuzhe's UMC employee number. The account is used by LI. LI could also log onto this company computer. As far as the user account *itoaservice* is concerned, it should be an account pre-set up for a new user on this computer.

                                                                                                           024

Q:    Are there any MMT materials duplicated by you and WANG Yongming stored in the previously cited notebook computer?

A:    I have always used this company computer to access MMT work materials that I duplicated and brought over, which are stored in the smaller black-colored *USB* drive previously cited as Article Two. Sometimes I would compile directly on the *USB*. Other times I would save directly onto this company computer. However, after a period of time, I would re-save valuable files back onto the *USB* drive and delete ones that have little value. Presently, on this company computer, there shouldn't be any MMT files or materials under my user account. These files and materials are all saved on the previously cited *USB*. When WANG would borrow this company computer, he always used my user

UNCLASSIFIED

account and password to log in. I have observed non-UMC files and materials that other(s) stored under my account. Since WANG was the only one who would use my user account and password, when I saw those kinds of materials, I would delete everything in one fell swoop.

Q:     The time now is 11:35 p.m. Would you like a break from the interview?

A:     I am fine for now.

Q:     Why would LI Fuzhe also have a user account for this notebook computer? How was it being used?

A:     LI Fuzhe and I started at UMC around the same time. Approximately in the beginning of 2016 when we were discussing UMC's memory project, we needed to access some personal materials and so together we requested a company computer that had *USB* permissions from CHEN Zhengkun. This is why this company computer has both my and LI's user accounts. I have asked LI how he would use this notebook computer. LI told me that he would use it to access reports previously written by him for reference purposes.

Q:     (Note:  Property seized on February 7, 2017 marked as *A-6*; Item Description:  WANG Yongming's cell phone; one captured *Line* chat with *JT*, [or] HE Jianting) In the noted item, on June 30, 2016, WANG Yongming asked you, "Where is Fuzhe's company computer? Could I borrow it to look at documents?" Your response, "Fuzhe's was taken by *Stephen*…mine is in the gap on top of my small cabinet...*Passwor Qwer1234...*" WANG Yongming replied, "Thank you...I'll be careful with it." What is the meaning of this conversation?

A:     (After an examination) LI Fuzhe and I started by each requesting a company computer from CHEN Zhengkun. This chat was from the time when WANG Yongming asked me the whereabouts of the company computer assigned to LI. WANG wanted to use it to access his personal *USB* files and materials. Since CHEN Zhengkun, aka *Stephen*, had taken LI's company computer, I told WANG to use the computer assigned to me password at the time was *Qwer1234*, but it was changed at regular intervals. It was against policy to access personal materials at UMC. This was why at the end WANG made a point to express that he'd exercise caution when operating the computer.

Q:     Could you elaborate on the process of how you and LI Fuzhe requested and were granted company computers that could be used to access personal materials?

A:     After giving his consent, CHEN Zhengkun instructed his assistant *Luisa* (I can't recall her full name) at the Xinzhu office to process our request. Later UMC's *IT* staff set up two company computers and issued them to LI and me.

Q:     Even though your using the company computers was with CHEN Zhengkun's consent and the computers were set up and given to you by UMC's *IT* staff, yet you indicated, "It was against policy to access personal materials at UMC. This was why at the end WANG

[Yongming] made a point to express that he'd exercise caution when operating the computer." Was the reason why WANG Yongming said he'd exercise caution when operating the computer because he was accessing files duplicated and taken from MMT?

A:    The company computers were intended for us to access files and materials on *USB*s. There were no policy compliance issues there. Accessing files duplicated and taken from MMT had to be why WANG said that he'd exercise caution when operating the computer. I never inquired what he was doing on the computer when he asked to borrow it.

Q:    Was CHEN Zhengkun aware that you and WANG Yongming would use the company computer to access files and materials duplicated and taken from MMT? Or did you intend to access the files and materials duplicated and taken from MMT even when you submitted your request to CHEN Zhengkun to be issued a company computer?

A:    MMT did not prohibit or restrict employees from taking work files home prior to 2015. Therefore, I presumed that all MMT employees duplicated and took company files by way of *USB* drives. Given that space on MMT-issued hard disks ran inadequate, employees group purchased *USB* drives. The *USB* drive seized and held in the Prosecutor's custody was group purchased by other colleagues and me while I worked at MMT. When LI Fuzhe and I requested CHEN Zhengkun to assign us company computers, we did not inform CHEN that we would be using the computers to access MMT materials. I was not aware how CHEN interpreted things. Moreover, CHEN was not aware that WANG Yongming was also using this company computer.

Q:    Where is the company computer assigned to and used by LI Fuzhe located?

A:    I have asked LI Fuzhe. He said that after the search by your Division on February  026
      2017, he returned the computer issued to him.

Q:    Prior to the search conducted by this Division on February 7, 2017, RONG Letian instructed you and WANG Yongming to put away so-called personal materials. Then LI Fuzhe returned the company computer issued to him after the search was conducted. Did these things take place because either these personal materials or the files stored in the company computer contained evidence of breached MMT trade secrets?

A:    RONG Letian probably assumed that those of us who came from other companies to join UMC's memory project would to some extent bring materials from our former employers. As for the company computer assigned to LI Fuzhe, I have no way to know whether it stored MMT materials.

Q:    The time now is 12:52 a.m., February 15, 2017. The recording device was discovered to have experienced poor power connections and stopped recording. The batteries were changed at 12:52 a.m. and now recording has resumed. Do you understand?

A:    I do.

Q:      The time now is 12:55 a.m. You have made the request for a rest break, and thus this Division is presently suspending the interview. Do you understand?

A:      I do.

Q:      The time now is 1:13 a.m. You have rested some. This Division will resume the interview. Do you understand?

A:      I do.

Q:      Please examine the materials previously cited as Article Number Three, hardcopies of documents labeled two to eight and ten to fifteen that total 13 notebooks. Explain what is contained in each item. Are they MMT trade secrets?

A:      The items labeled four, five, and seven are materials on Powerchip Technology's manufacturing process from when I worked there. Since it was on the certified optimal manufacturing process, it should be considered Powerchip Technology's trade secrets. The items labeled three, six, and twelve are materials on Rexchip Electronics's manufacturing process from when I worked there, which should also be considered Rexchip Electronics's trade secrets. The items labeled eleven and fourteen are materials on Rexchip Electronics's high-volume production process from when I worked there. During that period, Rexchip Electronics entered into a merger with Micron Technology and was renamed MMT, and so these materials later became MMT properties and should be considered MMT's trade secrets. The papers labeled two are new hire training 027 materials that I created. Their contents are the *ABC*s of integrating production processes that incorporate all previously cited materials on manufacturing, that is to say the fundamentals on the subject with additional narratives such as my own views and learnings. They operate much like my personal notes. I don't know whether they would be considered trade secrets. Label thirteen is the Introduction to an Integrated Manufacturing Process created by YU Binyuan [0151/1755/3293], Technology Team Lead of Rexchip Electronics's Manufacturing Integration Department. I received this set of materials during a training and kept them when the training concluded. YU should now be a Department Manager at MMT. The information is relatively basic and I don't know whether it is considered trade secrets. The item labeled ten is the classification codes for Rexchip Electronics's *DRAM* wafer testing. I don't know if it falls under trade secrets. Item fifteen is a hodgepodge of materials I retained from when I was at Powerchip Technology. They are most likely not trade secrets. Three sets of materials are under label eight. The first is Elpida Memory's product description (*Data Sheet*) that I downloaded from the internet, which is not a trade secret. Handouts from when I worked at MMT and attended meeting(s) on the *1x* nano *DRAM* manufacturing process make up the second set of materials. The third item is a brief on MMT's present yield rate for its 20-nanometer class *DRAM*. I cannot be sure if either or both sets of materials are considered trade secrets.

Q:      What is in the Elpida-Rexchip Houli R&D Center Business Plan noted as Article Five?
        Are the contents regarded as Rexchip Electronics's trade secrets?

A:      This was a business plan drafted by Rexchip Electronics in December 2010 to apply for
        special research program funding offered by the Ministry of Economic Affairs. At the
        time Rexchip Electronics was an Elpida subsidiary; Elpida owned approximately 50%
        equity in Rexchip. Someone drafted this plan in order to request for government funding.
        I was not the author. I did save it when I saw it on the chance that it might serve as a
        reference later on. I don't believe the materials contain trade secrets.

Q:      If the Elpida-Rexchip Houli R&D Center Business Plan noted as Article Five is not
        considered Rexchip Electronics's trade secrets, then why is the cover page specifically
        marked Secret on its upper right-hand corner? Why did you take this secret document out
        of Rexchip Electronics?

A:      Although this document is marked as Secret, its actual contents have been made available
        on financial reports and at shareholder meetings, and so I don't feel that it is a true secret
        document. I take materials that I would probably need for future reference out of habit.

Q:      Do you know a CHEN Yiling? Are there any financial dealings and/or ill will between
        you and CHEN?

A:      I do know CHEN Yiling. S/He is a colleague whom I've worked with at Taiwan   028
        Semiconductor Manufacturing Company (TSMC), Rexchip Electronics, and MMT.
        There is no ill will nor are there any financial dealings between us.

Q:      When interviewed by the Prosecutor on February 13, 2017, after examining the smaller
        black-colored USB drive numbered Article Two, CHEN Yiling offered, "...also, in the
        *Job Data* file folder found in the smaller USB drive branded *Kingstone [sic]* on the
        outside are contents identical to the file that I first saw in the mobile hard drive that HE
        Jianting freely volunteered...HE's separation was October 2015, but the directory shows a
        MMT file access time of January 2016. HE had already left MMT by that time, so it's
        proof that he looked at these files. These files and the *UMC step naming* files he was to
        create were placed in the same directory folder. I believe he referenced MMT files when
        he was working on similar processes at UMC. When he was deciding how the
        manufacturing process should run, he might have referenced the manufacturing process
        now found at MMT." This is clear indication that after you separated from MMT, you
        took the company's files and used them at UMC. What is your explanation of these
        events?

A:      Files that I've used in each successive job throughout the years have all been saved under
        the *Job Data* file folder on the USB drive. I returned to UMC employee housing
        accompanied by personnel from this Division on February 8, 2017 and consented to
        handing over the mobile hard drive to their custody. The files within it are more or less
        the same as what is in the *Job Data* folder on the USB drive. While I worked at UMC I
        did access MMT files and materials, but only did so for my personal learning, to broaden

my knowledge base, and to make improved work-related judgement calls. My understanding at the time was that the UMC memory development project followed Samsung's technology trajectory instead of being an MMT copycat, and so there was no direct use of MMT technology. There was no issue of violating trade secrets. Nevertheless, after I was interviewed by representatives of this Division last week, I did online research and consulted the company's in-house legal team. This was when I learned that in addition to illegal access, because I did read and reference MMT file information, I also run the risk of illegal use. I only came of this knowledge recently.

Q:     The time now is 2:24 a.m. This Division will suspend the interview to provide you a rest and meal break. Do you understand?

A:     I do.

Q:     The time now is 2:32 a.m. You have eaten as well as rested some. This Division will resume the interview. Do you understand?

A:     I do.

Q:     Do you know a CHEN Xixian? Are there any financial dealings and/or ill will be  029 you and CHEN?

A:     I do know CHEN Xixian. S/He is on the in-house legal team at MMT. There is no ill will nor are there any financial dealings between us.

Q:     When interviewed by the Prosecutor on February 13, 2017, CHEN Xixian offered, "While inspecting seized evidence today, I came across materials on *1x* nano, currently the most advanced manufacturing process at MMT. In theory, HE Jianting should not have had any contact [with it]." Also, according to CHEN Yiling's account, "HE Jianting participated in the *1x* nano project. He was the manufacturing integration supervisor. The file(s) I inspected today must have been taken by HE Jianting upon separation from the company. By that time, MMT had already designed its earliest *1x* nano manufacturing process." This indicates that label eight's second item was from when you worked at MMT and participated in *1x* nano *DRAM* production meetings. The meeting materials contained extremely advanced MMT trade secrets. Why did you take them upon separation from the company and go so far as to use them as reference when at UMC?

A:     When I left my job at MMT, MMT was still developing the *1x* nano manufacturing process. Its yield rate was zero at that time. I took materials that I might later use for reference out of habit. Label eight's second item, the *1x* nano *DRAM* production meeting materials, was only a relatively basic introduction. I cannot be certain if it could be considered trade secrets. Stored in my black USB flash drive and mobile hard drive – both items have been seized and are in the custody of the Prosecutor and this Division – are materials containing more in-depth information on the *1x* nano manufacturing process. I acknowledge that these materials are MMT trade secrets.

Q:      (Note:  Property seized on February 14, 2017 numbered *2B-2*; Property:  one MMT document) The noted item is a letter dated April 19, 2016, numbered 105-Micron Technology-0040, and addressed to HE Jianting.  What are its contents and why was it sent?

A:      (After an examination) This letter is a reminder from MMT that the company and I signed an employment contract and a non-disclosure and intellectual property agreement on February 14, 2014. Upon separation I must faithfully abide by the provisions that prohibit employee poaching and the violation of confidentiality. One copy each of the two signed contracts are enclosed as attachments. I am not certain if this is standard MMT procedure.

Q:      According to Article 1.2 of the non-disclosure and intellectual property agreement entered into between you and MMT: "I agree to the adoption of reasonable defensive measures to protect secret information, including but not limited to: (1) the storage of all documents, diagrams, drawings, and/or handwritten materials that contain secret information in any shape or form at a secure location..." and Article 1.3: "When 030 employment relationship with MMT terminates and/or upon MMT's request, I will set aside the documents, records, notebooks, and all other items containing secret information in my possession, custody, or control at the time, including duplicates in both paper and electronic formats, for MMT. Whether created by myself or others. I may not retain copies of such items in any format. If I store secret information on non-MMT properties, including but not limited to personal computers, telephones, tablet computers, personal email accounts, file-sharing accounts, and/or any other devices and databases, I will immediately return secret information of this nature to MMT and destroy any and all copies in my possession, custody, or control. I pledge to MMT of their return and/or destruction." Also, the previously noted MMT letter reiterates, "During the course of your employment here, you are obligated to maintain the confidentiality of secret information that you come into contact with, know of, or are in possession of. Article 9.4.3 of your employment contract stipulates that you must strictly abide by the same non-disclosure responsibilities upon separation. Unauthorized disclosure is strictly prohibited. This includes, but is not limited to, illegal activities such as the direct or indirect acquisition and/or exploitation by your new employer or a third party." During your employment at MMT, there clearly exist stipulations to safeguard the company's trade secrets, no unauthorized duplication of the company's secret materials, and no unauthorized, unsanctioned use of acquired trade secrets even after separation. Do you have any objections to the above?

A:      I do not.

Q:      (Note:  Property seized on February 14, 2017 numbered *2B-3*; Property:  One employment contract) The noted item is a signed contract of employment between Fujian Province Jinhua Integrated Circuit Company (JHICC) and you. What are its contents and why was it signed?

UNCLASSIFIED

A:    (After an examination) I signed this contract in either October or November 2016. The terms were that JHICC was to provide me a project bonus, effective July 1, 2016, to June 30, 2021. The money would come to approximately NTD 1.5 million per annum (same below) after taxes for a total of five years. JHICC would remit money monthly into my Xiamen Bank account. The reason behind signing this contract was because CHEN Zhengkun wanted to attract external hires with a better compensation package, to recruit people from other *DRAM* companies to work on UMC's memory project. And so CHEN was able to secure this development bonus from JHICC. Then he designated a few employees who he believed to be superior performers and deserve the incentive. My understanding was that, along with myself, LI Fuzhe and GUO Fengming opened accounts at Xiamen Bank after signing the contract with JHICC in order to draw the bonus money. Our entering into a contract with JHICC signified that we would be precluded from receiving bonuses, quarterly awards, and an additional signing bonus from UMC. I was aware of how much on average employees at the Team Lead level would receive in terms of bonuses, quarterly awards, as well as an additional sign 031 bonus.

Q:    Did WANG Yongming, RONG Letian, and CHEN Zhengkun also sign the cited employment contract with JHICC?

A:    Mine was the first group who signed the employment contract with JHICC. WANG was a member of the second group. At the present, the process has yet to run its course and they have not collected the project bonus from JHICC. I really don't know whether RONG and CHEN signed the employment contract with JHICC.

Q:    The time now is 3:48 a.m. The recording device's batteries have been depleted and recording stopped. This Division has changed the recorder pen and recording has resumed. Do you understand?

A:    I do.

Q:    In the transcript from February 7, 2017, you stated, "...in November 2015 my initial annual salary was approximately [NTD] 1.9 million as a new UMC employee. CHEN Zhengkun believed that a salary like mine, lower than what it was at MMT, made it more difficult to recruit new employees. During February or March 2016, after he took the initiative and fought on my behalf, my annual salary was revised to approximately [NTD] 2.2 to 2.3 million..." If the [NTD] 1.5 million JHICC project bonus that you started receiving beginning July 1, 2016, was added, how much would your salary be?

A:    The salary amount I spoke of last time included my initial signing bonus. If you go by what it was from July 1, 2016 forward, my annual salary was approximately [NTD] 1.9 million because I was no longer eligible to receive bonuses, quarterly awards, and the additional signing bonus. With the [NTD] 1.5 million in JHICC project bonuses added, my annual salary came to approximately [NTD] 3.4 million.

UNCLASSIFIED

UNCLASSIFIED

Q:      In view of the aforementioned, your annual salary at MMT was approximately [NTD] 2.2 to 2.4 million. After you came on board at UMC, your annual salary rose to [NTD] 3.4 million. Was this the reason why you separated from MMT and brought its trade secret materials over to UMC?

A:      No. When I first separated from MMT and onboarded at UMC, UMC did not collaborate with JHICC. JHICC had also not been established. At the time, the annual salary that I was paid by UMC wasn't as high as what I received at MMT. Only when CHEN Zhengkun helped with my first adjustment in February or March 2016 did my salary come close to what it was at MMT. Not until I signed the employment contract with JHICC did I start to receive an annual salary of [NTD] 3.4 million beginning in July 1, 2016. I did take MMT materials to UMC. It was because I wanted to continue researching and studying. I gave no consideration to the fact that although UMC    032 Samsung's technological trajectory, my accessing secret MMT materials at UMC still amounted to usage risks.

Q:      The time now is 4:05 a.m. Are you able to continue this interview given your present physical and mental conditions?

A:      I'd like to finish this interview as soon as possible.

Q:      Why did UMC employees like you who signed the aforementioned employment contract with JHICC needed to open an account at Xiamen Bank?

A:      I don't know. It was around the time of our contract signing that CHEN Zhengkun told us to open an account at Xiamen Bank. The three of us – LI Fuzhe, GUO Fengming, and I – flew to Xiamen together. Once we arrived, JHICC personnel were there to take us from the airport to the bank so we could open our respective bank accounts. After doing so, we boarded a flight back to Taiwan on the same day.

Q:      Did you, LI Fuzhe, and/or GUO Mingfeng meet with anyone from JHICC's management team?

A:      Yes. It was JHICC employee(s) who took us to open the bank account. After that concluded, we did first stop to have lunch. A Taiwanese plant manager from JHICC, WU Kunrong, was present and accompanied us during the meal.

Q:      Did WU Kunrong or any other JHICC employee discuss with you, LI Fuzhe, and/or GUO Mingfeng the UMC memory project's implementation?

A:      No. We simply shared a meal together.

Q:      When did WANG Yongming find out that he could sign a contract with JHICC and be paid a bonus of approximately [NTD] 1.5 million per annum even after he onboarded at UMC?

UNCLASSIFIED

UNCLASSIFIED

A:      I remembered that WANG Yongming learned of it about one month before I signed the employment contract with JHICC.

Q:      (Note:  Property seized on February 7, 2017 numbered *A-6*; Property:  WANG Yongming's cell phone, one chat captured on the *Line* app) On August 25, 2016, WANG Yongming expressed to you, "Big *S* said today that I must sign for four years in order to receive that bonus stipend from China...given my current circumstances, I don't know if I'd be able to hang on for four years...The Big Guy said that *Sir* RONG did recommend me..." Was he referring to the matter of WANG Yongming signing a contract with JHICC? What were the specific details?                                          033

A:      (After an examination) Yes. Both Big *S* and Big Guy referred to CHEN Zhengkun. It was CHEN who told WANG Yongming about the employment contract with JHICC. As for *Sir* RONG, that was RONG Letian. RONG was the one who recommended WANG to be promoted from team lead to department manager.

Q:      The time now is 4:40 a.m. You have made the request for a rest break, and thus this Division is presently suspending the interview. Do you understand?

A:      I do.

Q:      The time now is 4:50 a.m. You have rested some. This Division will resume the interview. Do you understand?

A:      I do.

Q:      In the aforementioned chat captured from the *Line* app on WANG Yongming's cell phone, on March 22, 2016, WANG expressed to you, "Ah, it's all right! The salary will be about the same as now...does our UMC pay packages include bonuses?...*Sandy* only spoke of an amount." You then indicated, "If and when results are produced, there should be additional incentive awards." What were the specific details?

A:      These are the compensation details that WANG Yongming discussed with me after he moved on to UMC. Not counting bonuses, his pay at UMC was much the same as his pay at MMT. Also, I mentioned to WANG that CHEN Zhengkun was working on securing funds as incentive awards, provided that there is delivery of the *DRAM* product(s).

Q:      You previously spoke of how CHEN Zhengkun was trying to secure money for additional incentive awards. How was it tied to the employment contract that you signed with JHICC?

A:      CHEN Zhengkun wanted to offer encouragement to the R&D personnel about to join the memory project at the time, so he proposed the idea that if there was success in *DRAM* product development, they would be eligible to receive extra incentive award money. As for what CHEN later secured with JHICC in terms of signing employment contracts, I

UNCLASSIFIED

UNCLASSIFIED

believe the two are entirely separate, especially since the incentive awards were never established.

Q:     You belong to *PM2*. What are the respective responsibilities of *PM2*'s Integration Department I and Integration Department II? Who is the department manager of Integration Department II?

                                                                                    034

A:     At UMC, we split the research and development of the *DRAM F32* manufacturing process into six segments. Integration Department I is responsible for segments one, four, and five, whereas Integration Department II is responsible for segments two, three, and six. Integration Department II has a unit that is in charge of coordinating all photomask-related matters and the *design rule*s for *DRAM* logic circuitry. The manager of Integration Department II is WEI Mingde.

Q:     The time now is 5:20 a.m. This Division's personnel is suspending the video recording to replace the video CD. The recording will continue at 5:22 a.m. Do you understand?

A:     I do.

Q:     What exactly do *layout* and *design rule* mean? Are there any differences?

A:     *Layout* is the top view of the whole *DRAM* product. The technical drawing looks down from above and shows the layout, design, and specs of the *DRAM* integrated circuit. Integration Department II at UMC has team(s) tasked to coordinate with outside *IC* design vendors on photomask production and *design rule*s. The guiding principle has been that UMC would establish *rule*(s) in accordance with its own capabilities, such as determining the smallest and largest ranges allowed for wire spacing. The *IC* design vendors would then follow the *rule*(s) in the *design* of the circuit design drawing (but now it may be that the *IC* design vendors would take the existing design layout and in turn dictate to us the *rule*(s) required). Then UMC would combine the circuit layout and the *DRAM memory cell*'s memory range to produce the product's top view, or in other words, the complete *layout*.

Q:     When interviewed by the Prosecutor on February 8, 2017, WANG Yongming offered, "He (RONG Letian) is my supervisor. In discussions he'd ask if I have any MMT specs and requirements on hand. Since he was the one who interviewed me and knew that I came from MMT, he hoped that I could be of some assistance to help with the entire UMC *F32 DRAM* design specifications so as to devise a better scope...if I hadn't download file(s), my revision(s) probably wouldn't be as comprehensive..." Namely, RONG Letian directed WANG Yongming to help by using MMT trade secret materials and revising UMC's *F32 DRAM* application specifications. If WANG didn't download file(s) from MMT, he wouldn't have been able to improve UMC's design specifications. Have WANG Yongming and/or RONG Letian ever discussed these matters with you?

A:     WANG Yongming did complain to me about how RONG Letian had asked WANG to do some comparisons of MMT and UMC *design rule*s. However, I am not clear on the

UNCLASSIFIED                                          035

UNCLASSIFIED

details. I don't even know if WANG ever followed through to help RONG. My feelings are that WEI Mingde and his *team* are capable of accomplishing this objective without the MMT *design rule*s.

Q:      Was it because WANG Yongming complied with RONG Letian's instructions and helped with the comparison of MMT and UMC *design rule*s that led RONG to recommend WANG's promotion from team lead to department manager? Or why was WANG able to sign the employment contract with JHICC and collect the project bonus paid out by JHICC?

A:      I don't believe either was the case. *Design rule* was not part of WANG Yongming's job responsibilities. Being promoted from team lead to department manager should have been the result of exceptional performance in his core responsibilities. As for signing the employment contract with JHICC, that was arranged by CHEN Zhengkun. WANG wasn't the only person who signed a contract. I don't know whether WANG and others eventually arranged the contract signing.

Q:      This Division is again confirming that in the mobile hard drive you proactively provided and now in the custody of this Division as well as the *USB* drive seized and held by the Prosecutor are stored MMT trade secrets. Were they duplicated and taken out of MMT after you signed the employment contract and non-disclosure and intellectual property agreement with MMT on February 14, 2014?

A:      I duplicated MMT files and materials onto the mobile hard drive as well as the *USB* drive both before and after signing with MMT.

Q:      Of the MMT trade secret materials cited and/or touched upon during this interview, which were duplicated and taken out after February 14, 2014?

A:      I am certain that the meeting materials discussing MMT's *1x* nano *DRAM* manufacturing process that was noted earlier, the introduction of the present *DRAM* 20-nanometer yield rate, as well as files saved on the mobile hard drive and the *USB* drive(s) that are related to the manufacturing process are basically the only items duplicated after my signing with MMT on February 14, 2014. As for the other materials, most were duplicated and taken out *prior to that date*.

Q:      The time now is 7:10 a.m. This Division is presently suspending the interview for a rest break. Do you understand?

A:      I do.

Q:      The time now is 7:45 a.m. You have rested some. This Division will resume the interview. Do you understand?

A:      I do.

036

UNCLASSIFIED

UNCLASSIFIED

Q:     Do you consent to allowing this Division's personnel to log into your two email accounts, *jengting.tw@yahoo.com.tw* and *jengting.tw@gmail.com* and perform downloads?

A:     I do. My password for both email accounts is *jthobb3317*. Personnel from your Division is free to download after inputting the password.

Q:     The time now is 9:15 a.m. You have finished your meal and rested some. This Division will resume the interview. Do you understand?

A:     I do.

Q:     Why can't the password cited be used to log into your email account, *jengting.tw@yahoo.com.tw*?

A:     Since *Yahoo* email accounts now require two-step authentication, I have been using my cell phone to log into this account. It's been a long time since I've logged in using a notebook computer. Your Division personnel could browse using my cell phone that has been seized and is in your custody today.

Q:     When interviewed by this Division on February 13, 2017, and after an examination of the mobile hard drive that you that you proactively delivered to this Division's custody, CHEN Yiling indicated, "Included in the mobile hard drive under *D data* are the file folders *3DI, BKE, F16data, F23 lxnm110s, F28 20nm, F28 20nm100s, F32 25nm, F32 25nm90s, F38 30 nm, F45 40 nm, F45 40nm2g3c, F54, F63, F68,* and *F72,* and all are internal MMT secret materials. Without the consent of MMT, these materials may not be leaked to clients or competitors. These materials were duplicated directly from MMT, even file names remained the same and unaltered....File folders *F23 1xnm110s, F28 20 nm, F28 20nm100s, F32 25nm,* and *F32 25nm90s* all contain products currently in mass production at MMT...In the *F23 1xnm110s* file folder, the three files named *Flow\ dram_110_series_(1xnm)_traveler_(zlla)-2015 Jan.pdf, dram_comparison_ workshop_100-110_series.pdf,* and *iRDL Intro Feb25 2015.pptx* contain *1x*-nanometer (10 to 20 nanometers) manufacturing technology. The file *DRAM_100_series_(20nm)_ traveler_ (v00h) 150730.pdf* and the path *F11 data\F11 transfer Doc\TRD\Etch\F15_F11 _DRAM_ DE_AMAT eMax_CUOA102_TRD.xlsx* in the *F28 20nm 100s* file folder are all materials on and/or related to 20-nanometer manufacturing technology. In the *F32 25nm 90s* file folder, *2E0F (mobile LP3)\flow\ Fab15 25nm 4G3D&4GLP3 Process Flow_20131206.xlsx* and the path *4G3D(V90B) & 2G3F\flow\25nm Process Flow Rev.02.pdf* are all materials on 25-nanometer manufacturing technology. These materials include the more than 1,000 manufacturing processes of *DRAM* products, as well as all kinds of manufacturing parameters and different *technical generation*s of different products. The contents of the materials encompass MMT's achievements from the past ten years. These are very important trade secrets for MMT. If the information is 〔037 by competitors, no doubt it would accelerate their production schedule for importing this category of *DRAM* products....under the *F16 data* category are all materials on future production schedule estimates for the entire MMT product line in the *PLM* file folder and MMT mass production plans for every product from yearend 2013 to December 2016 in

UNCLASSIFIED

UNCLASSIFIED

the *MPUP* file folder. These plans would allow competitors to learn of MMT's mass-produced products and then proceed to form their own operational strategies. Thus, these items are indeed MMT trade secrets." What do you have to say about the statements made by CHEN Yiling?

A:     Of the statements made by CHEN Yiling, with the exception of the MMT mass production plan in the *PLM* file folder of the *F16 data* category, the materials have become obsolete since they date from yearend 2103 to yearend 2016. Also, when drawing up a mass production plan, MMT would also release its generational turnover plan, yet frequently great disparity exists between the plans and their actual execution. Whether things were as he said, that if competitors are informed of these plans meant that they would proceed to form their own operational strategies, still remain to be determined. As for the other pieces that he said, I am basically in agreement. I am of the opinion that what are considered MMT trade secrets should be validated by an impartial third party.

Q:     After an examination of hardcopy documents that you gave to HUANG Shuhan for safekeeping prior to the search conducted by this Division's personnel on February 7, 2017, CHEN Yiling indicated, "The *ABC*s for integrating the manufacturing process (*F68*), Article Two, are materials on Rexchip Electronics's 68-nanometer production. If this document is given to some low-end mainland [Chinese] *DRAM* manufacturers, then they'd be able to engage in low-end *DRAM* production. Article Three's *Prod Group: 2GDDR3 04C* document is on the 40-nanometer manufacturing process. The document that is Article Four is information on the 72-nanometer manufacturing process. Articles Five to Fourteen are documents on the manufacturing processes of various *DRAM* products, and all are internal MMT secret documents. In the Article Fifteen file folder is an *Elpida ECD-DPB-111* document on yellow LED light technology, which is exposure data on the manufacturing of *DRAM* product(s). All previously stated materials on the manufacturing process are MMT trade secrets." What do you have to say about this?

A:     I believe that CHEN Yiling's statements are not entirely accurate. Like I said before, in the hardcopy documents known as Article Three, the items labeled four, five, and seven, are materials on the manufacturing process from when I worked at Powerchip Technology and not MMT properties. The hardcopy document labeled two is new hire training material that drew from Rexchip's 68-nanometer manufacturing technology. However, with regard to what he said about low-end mainland Chinese *DRAM* manufacturers able to engage in low-end *DRAM* production, that is entirely CHEN's point of view. I do not identify with it, because the technology lags so far behind that it is not at all cost effective. The item labeled nine is not mine. The documents labele   038 items six, eight, and ten to fourteen are all considered MMT properties. I agree that the items labeled six, ten, eleven, twelve, and fourteen are MMT trade secrets. There are three documents under label eight. One was previously shared online. Only the other two are MMT trade secrets, and of which I have no quarrel with. Whether the document labeled thirteen should be considered trade secrets is somewhat controversial, and I believe that it must be settled by an impartial party. The folder labeled fifteen contains the document *Elpida ECD-DPB-1*, 72-nanometer information that is a technology

UNCLASSIFIED

transfer from Elpida Memory to Powerchip Technology. It is not owned by MMT. The document is annotated with Powerchip Technology's initials, *PSC*.

Q:    (Subpoena delivered to the Taiwan Taichung District Prosecutors Office) Do you wish to be accompanied by this Division's personnel to the Taichung District Prosecutors Office for a second round of interview by the Prosecutor?

A:    Yes.

Q:    Do you have anything to add?

A:    The materials that I duplicated and took from MMT were only for my personal research and reference purposes. Since the UMC memory project also ultimately adopted Samsung's technological trajectory and not MMT's manufacturing process, I had always been under the impression prior to being interviewed by your Division's personnel that as long as I didn't make use of the materials that I took from MMT, there would be no legal issues. Now I have been made aware that just by having trade secrets in my possession is considered breaking the law. I hope the Prosecutor will take into consideration that I didn't knowingly and willfully break the law and be lenient in the sentencing request. Moreover, I would like to point out that MMT did not prohibit nor exert any control over its employees' use of USB drives, cloud storage, and/or email to reproduce, download, and/or forward business materials before 2015. The company even went so far as to encourage its employees to take and work on files at home.

Q:    Did you speak to the best of your knowledge?

A:    Yes, I did.

The above transcript totals 20 pages and is completed at 11:40 a.m. on February 15, 2017. The interviewee and his legal counsel have reviewed and verified that the contents are free of error before affixing their signatures and thumb prints.

                         Interviewee:
                         Interviewer:
                         Stenographer:

                                                              039