UNCLASSIFIED

*A copy of this transcript was not available in print on February 15, 2017, when HE Jianting [IL] thus it is being been made available for side-by-side reference.*

|  | **TRANSCRIPT** | | | | February 14, 2017 | |
|---|---|---|---|---|---|---|
|  | | | | | Tainan Investigation Division, MJIB | |
| SYNOPSIS | WANG [3769] FNU allegedly violated the Trade Secrets Act. | | | | | |
| Q | NAME | NICKNAME | GENDER | DATE OF BIRTH (YYYY/MM/DD) | PLACE OF BIRTH | OCCUPATION (GRADE LEVEL) | NATIONAL ID NUMBER |
| A | HE Jianting [0149/1696/1694] | | Male | ▬ | Taichung | Engineer | ▬ |
| Q | ADDRESS | | | TELEPHONE | | HOUSEHOLD ECONOMIC STATUS | EDUCATION |
| A | Residence: ▬ | | | ▬ | | middle class | Master's Degree, Institute of Applied Mechanics, National Taiwan University |

Q: You are being accused of violating Articles 13.1 and 13.2 of the Trade Secrets Act and Article 359 of the Criminal Procedure Code. This Division (New Taipei City Investigation Division of the Ministry of Justice Investigation Bureau) has requested your presence here today as the accused. You arrived at 7:15 p.m. on February 14, 2017. After being granted a meal and rest break, the examination interview commenced at 8:23 p.m. During the interview, you are allowed to exercise the following rights: 1) Remain silent and not make statements contrary to your own wishes. 2) You have the right to legal representation. If you are low income, lower-middle income, of indigenous status, mentally handicapped, or a member of any other protected class qualified to apply for legal assistance under the law, you may do so. 3) You may request an investigation of evidence favorable to you. Do you understand?

A: Yes, I do.

Q: Do you belong to a protected class, such as low income, lower-middle income, indigenous status, or any other that would qualify you to apply for legal assistance under the law?

A: No, I do not.

Q: Since the sun has already set, do you consent to a nighttime interview?

A: I do.

Q: Do you need to appoint defense counsel?

A: I do. I have already retained JIA Junyi, Esq. as my defense counsel. He is currently on his way here.

Q: Do you consent to being interviewed prior to legal counsel's arrival?

021

A: I would like the interview to commence when Mr. JIA is present.

Q: The time now is 8:38 p.m. This Division will suspend the interview until your legal counsel arrives. However, the rules stipulate that if more than four hours elapse, we must proceed with the interview. Do you understand?

A: I do.

Q: The time now is 10:01 p.m. Your legal counsel JIA Junyi, Esq. is now present. This Division will now proceed with the interview. Do you understand?

A: I do.

Q: Do you have a criminal record?

A: No.

Q: Pursuant to Search Warrant Request No. 000421 issued by Taiwan Taichung District Court in the 2017 today (the 14th) this Division conducted a search of your Project Management II (*PM2*) offices located at 57 Nanke Third Road, Xinshi District, Tainan, at the New Business Development Center of United Microelectronics Corporation (hereinafter UMC). Were you present for the duration of the search? Do you have any objections regarding the search process?

A: I was present for the entire process. I have no objections.

Q: Do you have anything to add to the transcript produced at this office on February 7, 2017?

A: Yes. In the last transcript, I didn't inform your Division that I duplicated and took work-related materials – both hardcopies and electronic files on a *USB* drive – from my former employer, Micron Memory Taiwan (MMT), to the *PM2* office at UMC, so as to be able to read and reference them at work. Also, on that same afternoon, approximately 15 minutes prior to your Division's arrival at the *PM2* office to conduct the search, *PM2*'s person in charge, Assistant Manager RONG Letian, did come over to tell me that the Prosecutor is coming. If there were any personal materials present, I should hurry up and put them away. After hearing this and just as I was taking out the previously mentioned *USB* drive that contains the MMT electronic files (which also include materials from Rexchip Electronics and Powerchip Technology), WANG Yongming, who was also told by RONG Letian, was handing his personal materials over to HUANG Shuhan. HUANG sat on the right-hand side behind WANG. I, too, gave HUANG my USB drive and paper copies and asked her to store them elsewhere. Not long after I gave [them] to her Division personnel entered to conduct the search. HUANG put some of the materials given to her in her cabinet, but took some away from the *PM2* office. What was removed included WANG's cell phone, which was on her person, when she was requested by your Division to return to the office.

022

Q: You said earlier that RONG Letian came to where you sat, told you that the Prosecutor is coming to conduct a search, and to hurry up and put away any personal materials. What was meant by personal materials that needed to be put away?

A: I knew what RONG Letian meant. He was referring to materials brought to UMC from MMT, where I previously worked.

Q: How did RONG Letian let WANG Yongming know that the Prosecutor and this Division's personnel were coming to conduct a search?

A: I don't know. After I took out the previously mentioned USB drive and paper copies, I either saw WANG take similar items to HUANG, or I might have asked WANG how he was going to put away things. That was how I knew WANG was also notified by RONG.

Q: When interviewed by the Prosecutor on February 8, 2017, WANG Yongming stated, "…RONG Letian spoke to us about this matter during yesterday's search by the government investigators. He told HE Jianting and me to remove MMT-related items…my understanding was that he must also have some MMT materials…called me into his office to tell me…my impression was both at the same time…" Is this an accurate depiction of what took place at the time?

A: What WANG said differs from my recollection. RONG Letian did in fact tell me that the Prosecutor is coming for a search, but he did not tell me explicitly to remove MMT materials. It is my understanding that RONG meant the MMT materials were included. WANG certainly was aware that I brought work materials from MMT over to UMC. RONG did call me to come into his office, but I declined since I was busy. He then told me that the Prosecutor was on his way to conduct a search. As far as how RONG notified WANG, I didn't see any of it. RONG didn't speak to us at the same time.

Q: Why does WANG Yongming know that you brought MMT materials to UMC?

A: I've mentioned it during chats with WANG. I've also requested CHEN Zhengkun (also known by the English name *Stephen*) to provide me with a company computer that has *USB* read permissions, so that I could access personal materials at the office. There were times when WANG would borrow this computer. I have, therefore, chatted with WANG about my bringing over MMT materials.

Q: Has WANG Yongming also used this company computer to access related files and materials he took from MMT?

A: I know that WANG also took related MMT work materials. When he has borrowed this company computer, it would be to access his personal materials. Since the office computers restrict *USB* read access, personal materials could only be accessed on this type of company computer, which has been approved for no *USB* restrictions. As for whether WANG did use this particular company computer to access files and materials he took from MMT, I have no knowledge.

Q: As for the previously mentioned paper documents and USB drive(s) that were given to HUANG Shuhan by you and WANG Yongming prior to the search conducted by this Division on February 7, 2017, where are they now?

A: After being questioned by the Prosecutor on February 8, 2017, I returned to the office sometime between 5:00 p.m. and 6:00 p.m. The company's legal department personnel said at the time that the items WANG and I gave to HUANG for safekeeping must be handed over to the Prosecutor. Therefore, these items should all be with the Prosecutor at this time.

Q: (Note: The catalogued list and properties in the custody of the Taiwan Taichung District Prosecutors Office) Items noted are the previously mentioned objects that you and WANG Yongming gave to HUANG Shuhan. Prosecutors Office personnel rendered a catalog of the seized properties after they were turned over to the Prosecutor on February 9, 2017. Please examine the contents and identify the items that were in your and WANG's possessions?

A: (After an examination) One notebook computer marked as Article One; the smaller black-colored USB drive in the plastic bag marked as Article Two; of the paper materials marked as Article Three, a total of 13 notebooks labeled two to eight and ten to fifteen; and the Elpida-Rexchip Houli R&D Center Business Plan marked as Article Five. These are the items I gave to HUANG Shuhan at the time. As for the other items, they should all belong to WANG.

Q: Three user accounts, 00046294, 00046324, and *itoaservice,* appear on the notebook computer numbered Article One when it is powered on. Who are their respective users? What are the passwords?

A: My UMC employee number is 00046294 so this user account is mine. The password is *ASDf1234*. 00046324 should be LI Fuzhe's UMC employee number. The account is used by LI. LI could also log onto this company computer. As far as the user account *itoaservice* is concerned, it should be an account pre-set up for a new user on this computer.

024

Q: Are there any MMT materials duplicated by you and WANG Yongming stored in the previously cited notebook computer?

A: I have always used this company computer to access MMT work materials that I duplicated and brought over, which are stored in the smaller black-colored *USB* drive previously cited as Article Two. Sometimes I would compile directly on the *USB*. Other times I would save directly onto this company computer. However, after a period of time, I would re-save valuable files back onto the *USB* drive and delete ones that have little value. Presently, on this company computer, there shouldn't be any MMT files or materials under my user account. These files and materials are all saved on the previously cited *USB*. When WANG would borrow this company computer, he always used my user

Q:   (Note: Property seized on February 14, 2017 numbered *2B-2*; Property: one MMT document) The noted item is a letter dated April 19, 2016, numbered 105-Micron Technology-0040, and addressed to HE Jianting. What are its contents and why was it sent?

A:   (After an examination) This letter is a reminder from MMT that the company and I signed an employment contract and a non-disclosure and intellectual property agreement on February 14, 2014. Upon separation I must faithfully abide by the provisions that prohibit employee poaching and the violation of confidentiality. One copy each of the two signed contracts are enclosed as attachments. I am not certain if this is standard MMT procedure.

Q:   According to Article 1.2 of the non-disclosure and intellectual property agreement entered into between you and MMT: "I agree to the adoption of reasonable defensive measures to protect secret information, including but not limited to: (1) the storage of all documents, diagrams, drawings, and/or handwritten materials that contain secret information in any shape or form at a secure location..." and Article 1.3: "When employment relationship with MMT terminates and/or upon MMT's request, I will set aside the documents, records, notebooks, and all other items containing secret information in my possession, custody, or control at the time, including duplicates in both paper and electronic formats, for MMT. Whether created by myself or others. I may not retain copies of such items in any format. If I store secret information on non-MMT properties, including but not limited to personal computers, telephones, tablet computers, personal email accounts, file-sharing accounts, and/or any other devices and databases, I will immediately return secret information of this nature to MMT and destroy any and all copies in my possession, custody, or control. I pledge to MMT of their return and/or destruction." Also, the previously noted MMT letter reiterates, "During the course of your employment here, you are obligated to maintain the confidentiality of secret information that you come into contact with, know of, or are in possession of. Article 9.4.3 of your employment contract stipulates that you must strictly abide by the same non-disclosure responsibilities upon separation. Unauthorized disclosure is strictly prohibited. This includes, but is not limited to, illegal activities such as the direct or indirect acquisition and/or exploitation by your new employer or a third party." During your employment at MMT, there clearly exist stipulations to safeguard the company's trade secrets, no unauthorized duplication of the company's secret materials, and no unauthorized, unsanctioned use of acquired trade secrets even after separation. Do you have any objections to the above?

030

A:   I do not.

Q:   (Note: Property seized on February 14, 2017 numbered *2B-3*; Property: One employment contract) The noted item is a signed contract of employment between Fujian Province Jinhua Integrated Circuit Company (JHICC) and you. What are its contents and why was it signed?

A: (After an examination) I signed this contract in either October or November 2016. The terms were that JHICC was to provide me a project bonus, effective July 1, 2016, to June 30, 2021. The money would come to approximately NTD 1.5 million per annum (same below) after taxes for a total of five years. JHICC would remit money monthly into my Xiamen Bank account. The reason behind signing this contract was because CHEN Zhengkun wanted to attract external hires with a better compensation package, to recruit people from other *DRAM* companies to work on UMC's memory project. And so CHEN was able to secure this development bonus from JHICC. Then he designated a few employees who he believed to be superior performers and deserve the incentive. My understanding was that, along with myself, LI Fuzhe and GUO Fengming opened accounts at Xiamen Bank after signing the contract with JHICC in order to draw the bonus money. Our entering into a contract with JHICC signified that we would be precluded from receiving bonuses, quarterly awards, and an additional signing bonus from UMC. I was aware of how much on average employees at the Team Lead level would receive in terms of bonuses, quarterly awards, as well as an additional signing bonus. 031

Q: Did WANG Yongming, RONG Letian, and CHEN Zhengkun also sign the cited employment contract with JHICC?

A: Mine was the first group who signed the employment contract with JHICC. WANG was a member of the second group. At the present, the process has yet to run its course and they have not collected the project bonus from JHICC. I really don't know whether RONG and CHEN signed the employment contract with JHICC.

Q: The time now is 3:48 a.m. The recording device's batteries have been depleted and recording stopped. This Division has changed the recorder pen and recording has resumed. Do you understand?

A: I do.

Q: In the transcript from February 7, 2017, you stated, "...in November 2015 my initial annual salary was approximately [NTD] 1.9 million as a new UMC employee. CHEN Zhengkun believed that a salary like mine, lower than what it was at MMT, made it more difficult to recruit new employees. During February or March 2016, after he took the initiative and fought on my behalf, my annual salary was revised to approximately [NTD] 2.2 to 2.3 million..." If the [NTD] 1.5 million JHICC project bonus that you started receiving beginning July 1, 2016, was added, how much would your salary be?

A: The salary amount I spoke of last time included my initial signing bonus. If you go by what it was from July 1, 2016 forward, my annual salary was approximately [NTD] 1.9 million because I was no longer eligible to receive bonuses, quarterly awards, and the additional signing bonus. With the [NTD] 1.5 million in JHICC project bonuses added, my annual salary came to approximately [NTD] 3.4 million.

UNCLASSIFIED

Q: In view of the aforementioned, your annual salary at MMT was approximately [NTD] 2.2 to 2.4 million. After you came on board at UMC, your annual salary rose to [NTD] 3.4 million. Was this the reason why you separated from MMT and brought its trade secret materials over to UMC?

A: No. When I first separated from MMT and onboarded at UMC, UMC did not collaborate with JHICC. JHICC had also not been established. At the time, the annual salary that I was paid by UMC wasn't as high as what I received at MMT. Only when CHEN Zhengkun helped with my first adjustment in February or March 2016 did my salary come close to what it was at MMT. Not until I signed the employment contract with JHICC did I start to receive an annual salary of [NTD] 3.4 million beginning in July 1, 2016. I did take MMT materials to UMC. It was because I wanted to continue researching and studying. I gave no consideration to the fact that although UMC Samsung's technological trajectory, my accessing secret MMT materials at UMC still amounted to usage risks.

032

Q: The time now is 4:05 a.m. Are you able to continue this interview given your present physical and mental conditions?

A: I'd like to finish this interview as soon as possible.

Q: Why did UMC employees like you who signed the aforementioned employment contract with JHICC needed to open an account at Xiamen Bank?

A: I don't know. It was around the time of our contract signing that CHEN Zhengkun told us to open an account at Xiamen Bank. The three of us – LI Fuzhe, GUO Fengming, and I – flew to Xiamen together. Once we arrived, JHICC personnel were there to take us from the airport to the bank so we could open our respective bank accounts. After doing so, we boarded a flight back to Taiwan on the same day.

Q: Did you, LI Fuzhe, and/or GUO Mingfeng meet with anyone from JHICC's management team?

A: Yes. It was JHICC employee(s) who took us to open the bank account. After that concluded, we did first stop to have lunch. A Taiwanese plant manager from JHICC, WU Kunrong, was present and accompanied us during the meal.

Q: Did WU Kunrong or any other JHICC employee discuss with you, LI Fuzhe, and/or GUO Mingfeng the UMC memory project's implementation?

A: No. We simply shared a meal together.

Q: When did WANG Yongming find out that he could sign a contract with JHICC and be paid a bonus of approximately [NTD] 1.5 million per annum even after he onboarded at UMC?

31
UNCLASSIFIED

      transfer from Elpida Memory to Powerchip Technology. It is not owned by MMT. The document is annotated with Powerchip Technology's initials, *PSC*.

Q:    (Subpoena delivered to the Taiwan Taichung District Prosecutors Office) Do you wish to be accompanied by this Division's personnel to the Taichung District Prosecutors Office for a second round of interview by the Prosecutor?

A:    Yes.

Q:    Do you have anything to add?

A:    The materials that I duplicated and took from MMT were only for my personal research and reference purposes. Since the UMC memory project also ultimately adopted Samsung's technological trajectory and not MMT's manufacturing process, I had always been under the impression prior to being interviewed by your Division's personnel that as long as I didn't make use of the materials that I took from MMT, there would be no legal issues. Now I have been made aware that just by having trade secrets in my possession is considered breaking the law. I hope the Prosecutor will take into consideration that I didn't knowingly and willfully break the law and be lenient in the sentencing request. Moreover, I would like to point out that MMT did not prohibit nor exert any control over its employees' use of USB drives, cloud storage, and/or email to reproduce, download, and/or forward business materials before 2015. The company even went so far as to encourage its employees to take and work on files at home.

Q:    Did you speak to the best of your knowledge?

A:    Yes, I did.

The above transcript totals 20 pages and is completed at 11:40 a.m. on February 15, 2017. The interviewee and his legal counsel have reviewed and verified that the contents are free of error before affixing their signatures and thumb prints.

                      Interviewee:
                      Interviewer:
                      Stenographer:

039