STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

 450 Golden Gate Avenue, Box 36055
 San Francisco, California 94102-3495
 Telephone: (415) 436-7200
 Laura.Vartain@usdoj.gov
 Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

 950 Pennsylvania Ave., NW
 Washington, DC 20530
 Tel: (202) 353-3434
 Fax: (202) 233-2146
 Nicholas.Hunter@usdoj.gov
 Stephen.Marzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-CR-00465 MMC |
|    Plaintiff, | UNITED STATES' TRIAL BRIEF REGARDING CO-CONSPIRATOR STATEMENTS |
|  v. | The Honorable Maxine M. Chesney |
| FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD, | TRIAL DATE: FEBRUARY 28 Courtroom 7, 19th Floor |
|    Defendant. | |

It is the law of this and other circuits that co-conspirator statements are admissible under Rule 801(d)(2)(E) even when the "conspiracy" for purposes of determining admissibility is legal and unrelated to the indicted conspiracy. *See United States v. Layton*, 855 F.2d 1388 (9th Cir. 1988).  As applied to this case, therefore, statements are admissible as co-conspirator statements if they are made in furtherance of UMC and Jinhua's joint efforts to develop DRAM.  The statements need not be made by a person with specific knowledge of stolen trade secrets or use of those trade secrets.  All that is required is that the statements be made in furtherance of UMC and Jinhua's efforts to develop DRAM.

*Layton* involved a defendant found guilty of conspiracy and attempt to murder a member of Congress in the Republic of Guyana.  855 F.2d at 1393-94.  Prior to the murders, the defendant lived at a settlement in Guyana called Jonestown.  *Id*. at 1393.  Congressman Leo J. Ryan came to the settlement to investigate poor living conditions and assist residents in leaving the settlement. *Id*.  Prior to Congressman Ryan's arrival, the leader of Jonestown—Jim Jones—"announced his opposition [to Congressman Ryan's] visit in several tape-recorded speeches delivered to the Jonestown community in the days preceding Ryan's arrival."  *Id*.

The Ninth Circuit found the recordings admissible as co-conspirator statements even though Jones was not part of the murder conspiracy.  Instead, the Court agreed that "Jones and Layton had participated in a conspiracy to prevent the Ryan delegation from discovery the truth about the conditions at Jonestown."  *Id*. at 1397.  Even though that conspiracy was not the charged conspiracy—and was not even illegal—the statements were admissible under Rule 801(d)(2)(E) against Layton.  "Statements of a coconspirator qualify as nonhearsay under Rule 801(d)(2)(E) if they were made during the course and in furtherance of a 'concert of action' between the declarant and defendant.'"  *Id*.  It does not matter if the 801(d)(2)(E) conspiracy is the same as the crime charged.  "The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture."  *Id*.  "The common enterprise or joint venture on which admission of a coventurer's statement is based need not be the same as the charged conspiracy, if any."  *Id*.  **Statements made during the course and in furtherance of any enterprise, whether legal or illegal," are admissible under Rule 801(d)(2)(E),** when both he defendant and the declarant are involved in the enterprise.  *Id*. at 1400 (emphasis added).

In this case, the Court has now seen a volume of evidence that Project M was a joint effort between UMC and Project M to develop DRAM for manufacturing in China. As the Court has repeatedly noted, however, there is no direct evidence that *every* employee of UMC or Jinhua working on Project M had knowledge about the illegal theft or use of Micron's trade secrets. But under *Layton*, that is not a sufficient reason to preclude the admission of the statement under Rule 801(d)(2)(E). It is sufficient for the purpose of determining admissibility that the declarant be involved in the "concert of action" of creating DRAM under that project. That is the clear import of *Layton*: **any UMC or Jinhua document about the development of DRAM for Project M is an admissible co-conspirator statement under Rule 801(d)(2)(E).**

Just like Jim Jones' statements in *Layton*, UMC's corporate documents made in furtherance of Project M are admissible under Rule 801(d)(2)(E). In *Layton*, Jim Jones was not a defendant. UMC is not a defendant in this trial. Jones was not a member of the conspiracy to murder a congressman. Not every employee of UMC who made statement in furtherance of Project M is a member of the conspiracies to steal Micron's trade secrets and commit economic espionage. But just as UMC and Jinhua agreed to develop DRAM jointly (potentially separate from the conspiracy to do so with stolen trade secrets[1]), Jim Jones and Layton agreed to attempt to conceal living conditions in Jonestown from Congressman Ryan (separate and apart from Layton's conspiracy to commit murder). Jim Jones' statements in furtherance of that legal conspiracy were admissible in *Layton*. And UMC's statements in furtherance of DRAM development are admissible here.

The rule of *Layton* is not unique to the Ninth Circuit. It is black-letter law. *Layton* cites cases from the Third, Fifth, Seventh, and District of Columbia Circuits for the same rule, along with Louisell & Mueller treatise on federal evidence. *See Layton*, 855 F.2d at 1399. As explained in Wright & Miller, the Senate Judiciary Committee explained as follows with regard to Rule 801(d)(2)(E):

> While (this) rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint

---

[1] The United States believes its evidence will show that Project M was conceived as an illegal conspiracy to steal Micron's trade secrets and develop DRAM based on almost wholly on Micron's stolen trade secrets.

venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged.

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 6778 (quoting S. Rep. No. 93-1277, 93d Cong., 2d Sess. 24, reprinted in (1974)).  "The expansion beyond criminal joint ventures . . . reflects the rationale underlying the hearsay exemption which depends on an association between the party and the declarant, but not necessarily a criminal association." *Id.*  "Rule 801(d)(2)(E) . . . addresses teamwork more generally." *Id.*  "The key is coordinated action. . . . The hearsay exemption 'embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal.'" *Id.* (quoting *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983)).

Courts across the country have thus applied the rule of *Layton* to admit statements made in furtherance of broadly defined, uncharged, and non-illicit conspiracies. *See, e.g.*, *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) ("common scheme to recruit [a] business to their towns"); *United States v. Gewin*, 471 F.3d 197, 200 (D.C. Cir. 2006) (lawful "common enterprise of stock promotion"); *United States v. Brockenborrugh*, 575 F.3d 726, 736 (D.C. Cir. 2009) (co-conspirators involved in a lawful "business relationship" and "lawful joint enterprise to acquire the property"); *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979) (voyage of a ship "was a 'joint venture' in and of itself apart from the illegality of its purpose"); *United States v. Ferris*, No. CR-18-159-D, 2019 WL 3935102, at *6 (W.D. Okla. 2019) ("community of purpose" to "ensure better service and care for . . . patients");. The Court should do so here.

Statements made in furtherance of Project M before the creation of Jinhua are admissible against Jinhua.  Circuit law holds that prior statements by coconspirators made in the course of and furtherance of the conspiracy are not hearsay when admitted against the subsequently joining conspirator: "Statements of a co-conspirator are not hearsay even if made prior to the entry of the conspiracy by the party against whom it is used." *United States v. Anderson*, 532 F.2d 1218, 1230 (9th Cir. 1976); *see United States v. Mkhsian*, 5 F.3d 1306, 1312 (9th Cir. 1993).

The Court should therefore admit all statements made by agents of UMC and Jinhua made in

furtherance of their "concert of action" to develop DRAM in 2015-2018.  The United States has proven that UMC and Jinhua were engaged in a joint effort to cooperatively develop and manufacture DRAM. The Technology Cooperation Agreement between UMC and Jinhua states: "[UMC] and [Jinhua] shall both comprehensively provide the global resources which they respectively own and collaborate to engage in development of process technologies related to [DRAM]."  P1193T.0001.  The agreement describes the "cooperative research and development by the two parties," and that the developed DRAM process technology would be transferred to Jinhua "to achieve mass production."  *Id.*  Jinhua would then "carry on subsequent research and development work based on" the technology.  *Id.*  The agreement required UMC to "provide a written report to the designated personnel of [Jinhua] at least every two months regarding the results and progress of the technological cooperation."  P1193T.0002, § 2.3.  It also required UMC to "use the dedicated research and development equipment to develop the joint development technology," and the technology would be "jointly owned by both parties."  *Id.*, § 2.5.

The Project Cooperation Framework Agreement signed on February 19, 2016, further illustrates that the development of DRAM at UMC and Jinhua was a joint effort.  "[I]n accordance with the principals of . . . mutual benefit . . . the parties plan to cooperatively develop the construction, operation and research and development principals for a semiconductor chip project in Jinjiang Economic Development Zone."  P1023T.0002.  The "[p]urpose of the cooperation" was "through cooperation of the semiconductor chip industries across the Taiwan strait, integrate global talent resources into the Mainland industrial chain, to build a semiconductor chip enterprise."  P1023T.0003, § 2.1.  The agreement required UMC and "the project company"—Jinhua—to "conduct technical cooperation at the research and development base jointly designated by the three parties."  P1023T.0003, § 2.6(b).  UMC was to "be responsible for transferring research and development results in accordance with a phased plan" and to "support [Jinhua] in gradually proving its yield."  *Id.*  As the 30% shareholder, UMC appointed the "general manager."  P1023T.0007, § 5.3.  Expenses before execution of the Project Cooperation Framework Agreement and "following its execution up to the execution of the joint venture agreement" – that is, the Technology Cooperation Agreement – were to be borne by Jinhua. The TCA between UMC and Jinhua – or to use the project name, Project M – was a "joint venture."

UMC, Jinhua, and Jinhua's shareholders put those plans into effect, and worked to jointly develop

1  DRAM.  Perhaps most telling of the jointness of the DRAM project is an email from UMC's CEO P.W.

2  Yen on February 29, 2019. (P1057T, not yet admitted).  P.W. Yen announced to his staff members that

3  UMC would "build and run" Jinhua and "CEO will be [Stephen Chen]."  P1057T.0001 (not admitted).

4  As the Court has now seen in the evidence, Chen proceeded to act as an officer of Jinhua both

5  individually and through subordinates such as Sandy Kuo and Bowen Huang.  Indeed, admitted evidence

6  shows that Chen was attending Jinhua board meetings as early as March 8, 2016 (P1036T), and serving

7  as a "supervisory board member" for Jinhua as early as May 4, 2016 (P1034).

8      Based on all of the evidence, UMC and Jinhua were barely distinguishable as separate entities

9  with regard to Project M.  They shared officers, directors, employees, tools, technology, and resources.

10  They were a joint venture in both the legal sense and the loose sense required under Rule 801(d)(2)(E).

11  There is certainly no legal problem, therefore, with admitting the statements of UMC related to project M

12  against Jinhua, regardless of whether those statements were made by individuals with direct knowledge

13  of the illicit nature by which Stephen Chen sought to make Project M successful.

17  Dated: March 21, 2022                    Respectfully Submitted,

18                                            STEPHANIE M. HINDS
                                              Acting United States Attorney

20                                                  /s/
                                              LAURA VARTAIN HORN
21                                            NICHOLAS WALSH
                                              Assistant United States Attorneys

23                                            NICHOLAS O. HUNTER
                                              STEPHEN MARZEN
24                                            Trial Attorneys, National Security Division